**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA ALEXANDRIA DIVISION**

| | |
|---|---|
| **COUNTY BOARD OF ARLINGTON COUNTY, VIRGINIA,**<br><br>*Plaintiff*,<br>*v.*<br><br>**NATIONAL PARK SERVICE**,<br><br>**U.S. DEPARTMENT OF THE INTERIOR,**<br><br>**DOUG BURGUM**, in his official capacity as Secretary of the Interior,<br><br>and<br><br>**JESSICA BOWRON**, in her official capacity as Comptroller exercising the Delegated Authority of the Director, National Park Service,<br><br>*Defendants*. | **Case No. __-cv-________** |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff the County Board of Arlington County, Virginia ("Arlington County" or "the County"), by and through its undersigned counsel, alleges as follows:

## INTRODUCTION

1. The Trump-Vance Administration has made it a priority to remake the physical landscape of the Nation's Capital in President Trump's image and based on his whims, destroying treasured public spaces in the process. Among these efforts have been the demolition of the White House's East Wing and flattening of its iconic Rose Garden, the shuttering (and contemplated demolition) of the Kennedy Center, and the botched renovation of the Lincoln Memorial reflecting pool.

2. This case concerns President Trump's latest vanity project, the construction of a 250-foot "Triumphal Arch" on Memorial Circle at the western end of Arlington Memorial Bridge. As contemplated, the Arch will dwarf Paris's Arc de Triomphe and directly obstruct the line of sight between the Lincoln Memorial and Arlington National Cemetery that was deliberately created to symbolize the nation's post-Civil War reunification. President Trump first unveiled the Administration's plan to construct the Arch in October 2025, at the time hailing it as a monument to the 250th anniversary of American Independence. More recently, the President announced the Arch would serve as a "top grade Military Complex/Triumphal Arch," which will store large quantities of ammunition and "house, store, and have the rapid ability to use large numbers of drones, plus Snipers."[1]

3. Memorial Circle, where this new military complex is to be located, sits within a busy traffic corridor that each day carries large numbers of commercial, personal, and emergency vehicles, as well as pedestrians and cyclists, within Arlington County, Virginia, and between the County and the District of Columbia. Construction of the Arch on Memorial Circle will accordingly cause significant harm to Arlington County and its residents.

[1] Donald J. Trump (realDonaldTrump), Truth Social (Sep. 20, 2026, at 07:34 ET), https://perma.cc/7YAR-Q54L.

4. Memorial Circle is part of the District of Columbia but is located on the Virginia side of the Potomac River and contiguous to the County itself, directly abutting County land. Construction of the Arch will harm public safety in Arlington by clogging thoroughfares needed for emergency transport services run by the County, including emergency services for Arlington National Cemetery and secondary emergency services for nearby Reagan National Airport. It threatens to increase noise and air pollution in Arlington by necessitating the diversion of certain flights into and out of Reagan National Airport. And it will significantly and detrimentally affect many historic properties in Arlington, including Arlington National Cemetery. Using the Arch to store large stockpiles of ammunition and as a staging point for drones and snipers, so close to commuters and tourists, will dramatically worsen these public-safety harms and the risk of accidents.

5. The National Park Service, the agency responsible for projects on national park land such as Memorial Circle, is proceeding full-speed toward ground-disturbing construction. Although the agency has claimed that a final decision to construct the Arch has not yet been made and purports to be engaged in a routine decisional process, that rushed process appears to be a pretext designed to shore up justifications for building the Arch in accordance with the President's repeated marching orders. Indeed, it appears certain that NPS will begin construction, with full-scale work likely to begin as soon as the National Capital Planning Commission rubber-stamps the project (potentially as soon as its scheduled meeting on November 5, 2026).

6. As part of the project development process, NPS was required to comply with the National Environmental Policy Act (NEPA) by taking a "hard look" at the environmental impacts of the Arch project. That statutorily mandated process obligated the agency to consider the many ways the project will harm the human environment, including its historic, cultural, and aesthetic impacts, and to evaluate reasonable alternatives and mitigation measures.

7. NPS failed to meet those obligations. Rather than conduct a thorough review, NPS instead completed a cursory and conclusory Environmental Assessment (EA), which it relied on in issuing a Finding of No Significant Impact (FONSI) that concluded it had no obligation to prepare a more detailed Environmental Impact Statement (EIS). In doing so, NPS failed to consider reasonable alternatives that would advance the project's stated purpose and need; improperly dismissed or minimized harms that the agency acknowledges the project will cause; and outright ignored other significant impacts of the project. This decision marks the consummation of the agency's decisionmaking process under NEPA—a definitive conclusion that it will not prepare an EIS—and has serious legal consequences by permitting the Arch project to move forward without any further environmental review and without any opportunity for public comment on the project's environmental effects. Indeed, NPS completed its decisional process under NEPA even before the announcement of the decision to "convert" the Arch "into a top grade Military Complex,"[2] meaning NPS's determination did not and will not consider the additional harms that will accrue from that decision.

8. The County brings this lawsuit to halt the agency's feverish pace toward construction of the Arch and to ensure that the "hard look" mandated by NEPA is completed before the agency commences disruptive and harmful ground-disturbing activities.

## PARTIES

9. Plaintiff the County Board of Arlington County, Virginia, is the governing body of Arlington County, a political subdivision of the Commonwealth of Virginia. The County owns, maintains, or is responsible for many of the roadways and multimodal facilities that connect Memorial Circle to surrounding roadways and carry vehicular traffic within Arlington and between Arlington and the District of Columbia. The County also has institutional and operational interests in maintaining safe traffic flow, providing timely and efficient emergency and public-safety responses across that

[2] *Supra* note 1.

transportation network, and protecting identified historic and environmental resources. The County has approximately 245,000 residents, a substantial proportion of whom commute for work or other needs on a daily basis in ways that will be harmed by increased traffic on and near Memorial Circle. Washington Reagan National Airport (DCA) is also located within Arlington County, and increased traffic at the busy and often-crowded airport has become a significant quality-of-life and safety issue for residents. Construction of the Triumphal Arch will very likely necessitate changes to the flight paths of jets arriving or departing from DCA, which is likely to increase noise and pollution over Arlington's main business and residential corridors.

10. Pursuant to Virginia Code §§ 15.2-702 and 15.2-1404, the County may sue "in its own name in relation to all matters connected with its duties."

11. Defendant National Park Service (NPS) is a bureau within the U.S. Department of the Interior. 54 U.S.C. § 100301. NPS is an agency within the meaning of the Administrative Procedure Act (APA), 5 U.S.C. § 551(1), 701(b)(1), and is headquartered in Washington, D.C. NPS is the federal agency with primary jurisdiction over the government's planned construction of the Triumphal Arch and issued the EA and FONSI challenged here.

12. Defendant U.S. Department of the Interior is an agency within the meaning of the APA, 5 U.S.C. § 551(1), 701(b)(1), and is headquartered in Washington, D.C. NPS's operations are overseen by Interior's Assistant Secretary for Fish and Wildlife and Parks.

13. The office of NPS Director is currently vacant. Defendant Jessica Bowron, the agency Comptroller, assumed the role of Acting Director of the National Park Service on or about January 20, 2025 and more recently has been referred to as the "Comptroller Exercising the Delegated Authority of the NPS Director." She is sued solely in her official capacity. The Director is responsible for "the supervision, management, and control of [National Park] System units." 54 U.S.C. § 100302(a)(3).

14. Doug Burgum is the Secretary of the Interior and is sued solely in his official capacity. As Secretary, Mr. Burgum has oversight over all decisions and actions of the National Park Service and is responsible for ensuring compliance with federal law in all NPS actions related to the Triumphal Arch.

## JURISDICTION AND VENUE

15. This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law.

16. The Court has authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers. The APA further authorizes the Court to grant temporary and permanent relief from, and to vacate and set aside, agency action. 5 U.S.C. §§ 705-706. These sources of authority allow the Court to issue the relief sought in this action, which does not include money damages.

17. Venue is proper in this district because Plaintiff resides in this district and Defendants are officers, employees, or agencies of the United States. 28 U.S.C. § 1391(e).

## LEGAL FRAMEWORK

18. More than 55 years ago, Congress passed NEPA, 42 U.S.C. §§ 4321-4370m-11, with the goal of improving environmental protection by requiring federal agencies to assess the effects of their actions on the human environment. *See* Pub. L. No. 91-190, 83 Stat. 852 (Jan. 1, 1970). NEPA is widely considered the first major environmental law in the United States.

19. Through NEPA, Congress "declare[d] a national policy" of "encourag[ing] productive and enjoyable harmony between man and his environment" and sought "to promote efforts which will prevent or eliminate damage to the environment," "stimulate the health and welfare of man," and "enrich the understanding of the ecological systems and natural resources important to the Nation." 83

Stat. 852 § 2, 42 U.S.C. § 4321; *see also* 42 U.S.C. § 4331(a) ("recognizing [] the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man … .").

20. NEPA places an affirmative "responsibility upon the Federal Government to further specific environmental goals," *Kleppe v. Sierra Club*, 427 U.S. 390, 409 (1976), including the mitigation of air and water pollution, prevention of soil erosion, ecosystem protection, and the avoidance of poorly designed transportation infrastructure and urban and suburban sprawl. *See* National Environmental Policy Act of 1969, S. Rep. No. 91-296, at 4 (July 9, 1969).

21. To satisfy NEPA, federal agencies must assess the reasonably foreseeable environmental effects of proposed major federal actions on the human environment. *See* 42 U.S.C. § 4332(2)(C).

22. Effects on the "human environment" include not only ecological effects such as air pollution and harm to endangered species, but also cultural, aesthetic, and economic effects. In enacting the statute, Congress directed that agencies "use all practicable means" to "preserve important historic, cultural, and natural aspects of our national heritage," "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences," among other goals. 42 U.S.C. § 4331(b).

23. As the Supreme Court has explained, 42 U.S.C. § 4332(2)(C) "is one of the 'action-forcing' provisions intended as a directive to 'all agencies to assure consideration of the environmental impact of their actions in decisionmaking.'" *Kleppe*, 427 U.S. at 409 & n. 18. It "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts" and that the information is also available to the broader public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). It thus prevents agencies from

undertaking significant actions only to discover hidden environmental consequences "after resources have been committed or the die otherwise cast." *Id.*

24. Accordingly, "[u]nder NEPA, an agency must take a 'hard look' at any impact the proposed action may have on 'public health or safety,'" *Indian River County v. Department of Transportation*, 348 F. Supp. 3d 17, 43 (D.D.C. 2018) (citation omitted), as well as whether the project might have significant historic, aesthetic, or cultural impacts on the human environment. *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019). In so doing, the agency should focus on any unmitigated adverse effects of the project. 516 DM 1, U.S. Department of the Interior Handbook of National Environmental Policy Act Implementing Procedures ("NEPA Handbook") § 1.2(b) (Feb. 24, 2026).[3]

25. Further, NEPA requires that agencies "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(H).

26. As amended by the 2023 Fiscal Responsibility Act, Pub. L. No. 118-5, 137 Stat. 40 (June 3, 2023), NEPA implements those overarching requirements through three potential tiers of environmental review.

27. For actions not otherwise excluded pursuant to an agency's categorical exclusion, 42 U.S.C. § 4336(a)(2), an agency must prepare either an EA or an EIS. 42 U.S.C. § 4336(b); *see also* NEPA Handbook § 1.2.

28. An agency must issue an EIS where the proposed action "has a reasonably foreseeable significant effect on the quality of the human environment." 42 U.S.C. § 4336(b)(1); *see* NEPA Handbook § 1.2(a)(5)(ii).

[3] On February 24, 2026, DOI issued a new set of procedures governing the agency's compliance with NEPA. *See* 91 Fed. Reg. 8,738 (Feb. 24, 2026). Those procedures apply to DOI bureaus such as NPS.

29. In an EIS, the agency must assess the environmental impact of the agency's proposed action, including any unavoidable adverse environmental effects should the proposed action be implemented, and consider reasonable alternatives to the proposed action. 42 U.S.C. § 4332(2)(C); NEPA Handbook § 2.3(a).

30. The scope of an agency's obligation to evaluate alternatives is defined by the project's purpose and need, which is the agency's statement of the "goals" and objectives of the project. *See City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). Said differently, an agency must consider reasonable alternatives that advance the stated purpose of the project and meet the need for the project as identified by the agency.

31. In addition, when an agency issues a notice of intent to prepare an EIS, it is required to solicit public comment on "alternatives or impacts and on relevant information, studies, or analyses with respect to the proposed agency action." 42 U.S.C. § 4336a(c); NEPA Handbook § 2.1(b).

32. For an action that does not have reasonably foreseeable significant effect, or "if the significance of such effect is unknown," the agency must prepare an EA. 42 U.S.C. § 4336(b)(2). An EA shall "set forth the basis" for the agency's finding either that the proposed action will not have a significant impact or that a significant impact is reasonably foreseeable mandating the preparation of an EIS. *Id.*

33. While an agency's obligation to consider alternatives is lessened when preparing an EA, *see Mt. Lookout-Mt. Nebo Property Prot. Ass'n v. FERC*, 143 F.3d 165, 172 (4th Cir. 1998), the "existence of a 'viable but unexamined alternative' renders the environmental review conducted under NEPA inadequate." *Env't Defense Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 877 (9th Cir. 2022) (citation omitted).

34. If the agency determines in an EA that the proposed action will not have a reasonably foreseeable significant effect on the human environment, it issues a FONSI and need not prepare an EIS. 42 U.S.C. § 4336e(7); NEPA Handbook § 6.1(a).

35. While a major federal action remains pending, agencies have a continuing obligation to evaluate the effects of changes to the project. *See Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996) ("First, the court must determine whether the agency took a hard look at the proffered new information. Second, if the agency did take a hard look, the court must determine whether the agency's decision not to prepare a supplemental [analysis] was arbitrary or capricious."); *Clinch Coal. v. Damon*, 316 F. Supp. 2d 364, 376 (W.D. Va. 2004) ("A supplemental NEPA document, either an EA or an EIS, is required if new information 'present[s] a seriously different picture of the environmental impact of the proposed project from what was previously envisioned.'" (citation omitted)); NEPA Handbook §§ 3.6, 6.1(j).

## FACTUAL ALLEGATIONS

### The Arch Project

36. Late last year, without any pretense of prior authorization or funding from Congress, President Trump announced plans to construct a massive new Arch in or near Washington, D.C., to celebrate the nation's 250th anniversary.[4]

37. Present plans show the Arch will rise 250 feet—more than twice the height of the Lincoln Memorial, taller than a 20-story commercial building, and tall enough to require the placement of an "eternal flame" on top to warn pilots approaching nearby Reagan National Airport. The structure itself will consist of reinforced concrete clad in granite and bejeweled with gold statuary in the form of a massive Lady Liberty. The "Triumphal Arch," as the Executive Branch now refers to the project, will be the largest monumental arch in the world.

[4] Callum Sutherland, *The 'Arc de Trump': President Shows Off Plans For His Latest Grandiose D.C. Construction Project*, TIME (Oct. 16, 2025), https://perma.cc/KD9S-GSHA.



38. The Triumphal Arch will occupy more than 15,000 square feet of ground space in Memorial Circle, a large traffic circle situated between the western end of Arlington Memorial Bridge and Arlington National Cemetery.



39. The Arch will permanently and significantly alter the viewshed of the region, including the Potomac River, the area surrounding the Lincoln Memorial, and Arlington National Cemetery. It will directly obstruct the sight line from the Lincoln Memorial to Arlington House, the home of Confederate General Robert E. Lee. For more than a century, that direct sight line has stood as a testament to the reunification of the nation after the Civil War and a point of reflection for visitors to our Nation's Capital and the sacred space of Arlington National Cemetery.

40. On September 20, 2026, President Trump announced a major expansion to the project's scope:

> At the strong request of the United States Military, and for National Security purposes, I have agreed to convert the magnificent Triumphal Arch, planned since the Civil War Era many years ago, at the Receptive Circle adjoining the Arlington Memorial Bridge, into a top grade Military Complex/Triumphal Arch, to house, store, and have the rapid ability to use large numbers of drones, plus Snipers, on both the roof and plaza areas, and additionally have and hold large quantities of sniper ammunition in storage. There will be no facility like this anywhere in the World. Out of the 59 top cities and Capitals, Washington, D.C., IS THE ONLY ONE IN THE WORLD THAT DOES NOT HAVE A TRIUMPHAL ARCH, but it will now and, by far, the greatest of them all! Thank you for your attention to this matter. President DONALD J. TRUMP.[5]

41. Although the Arch's location in Memorial Circle sits on National Park Service land in the District of Columbia, it is located across the Potomac River from the District proper and is geographically contiguous to Arlington County.

42. The Arch is slated to have five levels of accessible interior space, totaling more than 70,000 gross square feet, including a gallery and an observation deck. It is unclear where in the structure the snipers and ammunition will be housed relative to tourists and visitors to the observation deck. In addition to the Arch itself, the project will include a public plaza within Memorial Circle, security features, significant exterior lighting, utilities, and permanent traffic modifications.

---

[5] *Supra* note 1.

43. Despite ongoing historic preservation reviews related to the Arch project,[6] on September 3, 2026, Secretary Burgum announced that "we are preparing to start, over the next two-week period, the excavation work necessary for the Great Triumphal Arch … at Memorial Circle." Sec'y Doug Burgum (@SecretaryBurgum), X (Sept. 3, 2026, 3:01 PM).[7] NPS later asserted, in a declaration filed in separate litigation raising constitutional challenges to the Arch project, that the excavation work (for now) is limited to soil testing. *See Lemmon v. Trump*, No. 1:26-cv-00544, Decl. of Jennifer T. Nersesian, Dkt. No. 57-1 (Sep. 4, 2026). The court overseeing that separate litigation has ordered the government to provide "48 hours' notice before engaging in any activity on Memorial Circle other than on-site information gathering 'regarding any archaeological resources that may be present at the site.'" Minute Order, No. 1:26-cv-00544 (Sep. 4, 2026) (Chutkan, J.).

**NPS's NEPA review**

44. Because the Arch project constitutes a major federal action for purposes of NEPA, NPS was required to conduct an environmental review in accordance with the statute's requirements. 42 U.S.C. § 4336.

45. On June 18, 2026, NPS released an EA and FONSI for the Triumphal Arch project. Through this decision, NPS definitively concluded that it has no obligation to prepare an EIS for the project and that it will conduct no further environmental review.

46. In the EA, NPS defined the purpose and need for the project, NEPA Handbook § 1.5(b)(1)(i), as "celebrat[ing] 250 years of American independence by honoring America's founding principles through installation of *a structure* at the intersection of Arlington Memorial Bridge and Memorial Avenue within George Washington Memorial Parkway, in a manner consistent with the avenue's

---

[6] For example, NPS's review under the National Historic Preservation Act remains ongoing pending comments submitted by the Advisory Committee on Historic Preservation. And the project also requires approval by the National Capital Planning Commission.

[7] https://perma.cc/YNP3-34UJ.

established role as a ceremonial gateway and 'Avenue of Heroes' celebrating valor, sacrifice, and American heritage." EA at 4 (emphasis added).

47. Against that broad purpose and need, NPS assessed only one possibility: construction of the Arch. EA at 6-7. Although NPS has claimed that pillars were originally envisioned for the site decades ago and relied on that alleged original plan in choosing Memorial Circle for the location of the project, the agency did not consider the alternative of constructing those pillars. Nor did it consider any other alternatives for an arch at Memorial Circle, including a different plaza design or different traffic modifications. It likewise failed to consider any other alternatives, including honoring America's founding principles through construction of an arch (or any other structure) at a location other than Memorial Circle.

48. In the EA, NPS assessed a variety of impacts of the proposed project, acknowledging that several aspects of the project would cause harm. For example, the agency analyzed existing cultural resources, such as the views between Arlington House and the Lincoln Memorial, and determined the Arch would constitute an "obstruction [that] would" "alter a defining sightline." EA at 20. The agency also assessed the visual impact of the Arch on the surrounding corridor, finding that the "addition of the Arch at Memorial Circle would … introduc[e] a visually dominant vertical element into an area historically defined by open space and low structural forms." EA at 29.

49. As to water resources, the EA found that construction of the Arch would cause "surface water runoff [to] increase substantially because the new impermeable surface would prevent infiltration and evapotranspiration." EA at 35. "This would create long-term increases of runoff volumes, velocities, and peak flows." *Id*. "These conditions increase the risk of flash flooding, erosion at outfalls, roadway ponding, and sediment transport into the Potomac River." *Id.*

50. As to traffic effects, NPS acknowledged that "[r]oadways in Memorial Circle's immediate vicinity experience consistently high traffic demand and serve as a major convergence of regional

roadways and travel modes that interact through a complex series of merges, weaves, and intersections." EA at 36. In addition, the area accommodates a significant number of visitors to Arlington National Cemetery, as well as cyclists and pedestrians recreating and commuting. *Id*. at 37.

51. NPS explained that, because of the project, "peak season daily visitation" could increase "40 to 1,500 percent" "over existing conditions," EA at 39; that construction activities "would create broader disruptions" to traffic, "increasing uncertainty and reducing predictability for travelers," *id*. at 41; and that, once the project was completed, conditions at one area of Memorial Circle "could approach the upper limit of roadway capacity, resulting in significant delay, maneuverability, and limited ability to recover from disruptions." *Id*.

52. In a "Pedestrian Circulation Improvements and Signalization Concept Plan" accompanying the EA, NPS evaluated the specific impacts of its plan to adjust pedestrian crossings in Memorial Circle and to add traffic signals to aid pedestrians in accessing the Arch. EA at B-1. As a result of the signalization plan, NPS estimated that some intersections around Memorial Circle would suffer service delays and that the largest impact would occur at the "Washington Boulevard northbound right-turn movement onto the" Arlington Memorial Bridge during the weekday morning peak commuting time. *Id*. at B-14.

53. During construction, NPS estimated that the same part of Memorial Circle would have a "failing" level of service due to delays caused by road closures. *Id*. at B-15.

54. Addressing the signalization plan, NPS also stated a need to obtain additional data to refine the final design. Among the needed data is "[t]raffic volumes within proximity to the proposed [Arch project] site to include weekday and weekend volumes throughout the day," and "[p]rojected [Arch] visitation patterns to better predict the pedestrian calls at the signalized intersection by time of day." *Id*. at B-17. NPS did not, however, obtain or evaluate any such additional data.

55. As to noise, NPS acknowledged the "potential for temporary disturbance at nearby residential and ceremonial areas, providing short-term adverse impacts to the soundscape of the surrounding areas during construction." EA at 51. So too, "construction noise for two to three years could impact the solemn and ceremonial nature of" Arlington National Cemetery. *Id*.

56. Finally, NPS declined to fully consider the effects of the Arch project on aviation safety. The agency claimed that the Federal Aviation Administration (FAA) had "completed a feasibility study" concluding that the project would not impact "airspace" or "visual or instrument procedures" at DCA. EA at A-2.

57. Despite acknowledging traffic, public-safety, and other impacts and finding that the Arch will substantially and adversely affect numerous historic properties and National Historic Landmarks, NPS determined the Triumphal Arch would have "no significant impact" on the human environment. *See* FONSI at 5-6.

58. For example, the FONSI acknowledged that the Arch would have "adverse effects on the integrity of the corridor's historic viewshed" but found no significant impact because the Arch "does not eliminate historic visual relationships." FONSI at 5; *see also id*. (claiming the Arch is not "wholly incompatible" with the area's historic framework).

59. As to water resources, the FONSI claimed only that "stormwater would continue to be captured and conveyed through existing (and if necessary upgraded) drainage infrastructure … ." FONSI at 7.

60. For traffic impacts, the FONSI concluded only that "long-term traffic delays are not anticipated," because elements of the project would "enhance driver awareness and support safe, orderly movement." FONSI at 8. And for noise, the FONSI admitted that construction could "potentially creat[e] noticeable noise at ceremonies" at Arlington National Cemetery." *Id*. at 9. Finally, the agency concluded, based on FAA's analysis, that the project "would have no significant adverse effect on airspace" at DCA. *Id*. at 10.

## HARMS TO ARLINGTON COUNTY

61. Arlington County faces a cascade of concrete harms from construction and operation of the Triumphal Arch, many of which will be permanent and irreparable. These harms fall directly on the County itself: the Arch will burden its fire, emergency medical, and police services; its management of the transportation network it operates; its long-term land-use planning; its historic preservation program; and the infrastructure on which the County depends. In finding no significant impact and declining to prepare an EIS, NPS largely ignored or minimized those harms and deprived the County of the information it needs to plan for and, to the extent possible, mitigate them.

***Harms to the County's Transportation Network and Operations***

62. Arlington County is responsible for operations and safety on the transportation network it manages and maintains, and Memorial Circle connects directly to that network. Memorial Circle, together with the roadways and mixed-use paths that connect directly to it, is a regional convergence point that carries residential and commercial traffic, public buses, emergency vehicles, cyclists, and pedestrians traveling within Arlington County and between the County and the District of Columbia every day. NPS itself acknowledges as much, noting that the roadways around the Circle "serve as a major convergence of regional roadways and travel modes that interact through a complex series of merges, weaves, and intersections." EA at 36.

63. Accordingly, closures and restrictions to the road network connecting the planned construction site to Arlington County will ripple throughout Arlington. Those impacts will be compounded by NPS's plan to bar eastbound traffic on Memorial Avenue (including traffic feeding into the Circle from other major arteries) from turning north onto Arlington Boulevard, restrict northbound Washington Boulevard traffic from entering the Circle, and reduce Arlington Memorial Bridge to two westbound lanes, with additional closures and detours expected during various phases of construction.

64. Delays caused by construction will exacerbate traffic both in the Circle and in abutting areas of Arlington County. As to the Circle itself, increased traffic will likely result in increased vehicular and pedestrian accidents and other effects that require mitigation and potential deployment of County resources.

65. The limited traffic analysis NPS conducted in the EA disregarded the broader impacts the Arch will have on the region. Delays at the Circle will predictably cause drivers to change their routes, and the County must then respond to those changed traffic patterns by modifying infrastructure to mitigate new effects. For example, if traffic volume increases on the approaches to the Key Bridge or Roosevelt Bridge because of delays or closures in the approach to Memorial Bridge, the County would likely need to retime signals, modify traffic infrastructure, or take other active steps to counteract effects on its network. The EA, however, contains no regional traffic modeling that would allow Arlington County to predict how traffic diversions during and after construction will affect the County. Unlike with similar projects, NPS failed to conduct the type of traffic flow modeling that would allow the County to predict effects and mitigate potential harms.

66. Even after the planned construction has concluded, traffic and associated public-safety harms will continue. The current plans for the Arch show a public plaza inside the traffic circle, protected by a barricade seat wall and retractable bollards, designed to accommodate pedestrian visitors to the Arch. Those visitors will need to cross traffic into the center of a complex, high-volume traffic circle, which the Arch plan accommodates by introducing permanent traffic signalization into what is now a free-flowing traffic Circle. Introducing traffic signals and crosswalks necessary to ensure pedestrian safety will permanently and dramatically hinder vehicle passage through and around the Circle, with significant ripple effects for all the surrounding roadways and alternative routes.

67. NPS failed to account for the regional traffic network at all and confined its analysis to Memorial Circle itself. Even within that narrow study area, NPS's own traffic simulation showed that

congestion would back up past the edges of the modeled network and predicted 410 vehicles would be "denied" entry to the modeled network because back-ups extended beyond its boundaries. Failing to account for those consequences outside the artificially narrow bounds of the area of study skews the result and fails to accurately capture the impacts of the Arch. NPS proposed no mitigation for those impacts, which will spill back onto approaches that County roadway users rely on and harm the County and its traffic infrastructure.

68. Traffic effects on State Highway 110 will also cause disruptions to the County bus service that utilizes that highway. Arch-related delays on that corridor will slow bus service, undermine on-time performance, and depress ridership on County routes.

69. Arlington is a Vision Zero community committed to eliminating traffic deaths and serious injuries by 2030. In service of that goal, the County requires any comparable redevelopment within its jurisdiction to perform a robust safety analysis comparing existing and future operations, evaluating crash trends, assessing whether changes will improve or degrade safety, and identifying mitigation for any adverse impacts. NPS did not undertake any such comparable study, and because the Arch is a federal project on federal land, the County cannot require that analysis. But it is predictable that both the delays and diversions that will inevitably occur during construction and the permanent traffic modifications the Arch plan entails will create higher-risk conditions. And placing a major new trip generator in the center of the Circle, with high volumes of pedestrians and cyclists needing to safely cross traffic to reach the Arch, will inevitably decrease safety absent adequate mitigation and undermine the County's Vision Zero program.

70. Additionally, the sidewalk on the south side of Memorial Circle is the only existing path connecting the Mount Vernon Trail to the Cemetery and the Washington Boulevard Trail. NPS's construction plan would close that vital pedestrian and cyclist route, with no proposed alternative route, such that it is likely that pedestrians and cyclists will try to cross traffic to maintain their usual routes.

Further, residents' access to these walking and cycling trails are a key part of the livability and desirability that drive growth and inform County planning in the area. Interrupting access to these spaces will make the County less appealing to current and future residents and disrupt County planning.

71. NPS's failure to analyze these traffic effects will itself impose direct costs on the County. If a private developer were proposing any comparable development, the County would receive a discrete safety analysis and traffic modeling analysis for the project that would allow the County to adjust its planning for safety and infrastructure needs. NPS provided no such analysis, however, leaving the County to navigate a slew of significant "known unknowns." Indeed, NPS failed to even use as a baseline a more-detailed study of Memorial Circle that the agency prepared roughly a decade ago and largely ignored the County's technical comments on its transportation study. As a result, the County will have to devote increased staff and hours to constantly assessing and responding to the effects of each phase of construction and the ultimate permanent configuration of the Arch project, without the data and information needed to accurately plan ahead.

***Harms to the County's Emergency and Public-Safety Services***

72. The Arlington County Fire Department is the primary 911 fire and emergency medical services provider for Arlington National Cemetery and the surrounding area, including the Arlington Cemetery Metro Station and Memorial Circle. County fire and EMS personnel thus will be required to respond to fires, medical emergencies, and other incidents at the Arch site or in immediately adjacent areas that depend on passage through Memorial Circle, both during construction and after the Arch opens.

73. The County's current emergency response plans are designed around Memorial Circle's current configuration. Fire and EMS units responding from County stations reach these areas via the George Washington Memorial Parkway or by traveling through and around the Cemetery, near the Marine Corps War Memorial. The County also uses the area adjacent to Memorial Circle as a staging ground for incidents at the Cemetery and the Cemetery Metro station and has done so repeatedly during

past incidents. During major incidents, the County also relies on mutual aid services from Alexandria and the District of Columbia, which would reach the area via Arlington Memorial Bridge and the Circle. And the County's evacuation planning for the area depends on multiple routes in and out of the area of Memorial Circle. Construction and operation of the Arch will accordingly harm the County's ability to provide emergency services in the Cemetery and the immediate area of the Circle and will require staff to devote significant time to revising emergency service plans.

74. Beyond those harms in the immediate area, Memorial Circle and the roadways that feed it are also a chokepoint for County emergency responses elsewhere. For example, rescue units from central and north Arlington must travel via Route 110 and the George Washington Parkway, through the area around Memorial Circle, to respond to emergencies at Reagan National Airport. Although the Metropolitan Washington Airports Authority (MWAA) maintains its own fire and EMS units at the airport, its resources are limited, and Arlington routinely serves as a backup emergency service provider. In fact, Arlington responded to 52 requests for emergency services in and very near to the airport within the last 60 days. Arlington County personnel were also among the first responders to the tragic air collision at the Airport in January 2025, with swift-water rescue teams traveling from Station 5 in Crystal City and other units dispatched from the middle and northern parts of the County—all traveling through or near Memorial Circle to reach the scene. The County's ability to provide those services will be significantly hampered by the Arch project. The County also routinely responds to rescue calls on the GW Parkway and the Mount Vernon Trail, including calls for injured cyclists near the Boundary Channel and Columbia Island. Construction closures, lane reductions, and detours will slow those responses and narrow the County's choice of routes. So will the permanent changes that follow, including the addition of new traffic signals, a pedestrian plaza, and the expected increase in peak-season visitation that NPS itself recognized, *see* EA at 39.

75. In addition, MWAA emergency units also provide service to parts of Arlington County when County units are unavailable. While those calls are typically to areas adjacent to DCA, on a number of occasions MWAA units have needed to traverse the Circle to respond to serious incidents further away, such as on the GW Parkway. Traffic caused by the Arch project will impair the County's ability to receive these backup emergency services as well.

76. These changes will force the County to modify its emergency planning. When significant changes are made to traffic signals, traffic patterns, or major thoroughfares, the County must remodel response drive times using GIS analysis to ensure it can continue to meet response-time standards. It then must reallocate its personnel and equipment as needed. The Arch project will require that the County engage in that remodeling for different phases of construction and again once the permanent structure and modifications are in place. That remodeling will consume significant County staff time and will likely require the provision or reallocation of additional County resources to maintain acceptable emergency response times. But NPS has not even provided the County with information sufficient to begin that work—much less taken those significant harms into account.

77. The disruptions to emergency services caused by the Arch will be particularly pronounced during major regional events. Arlington Memorial Bridge and Memorial Circle serve as a protected route for Arlington County first responders onto the National Mall during National Special Security Events and other major events, such as presidential inaugurations and the recent 250th anniversary celebrations. The Cemetery also serves as a designated emergency egress point for protected persons during an emergency. The Circle is a particularly vital thoroughfare during recurring events that necessitate local closures, such as the Marine Corps Marathon or the Army Ten-Miler run. County units provide mutual aid during those events, and any evacuation of attendees from the Mall depends on this route being clear and accessible. When the Circle's capacity is reduced because of the Arch, County

responders will have to divert to Interstate 66, Interstate 395, or the Key Bridge during such events and revise their emergency planning accordingly.

78. The President's recent, surprise announcement that the Arch will "have and hold large quantities of sniper ammunition in storage" and "house, store, and have the rapid ability to use large numbers of drones" also creates new hazards to which County personnel will need to respond. County firefighters and paramedics will be called to respond to any fire, explosion, or accident involving or caused by those stockpiles or operations. Yet the site lacks basic firefighting infrastructure: The existing hydrant network ends at the Arlington Cemetery Metro Station, and NPS has yet to explain how water supply will be extended to the site. NPS did not analyze any of these risks and has not prepared any supplemental analysis since the President's announcement.

79. The Arch's announced drone operations also threaten the Arlington County Police Department's own unmanned aircraft program, which maintains a fleet of more than 20 drones (including backups) for use during major events and emergencies. Drones give County officers situational awareness they cannot otherwise obtain at both large-crowd events and specific safety incidents. For example, during a recent barricade incident, a County drone allowed officers to see inside the location where an armed suspect was holding a gun.

80. The County flies drones in Arlington airspace immediately adjacent to the Arch site, including along the Route 110 corridor between Rosslyn and Crystal City, for both planned events and emergency operations. Planned events include the annual Fourth of July celebrations, the Marine Corps Marathon, and the Army Ten-Miler, among others. That airspace lies within the Washington, D.C. Flight Restricted Zone, the most restricted airspace in the country, and along the flight path for Reagan National Airport. The County's operating area is already tightly bounded: It cannot fly in the District, including Memorial Circle, or within Arlington Cemetery or the Pentagon area without special authorization. Even for events the County has supported for years, flying in the same airspace, each

operation requires FAA waivers, repeated coordination and deconfliction meetings, and months of planning between multiple agencies. For the recent 250th anniversary celebration, only three drone operators were permitted to fly in the area: the County on the Virginia side, the Pentagon Force Protection Agency (Pentagon Police), and a joint U.S. Secret Service and FBI team at two sites within the District. Support for that single ten-hour operation required months of planning.

81. The addition of military drone operations at the Arch will make all of this monumentally harder. At a minimum, it will require additional coordination, communication, and personnel to deconflict airspace for each County operation and might require the County to co-locate with the agency operating the Arch drones in order to properly coordinate flight paths. Depending on the scale of drone operations at the Arch, the FAA could prioritize those activities and deny the County authorization to fly outright, or it might reduce the height and number of County drones authorized to fly, even for emergency operations. Each of these outcomes adds complexity and requires additional County personnel and time. This risk is not hypothetical; since the January 2025 deadly midair collision between an Army Black Hawk helicopter and a commercial aircraft near DCA, the FAA has refused to permit District helicopters to cross into Arlington and has heavily restricted access to the airspace even for law-enforcement-focused helicopter missions. Moreover, those limits on helicopter support have made the County's drone program all the more important as a substitute for support that would otherwise have been provided by helicopter—meaning that if and when similar restrictions are imposed on the County's drone use as a result of the Arch project, the impacts on the County's ability to maintain safety and emergency services will be all the more severe.

82. The proposed Arch will also undermine the County's provision of emergency services in Arlington National Cemetery. The Cemetery hosts more than 5,000 funerals annually—roughly 24 to 27 each weekday—to honor and remember those who have served their country. Construction of the Triumphal Arch will fundamentally disrupt these funerals. NPS's EA claimed only that the government

would "avoid disruptive construction activities during funerals" but proffered no explanation for how this could be accomplished, given the number of such observances on an ongoing basis and the agency's plan for near-continuous construction. Aside from the severe impact this will have on servicemembers and their families, it will detrimentally affect Arlington County, too. The County provides emergency services for the Cemetery and the nearby Metro station, and construction of the Arch and the increased traffic post-construction will directly impair the County's ability to reach mourners, visitors, and staff in the event of a medical emergency. It will also likely force the County to change its emergency plans and reroute vehicles serving those areas.

83. This concern is not theoretical. In the last 60 days, Arlington police, fire, and emergency units have responded to approximately 200 incidents in the area surrounding the Circle, including traffic stops and assisting with unconscious persons within Arlington National Cemetery. And the visitors the Arch is intended to attract will increase demand for those same emergency services.

***Harms to Historic Resources and the County's Historic Preservation Program***

84. Arlington County maintains a Historic Preservation Program that identifies, documents, and protects historic resources in the County and helps property owners steward those resources. That work includes assisting owners in pursuing listing on the National Register of Historic Places, which can provide property owners with access to financial incentives, including federal rehabilitation tax credits for eligible income-producing properties, potential tax deductions through preservation easements, and eligibility for certain preservation grants and loan programs. National Register listing also ensures that the effects of federally funded, licensed, or assisted projects on the property are considered through the Section 106 historic review process. In addition, designation formally recognizes a property's historic significance, enhancing its prestige, public visibility, and potential long-term market appeal. The County participates as a consulting party in NPS's review of the Arch under Section 106 of the National Historic Preservation Act.

85. Outside the area surrounding Memorial Circle, the Arch's greatest impact will be visual disturbances. Rising 250 feet, the Arch will cause significant adverse visual effects on multiple higher-elevation historic neighborhoods in Arlington, including Rosslyn, Radnor/Fort Myer Heights, Clarendon-Courthouse, Lyon Park, Penrose, Foxcroft Heights, and Arlington View. It will impair the integrity of historic resources in the County, including their feeling, setting, and design. The changed sight lines threaten to decrease property values and the aesthetic appeal of many historic and high-value residential properties in Arlington County, which will, in turn, decrease tax revenue to the County and affect the funds the County has available to spend on core services for its residents.

86. NPS itself concurs that the Arch will have adverse direct and indirect effects on historic resources, but it has failed to identify the full universe of historic properties that the Arch will affect. NPS likewise failed to complete a comprehensive architectural survey of the area for potential effects on properties eligible for, but not yet listed on, the National Register. Those properties include privately owned homes and areas significant to Arlington's local history, such as the neighborhoods of Arlington View, Foxcroft Heights, Arlington Ridge, Pentagon City, and Crystal City, to name a few, which are not yet listed. NPS has also not completed the archaeological investigation that its own Phase IA study indicates is needed.

87. These failures harm the County directly. Harms to historic properties that NPS failed to identify cannot be avoided or mitigated. The County's Historic Preservation Program would lose the ability to advocate for NPS to mitigate for those adverse effects. And impacts to unrecognized historic resources will impair the County's ability to document and protect its local history and help owners steward historic properties in the County.

***Harms to Infrastructure and Environmental Resources***

88. The project will also cause significant environmental harms that directly affect the County's interests. Construction of a 250-foot Arch will require deep excavation and caissons installed to a depth

of approximately 75 feet, necessitating near-continuous heavy equipment operations. Unless NPS takes appropriate precautions, that work risks vibration damage to the aging federally owned water main that feeds the Pentagon and Reagan National Airport and serves as a backup water connection for much of Arlington County, potentially compromising the County's backup supply.

89. This work will also harm the natural and scenic resources of the George Washington Memorial Parkway and the Potomac River corridor—permanently altering and damaging the parkway's setting and protected viewshed. Although the Parkway is administered by federal authorities, countless County residents travel on it daily, and its natural beauty and historic value contribute to the County's high desirability for current and future residents, including the County's ability to offer recreational areas and opportunities that consistently lead the County to be ranked near the top of cities with healthy residents.

***Harms to the County's Land-Use Planning and Airspace Interests***

90. For more than a decade, the County has coordinated with MWAA to align its land-use planning with airspace operations at Reagan National. A central element of that coordination is the One Engine Inoperative (OEI) condition. The FAA requires every airline to have approved procedures identifying departure corridors in the event that an aircraft engine fails during takeoff. Due to the region's constrained airspace, local development patterns, and Arlington's plans for future growth, MWAA worked with airlines to establish a single, consolidated OEI corridor to be protected at specific building heights to ensure a safe path between existing obstacles and protected airspace. Arlington County staff and officials at MWAA regularly engage to ensure development in the County aligns with that corridor.

91. Arlington County understands that the proposed height of the Arch project would encroach on the airspace designated by MWAA to be protected for OEI conditions and thus may affect the flight paths designated by airlines for use in emergency scenarios. The County understands that any structure

at the Arch site exceeding approximately 200 feet above mean sea level, or roughly 170 feet above grade, would penetrate MWAA's consolidated OEI surface.

92. At 250 feet above grade, the County understands the Arch would encroach 80 feet into designated OEI space and that this encroachment likely will require modifications to flight plans by MWAA and its partner airlines. That in turn would harm the County by restricting optionality in land-use planning, limiting permissible development, and causing increased noise in residential and business neighborhoods from altered flights paths.

93. Nor has NPS provided any analysis of how the height of the Arch will affect the frequent helicopter flights over the County or whether cranes used during construction—which will likely tower even higher than the Arch's planned 250 feet—will encroach on DCA airspace. Accordingly, the County is at risk of experiencing increased overflights caused by diversion of air traffic both during and after construction. Given the limited airspace around DCA, any meaningful number of diversions could increase air traffic directly over the County's busiest urban corridors, increasing noise and air pollution and detracting from the livability and desirability of living and working in those areas.

94. Further, because the Arch will constitute "an obstruction to air navigation," *see* 14 C.F.R. § 77.17(a), it will require a FAA-compliant aviation warning. Current plans show an "eternal flame" atop the Arch to warn approaching pilots. The new warning light(s) necessary to alert pilots approaching the area will compound the Arch's adverse nighttime visual effects on surrounding historic resources and area residents.

95. Nor did NPS assess the potential harm to airplanes and Arlington County residents from housing drones in a large facility that lies directly under the flight path of a major airport.

***Harms to the County's Participatory and Informational Interests***

96. The County repeatedly raised these harms with NPS and the other federal agencies responsible for the Arch, under review timelines that denied it any meaningful opportunity to participate. On June

15, 2026, the County's Historic Preservation Program submitted written comments to NPS as a Section 106 consulting party. It objected that NPS's 10-day review period for the Programmatic Agreement and Assessment of Effects "did not follow the standard process for Section 106," and it asked NPS to share the draft EA. On June 17, 2026, the County's Planning Director submitted written comments to the National Capital Planning Commission identifying the deficiencies in the project's transportation study and the County's concerns regarding emergency response, airspace, water infrastructure, and historic resources, accompanied by 32 detailed technical comments from the County's Division of Transportation. NCPC allowed the County only seven days to respond, compared with the 60 days it typically provides for projects affecting Arlington. The next day, June 18, NPS released the EA and the FONSI together.

97. By issuing the EA and FONSI without the analysis that NEPA required the agency to undertake, and without giving the County a meaningful opportunity to comment, NPS deprived the County of information it needs to protect the concrete interests described above. Those interests include planning emergency responses, managing its transportation network, protecting its land-use planning, safeguarding infrastructure, and stewarding historic resources. Preparation of an EIS—as NEPA required—would have resulted in NPS fully analyzing these effects (likely including by conducting modeling and other analysis that would assist the County's planning), considering alternatives and mitigation, and responding to the County's comments. A court order setting aside the FONSI and enjoining NPS from proceeding with the Arch project without conducting a full EIS in compliance with NEPA would at least partially redress the County's injuries.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Administrative Procedure Act

### 5 U.S.C. § 706(2)(A)
### Agency Action Not in Accordance with Law/Arbitrary and Capricious Agency Action—Inadequate NEPA Alternatives Analysis

98. Plaintiff restates and realleges all paragraphs above as if fully set forth here.

99. The Administrative Procedure Act authorizes judicial review of final agency action. 5 U.S.C. § 704.

100. Final agency actions are those (1) that "mark the 'consummation' of the agency's decisionmaking process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).

101. Issuance of the FONSI marks the consummation of NPS's decisionmaking process with respect to the environmental effects of the Arch project and constitutes a final decision not to prepare an EIS. The FONSI determines rights or obligations, including by authorizing the Arch project to proceed, pretermitting a more detailed analysis of the effects of the project on the human environment, and preventing Plaintiff and other interested parties from participating in an EIS review process. *See, e.g.*, *Sierra Club v. U.S. Army Corps of Engr's*, 446 F.3d 808, 815-16 (8th Cir. 2006).

102. Under NEPA, an agency preparing an EIS is required to conduct an analysis of "a reasonable range of alternatives to the proposed agency action … that are technically and economically feasible, and meet the purpose and need of the proposal." 42 U.S.C. § 4332(2)(c)(iii). That same requirement applies to preparation of EAs. *See Nat'l Audubon Soc'y v. U.S. Dep't of the Navy*, 422 F.3d 174, 206 (4th Cir. 2005).

103. NPS failed to analyze a reasonable range of alternatives. The EA describes the project's purpose and need as "celebrat[ing] 250 years of American independence by honoring America's founding principles through installation of a structure at the intersection of Arlington Memorial Bridge

and Memorial Avenue within George Washington Memorial Parkway, in a manner consistent with the avenue's established role as a ceremonial gateway and 'Avenue of Heroes' celebrating valor, sacrifice, and American heritage." EA at 4.

104. Despite that broad purpose and need, the EA assesses only one choice, the Arch project.

105. In fact, the EA makes clear NPS never assessed any other type of project meeting the purpose and need of the project, aside from briefly considering a shorter arch—most notably including the smaller pillars that NPS itself had previously cited as a basis for selecting the Memorial Circle site.

106. The EA makes no effort to reasonably analyze why only the Arch as proposed meets the self-described purpose and need of the project.

107. While an agency need not "discuss remote or speculative alternatives," *State of North Carolina v. FAA*, 957 F.2d 1125, 1134 (4th Cir. 1992), the EA provides no analysis whatsoever of why alternative projects would be so "remote" or "speculative" as to not even merit consideration.

108. Further, although "the range of alternatives an agency must consider [in an EA] is smaller than in an [EIS]," *id.*, NPS effectively conducted no alternatives analysis at all, let alone a reasonable one.

109. Accordingly, the EA and FONSI are contrary to law and arbitrary and capricious and should be set aside pursuant to 5 U.S.C. § 706(2)(A).

**COUNT II**
**Violation of the Administrative Procedure Act**

**5 U.S.C. § 706(2)(A)**
**Agency Action Not in Accordance with Law/Arbitrary and Capricious Agency Action—Failure to Prepare an EIS**

110. Plaintiff restates and realleges all paragraphs above as if fully set forth here.

111. The Administrative Procedure Act authorizes judicial review of final agency action. 5 U.S.C. § 704.

112. For the reasons described above, the FONSI is a final agency action subject to this Court's review.

113. The APA requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

114. "An agency shall issue an [EIS] with respect to a proposed agency action requiring an environmental document that has a reasonably foreseeable significant effect on the quality of the human environment." 42 U.S.C. § 4336(b)(1).

115. That EIS shall include an analysis of "any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(2)(C)(ii).

116. In determining whether adverse effects rise to the level of significance requiring preparation of an EIS, an agency may not disregard or minimize adverse effects by balancing them against positive effects.

117. Here, NPS did exactly that, considering in the FONSI "both beneficial effects and adverse effects" for purposes of determining whether any effects of the Arch project rose to the level of significance meriting preparation of an EIS.

118. For example, despite admitting the Arch would "introduce permanent adverse effects" on the viewshed of the area, the agency claimed those effects did not rise to the level of significance meriting preparation of an EIS simply because the "cultural landscapes would remain discernable" and because the Arch would include a viewing platform. FONSI at 6.

119. In so doing, NPS improperly minimized the adverse effects of the project in violation of NEPA.

120. Accordingly, the FONSI violates NEPA and is arbitrary and capricious, and should be vacated under 5 U.S.C. § 706(2)(A).

## COUNT III
## Violation of the Administrative Procedure Act

## 5 U.S.C. § 706(2)(A)
## Agency Action Not in Accordance with Law/Arbitrary and Capricious Agency Action—Inadequate NEPA Review

121. Plaintiff restates and realleges all paragraphs above as if fully set forth here.

122. The Administrative Procedure Act authorizes judicial review of final agency action. 5 U.S.C. § 704.

123. For the reasons set forth above the FONSI is a final agency action subject to this Court's review.

124. The APA requires courts to "hold unlawful and set aside agency action" that is "contrary to law" and/or "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A).

125. An EA "shall be a concise public document prepared by a Federal agency to set forth the basis of such agency's finding of no significant impact or determination that an environmental impact statement is necessary." 42 U.S.C. § 4336(b)(2).

126. "NEPA requires federal agencies to take a 'hard look' at the environmental consequences of their actions," *Ohio Valley Envt'l Coal. v. Aracoma Coal Corp.*, 556 F.3d 177, 194 (4th Cir. 2009), including when preparing an EA. *See Nat'l Audubon Soc'y*, 422 F.3d at 185.

127. In addition, in preparing an EA, an agency "may make use of any reliable data source." 42 U.S.C. § 4336(b)(3)(A).

128. Defendants acted arbitrarily and capriciously and contrary to law in issuing the EA and FONSI by, among other things:

a. Predetermining their NEPA analysis by committing to proceeding with the Arch project, in accordance with the President's wishes, irrespective of the results of the EA and any analysis of alternatives;

b. Failing to take the requisite "hard look" at the environmental effects of the Arch project, including effects on traffic, congestion, noise, water resources, and cultural and historic resources;

c. Failing to assess the potential harms from mishaps or accidents related to housing drones, military snipers, and ammunition within a large facility that lies within a major traffic circle in a busy and populous area;

b. Relying on unreliable or stale data for assessing the impacts of the Arch project on traffic congestion, aircraft noise, and water runoff, among others;

c. Failing to conduct a detailed analysis of impacts on public safety and air quality, among others; and

d. Failing to prepare a supplemental EA or full EIS to account for transformation of the Arch project into a military installation housing drones and ammunition, among other things; and

e. Failing to conclude the Arch project would not cause significant effects requiring preparation of an EIS.

129. NPS also has not contemplated the significant impacts on both public safety and traffic congestion that the addition of a top-grade military complex, complete with large ammunition stores and snipers, will have on the busy corridor.

130. Memorial Circle also sits within a no-fly zone for drones due to the potential for dangerous impacts on flights approaching or leaving Reagan Airport. NPS's FONSI did not consider how the rapid deployment of large numbers of drones—for unspecified "national security" reasons—would impact air traffic at the nearby airport.

131. Accordingly, the EA and FONSI are arbitrary and capricious and contrary to law and should be vacated under 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court:

a. Declare Defendants' failure to conduct an Environmental Impact Statement for the Triumphal Arch project, as required under NEPA, arbitrary and capricious and contrary to law under the APA.

b. Vacate and set aside Defendants' Finding of No Significant Impact and Environmental Assessment as arbitrary and capricious and contrary to law in violation of the APA.

c. Permanently and preliminarily enjoin Defendants from proceeding with any construction or demolition activity in furtherance of the Triumphal Arch project without conducting an EIS, adequately considering reasonable alternatives, and taking the "hard look" NEPA requires.

d. Award Plaintiff its costs, reasonable attorneys fees, and other disbursements deemed appropriate; and

e. Grant such other relief as the Court deems necessary, just, and proper.

October 8, 2026

Ryan Samuel (VA Bar No. 84400)
County Attorney
Arlington County Attorney's Office
2100 Clarendon Blvd. Suite 403
Arlington, Virginia 22201
Phone: (703) 228-3100
Fax: (703) 228-7106
rsamuel@arlingtonva.us

*Counsel for Plaintiff*

Respectfully submitted,

*/s/ Catherine M.A. Carroll*
Catherine M.A. Carroll (VA Bar No. 50939)
Kate Talmor[+] (DC Bar No. 90036191)
Gregory M. Cumming[+] (DC Bar No. 1018173)
Brian D. Netter[+] (DC Bar No. 979362)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
ccarroll@democracyforward.org
ktalmor@democracyforward.org
gcumming@democracyforward.org

*Counsel for Plaintiff*
[+] Motion to appear pro hac vice pending