**UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| **COUNTY BOARD OF ARLINGTON COUNTY, VIRGINIA,**<br>*Plaintiff*,<br>*v.*<br>**NATIONAL PARK SERVICE**, *et al.*,<br>*Defendants.* | **Case No. 26-cv-3372 (LMB-WEF)** |

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND SECTION 705 STAY, AND CONDITIONAL TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

**Page(s)**

BACKGROUND ....... 2

I. Legal Background ....... 2

A. The NPS Organic Act ....... 2

B. The Commemorative Works Act ....... 3

C. Section 8106 ....... 4

D. The National Environmental Policy Act ....... 4

II. Factual Background ....... 5

STANDARD OF REVIEW ....... 10

ARGUMENT ....... 11

I. The County Has a Strong Likelihood of Success on the Merits ....... 11

A. The County Has Standing ....... 11

B. The County Challenges Final Agency Action ....... 15

C. NPS's Authorization to Construct the Arch Project Violates the APA ....... 16

1. The Commemorative Works Act Prohibits Construction in Memorial Circle Without Express Congressional Authorization ....... 16

2. Section 8106 Bars Construction on NPS Land in the District ....... 19

3. NPS's authorization to construct the Arch is contrary to its Organic Act ....... 20

4. NPS's decision to construct the Arch is arbitrary and capricious ....... 22

5. NPS's decision exceeds its statutory authority ....... 27

D. NPS's NEPA Review Was Insufficient ....... 27

II. The County Will Suffer Irreparable Harm Absent Preliminary Relief ....... 30

III. The Equities Favor Entering an Injunction and Preserving the Status Quo ....... 33

IV. If It Becomes Necessary, the Court Should Enter an Administrative Stay to Protect the County ....... 35

CONCLUSION ....... 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFSCME v. SSA*, 172 F.4th 361 (4th Cir. 2026) (en banc) ....12, 30

*Air Evac EMS, Inc. v. McVey*, 37 F.4th 89 (4th Cir. 2022) ....31

*Ams. for Prosperity Found. v. Albence*, No. 26-2469, 2026 WL 2563151 (3d. Cir. Aug. 31, 2026) ....33

*Anacostia Watershed Soc'y v. Babbit*, 871 F. Supp. 475 (D.D.C. 1994) ....16

*Bennett v. Spear*, 520 U.S. 154 (1997) ....16

*Bluewater Network v. Salazar*, 721 F. Supp. 2d 7 (D.D.C. 2010) ....20

*Casa De Md., Inc. v. Wolf*, 486 F. Supp. 3d 928 (D. Md. 2020) ....11

*Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. Cir. 1991) ....30

*City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142 (9th Cir. 1997) ....27

*City of Charleston v. Joint Comm'n*, 473 F. Supp. 3d 596 (S.D.W.V. 2020) ....12

*Cnty. of Berks v. Otis Elevator Co.*, No. 15-cv-4862, 2015 WL 5585732 (E.D. Pa. Sept. 23, 2015) ....32

*County of King v. Turner*, 189 F.4th 819 (9th Cir. 2026) ....24

*Cure Land, LLC v. U.S. Dep't of Agric.*, 833 F.3d 1223 (10th Cir. 2016) ....16

*Daingerfield Island Prot. Soc'y v. Babbit*, 823 F. Supp. 950 (D.D.C. 1993) ....21

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194 (3d. Cir. 2024) ....34

*Dep't of Com. v. New York*, 588 U.S. 752 (2019) ....23, 24, 25

*Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100 (2025) ....15

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850 (9th Cir. 2022) ....16, 27, 29

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) ....22, 26

*Friends of Iwo Jima v. Nat'l Cap. Planning Comm'n*, 176 F.3d 768 (4th Cir. 1999) ....18

*Ga. Vocational Rehab. Agency Bus. Enter. Program v. United Case*, 354 F. Supp. 3d 690 (E.D. Va. 2018) ....10

*Gladstone Realtors v. Vill. Of Bellwood*, 441 U.S. 91 (1979) ....14

*Greater Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183 (D.D.C. 2008) ....20, 23

*HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021) ....31

*High Country Conservation Advocs. v. U.S. Forest Serv.*, 951 F.3d 1217 (10th Cir. 2020) ....30

*Johnson v. Allstate Ins. Co.*, No. 95-151, 1996 WL 66231 (D. Me. Jan. 26, 1996) ....................20

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986)....................27

*Laufer v. Naranda Hotels, LLC*, 60 F.4th 156 (4th Cir. 2023)....................15

*Lemmon v. Trump*, No. 26-cv-544 (D.D.C.) ....................passim

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ....................16

*Maryland v. United States Dep't of Agric.*, 770 F. Supp. 3d 779 (D. Md. 2025)....................31, 34

*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000) ....................30

*Miranda v. Garland*, 34 F.4th 338 (4th Cir. 2022) ....................33

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ....................22, 26

*Mt. Lookout-Mt. Nebo Prop. Prot. Ass'n v. FERC*, 143 F.3d 165 (4th Cir. 1998)....................27

*Mullins v. City of New York*, 626 F.3d 47 (2d. Cir. 2010)....................32

*Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget*, 763 F. Supp. 3d 13 (D.D.C. 2025) ....................35

*Nat'l Park Serv. v. Nat'l Tr. for Hist. Pres. in the U.S.*, 609 U.S. 1068 (2026) ....................19

*Nat'l Tr. for Hist. Pres. v. NPS*, 827 F. Supp. 3d 93 (D.D.C. 2026) ....................34

*Nat'l Tr. for Hist. Pres. in the U.S. v. Nat'l Park Serv.*, 185 F.4th 1185 (D.C. Cir. 2026)....................4, 19, 23, 33, 34

*New York v. Shinnecock Indian Nation*, 280 F. Supp. 2d 1 (E.D.N.Y. 2003) ....................31

*Niz-Chavez v. Garland*, 593 U.S. 155 (2021)....................18

*Nken v. Holder*, 556 U.S. 418 (2009) ....................33

*North Carolina v. City of Va. Beach*, 951 F.2d 596 (4th Cir. 1991)....................33

*Ohio v. EPA*, 603 U.S. 279 (2024) ....................22, 25

*PSEG Renewable Transmission LLC v. Arentz Fam., LP*, 185 F.4th 497 (4th Cir. 2026)....................31

*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020) .................... 11, 33

*S.W. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater*, 173 F.3d 1033 (6th Cir. 1999) ....................16

*Scott v. City Council for City of Santa Monica*, No. 17-7329, 2017 WL 4511380 (C.D. Cal. Oct. 8, 2017)....................32

*Sidelemine v. Blanche*, No. 26-2467, 2026 WL 3258708 (4th Cir. Oct. 28, 2026) ....................11

*Sierra Club v. Andrus*, 487 F. Supp. 443 (D.D.C. 1980) ....................23

*Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808 (8th Cir. 2006)....................16

*Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260 (4th Cir. 2018) ....................21

*Stat Emergency Med. Serv., Inc. v. Saginaw Valley Med. Ctrl. Auth.*, No. 13-14960, 2016 WL 3902742 (E.D. Mich. July 19, 2016) ........ 31

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ........ 12

*United States v. City of Berkeley*, 735 F. Supp. 937 (E.D. Mo. 1990) ........ 32

*United States v. F/V Alice Amanda*, 987 F.2d 1078 (4th Cir. 1993) ........ 22

*United States v. Texas*, 144 S. Ct. 797 (2024) ........ 11, 35

*Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414 (D.C. Cir. 2018) ........ 25

*Wash. Area Bicyclist Ass'n, Inc. v. Burgum*, 840 F. Supp. 3d 883 (D.D.C. 2026) ........ 14

*Winter v. NRDC*, 555 U.S. 7 (2008) ........ 11

**Statutes**

5 U.S.C. § 704 ........ 15

5 U.S.C. § 705 ........ 10, 11

5 U.S.C. § 706 ........ 16, 22

40 U.S.C. § 8106 ........ 1, 4

40 U.S.C. § 8901 ........ 3, 19

40 U.S.C. § 8902 ........ 3, 17,18

40 U.S.C. § 8903 ........ 4

40 U.S.C. § 8905 ........ 17, 19

40 U.S.C. § 8908 ........ 4, 17, 18

42 U.S.C. §§ 4321-4370m-11 ........ 4

42 U.S.C. § 4332 ........ 4, 27

54 U.S.C. § 100101 ........ 3, 20

Pub. L. No. 68-463, 43 Stat. 974 (1925) ........ 18, 19

Pub. L. No. 71-284, 46 Stat. 482 (1930) ........ 20

Pub. L. No. 108-126, 117 Stat. 1348 ........ 17

Pub. L. No. 111-88, 123 Stat. 2904 (2009) ........ 17

Pub. L. No. 117-81, 135 Stat. 1541 (2021) ........ 17

**Other Sources and Authorities**

Callum Sutherland, *The 'Arc de Trump': President Shows Off Plans For His Latest Grandiose D.C. Construction Project*, TIME (Oct. 16, 2025), https://perma.cc/KD9S-GSHA ........ 5

Commemorative Areas Washington, DC and Environs (Map Number 869/86501 B), Nat'l Park Serv. (June 24, 2003), https://perma.cc/NS43-RCZ3 ........ 4

Dan Diamond, *Trump Shuffles Key Federal Panel Ahead of Vote on His Arch*, The Wash. Post (Oct. 21, 2026), https://perma.cc/M6DM-44S7 .......... 24

Donald J. Trump (realDonaldTrump), Truth Social (Sep. 20, 2026, at 07:34 ET), https://perma.cc/7YAR-Q54L .......... 1, 6

Jacob R. Straus, Cong. Rsch. Serv., IF11937, Commemorative Works Act: Siting Memorials in the District of Columbia (2024), https://perma.cc/X6F7-HATM .......... 17

Nat'l Park Serv., Lady Bird Johnson Park, https://perma.cc/TC58-HMSJ (last updated Jan. 5, 2024) .......... 21

NCPC, Nov. 5, 2026 Commission Meeting, https://www.ncpc.gov/videos/655/04m41s .......... 9

Report of the Arlington Memorial Bridge Commission (Apr. 24, 1925), https://perma.cc/SUF4-6EUD .......... 5, 18

Sec'y Doug Burgum (@SecretaryBurgum), X (Sept. 3, 2026, 3:01 PM), https://perma.cc/YNP3-34UJ .......... 7

U.S. Commission of Fine Arts, Meeting Minutes (April 16, 2026), https://perma.cc/C9BA-37E2 .......... 5

This case involves the Trump-Vance administration's latest attempt to remake the Nation's Capital in his image. On November 5, 2026, the National Park Service authorized construction of a 250-foot "Triumphal Arch and Military Complex" on national park land in Memorial Circle, at the western end of the Arlington Memorial Bridge. This Arch will dwarf Paris's Arc de Triomphe and directly obstruct the sight line between the Lincoln Memorial and Arlington National Cemetery that was deliberately created to symbolize the nation's post-Civil War reunification. President Trump first revealed his plan to construct the Arch in October 2025 to commemorate the 250th anniversary of American Independence. After the plan faced intense public scrutiny and a legal challenge from Vietnam Veterans, the President belatedly announced that the Arch would serve as a dual-purpose tourist attraction and "top grade Military Complex/Triumphal Arch," which will store large quantities of ammunition and "house, store, and have the rapid ability to use large numbers of drones, plus Snipers."[1]

NPS's decision is unlawful and should be enjoined so the agency cannot begin potentially irreparable ground-disturbing activity while this litigation is pending. NPS has not obtained, or even attempted to obtain, the congressional authorization that is required by both the Commemorative Works Act and 40 U.S.C. § 8106. NPS's decision also violates the agency's Organic Act, which requires that the agency conserve the resources of the national park system. Constructing a massive arch and military complex is wholly incongruous with the purposes Congress ordained for the park unit in which the project would sit. And NPS's truncated review reveals that its entire process has been a charade designed to shore up legal justifications for building the Arch in accordance with President Trump's repeated marching orders. NPS invoked

[1] Donald J. Trump (realDonaldTrump), Truth Social (Sep. 20, 2026, at 07:34 ET), https://perma.cc/7YAR-Q54L.

a facetious congressional authorization for the project, failed to consider the serious safety risks inherent in the government's planned military installation, proffered the purpose of commemorating the semiquincentennial without addressing the military rationale the government now claims, and reached a decision so illogical that it cannot be ascribed to mere differences in judgment. The decision is thus arbitrary and capricious in violation of the APA. Similarly, NPS also improperly circumscribed its consideration of reasonable alternatives in violation of the National Environmental Policy Act.

Construction of the Triumphal Arch and Military Complex will directly and irreparably harm the interests of the County Board of Arlington County, the governing entity for the sovereign political subdivision that directly abuts Memorial Circle. Among other harms, the construction and continuing presence of the Arch will severely impede the County's provision of emergency services to the immediate surrounding area, including Arlington National Cemetery; burden County infrastructure and law-enforcement efforts; and interfere with the County's planning and development efforts, including by depriving the County of vital information about the impacts of the Arch. The County thus files this motion to ensure the agency cannot break ground on this project pending the Court's determination of its unlawfulness.

## BACKGROUND

### I. Legal Background

NPS's management of national park land—and particularly national park land in the District of Columbia—is constrained by numerous acts of Congress.

#### *A. The NPS Organic Act*

In the NPS Organic Act, Congress instructed the Director of NPS to "promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects,

and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). Through the Redwood Amendment, Congress "reaffirm[ed], declare[d], and direct[ed] that the promotion and regulation of the various System units shall be consistent with and founded in the purpose established by subsection (a), to the common benefit of all the people of the United States." *Id.* § 100101(b)(2). Accordingly, "[t]he authorization of activities shall be construed and the protection, management, and administration of the System units shall be conducted in light of the high public value and integrity of the System and shall not be exercised in derogation of the values and purposes for which the System units have been established, except as directly and specifically provided by Congress." *Id.*

*B. The Commemorative Works Act*

The Commemorative Works Act (CWA) governs placement of commemorative works[2] "in areas administered by the National Park Service and the Administrator of General Services in the District of Columbia and its environs." 40 U.S.C. § 8901(4). Congress codified in the CWA a specific purpose to "preserve, protect and maintain the limited amount of open space available to residents of, and visitors to, the Nation's Capital," *Id.* § 8901(3), and "to ensure that future commemorative works in areas administered by [NPS] … in the District of Columbia and its environs … are appropriately designed, constructed, and located; and reflect a consensus of the lasting national significance of the subjects involved." *Id.* § 8901(4)(A)-(B). Accordingly,

[2] A "commemorative work" is "any statue, monument, sculpture, memorial, plaque, inscription, or other structure or landscape feature, including a garden or memorial grove, designed to perpetuate in a permanent manner the memory of an individual, group, event or other significant element of American history." 40 U.S.C. § 8902(a)(2).

commemorative works "may be established on" the federal land subject to the statute "only as specifically authorized by law." *Id.* § 8903(a)(1).

Memorial Circle, the planned location for the Triumphal Arch and Military Complex, sits in an area (known as Area I)[3] within which a commemorative work is "deemed to be authorized only if the recommendation [to construct the work] is approved by law not later than 150 … days after" Congress is notified of the recommendation of the Secretary of the Interior. *Id.* § 8908(b)(1).

*C. Section 8106*

Under 40 U.S.C. § 8106, "[a] building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." "Section 8106 bars construction on parks and other public grounds of the federal government specifically in the District of Columbia, unless Congress provides 'express authority' to do so." *Nat'l Tr. for Hist. Pres. in the U.S. v. Nat'l Park Serv.*, 185 F.4th 1185, 1221 (D.C. Cir. 2026).

*D. The National Environmental Policy Act*

Under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370m-11, federal agencies must assess the reasonably foreseeable environmental effects of proposed major federal actions on the human environment. *See* 42 U.S.C. § 4332(2)(C). The relevant effects include not only ecological effects such as air pollution and harm to endangered species, but also cultural, aesthetic, and economic effects. In so doing, the agency must examine "a reasonable range of alternatives to the proposed agency action" that would meet the purpose and need of the proposal. *Id.* § 4332(2)(C)(iii).

---

[3] Commemorative Areas Washington, DC and Environs (Map Number 869/86501 B), Nat'l Park Serv. (June 24, 2003), https://perma.cc/NS43-RCZ3.

## II. Factual Background

In late 2025, without any pretense of prior authorization or funding from Congress, President Trump announced plans to construct a massive new Arch in or near Washington, D.C., to celebrate the nation's 250th anniversary.[4] That announcement was followed by the filing, in early 2026, of litigation brought by Vietnam War veterans seeking to forestall construction of the Arch. *See Lemmon v. v. Trump*, No. 26-cv-544 (D.D.C.).

In an April 2026 meeting of the Commission of Fine Arts, months after the President first announced his plans, Secretary Burgum linked construction of the Arch to a 1924 report by the Memorial Bridge Commission that recommended the construction of two 166-foot-high columns on either side of Memorial Bridge near Memorial Circle.[5] There is no evidence that the Memorial Bridge Commission ever considered or recommended construction of an Arch.[6]

Thereafter, NPS went through the motions of a truncated environmental and historic preservation review process. To ostensibly comply with NEPA, the agency prepared an EA (the first version of which was issued in June 2026) that assessed only the building of an arch in one location and that conducted minimal analysis of the adverse effects of the project on traffic, cultural and historic landscapes, and public safety. To purportedly comply with Section 106 of the National Historic Preservation Act, NPS initiated a review that provided for only minimal comment and participation by consulting parties. NPS abruptly terminated the Section 106 process on September 24, 2026, without warning to consulting parties, citing a supposed inability to reach a

---

[4] Callum Sutherland, *The 'Arc de Trump': President Shows Off Plans For His Latest Grandiose D.C. Construction Project*, TIME (Oct. 16, 2025), https://perma.cc/KD9S-GSHA.

[5] U.S. Commission of Fine Arts, Meeting Minutes (April 16, 2026), available at https://perma.cc/C9BA-37E2.

[6] Report of the Arlington Memorial Bridge Commission (Apr. 24, 1925), https://perma.cc/SUF4-6EUD.

memorandum of agreement among the consulting parties. *See* Ex. A, Decl. of Lorin Farris ¶¶ 8-10 (describing rushed and unusual process).

On September 20, 2026, following extensive public criticism and litigation in *Lemmon*, No. 26-cv-544, Dkt. No. 74-9, President Trump announced a major expansion to the project's scope:

> At the strong request of the United States Military, and for National Security purposes, I have agreed to convert the magnificent Triumphal Arch, planned since the Civil War Era many years ago, at the Receptive Circle adjoining the Arlington Memorial Bridge, into a top grade Military Complex/Triumphal Arch, to house, store, and have the rapid ability to use large numbers of drones, plus Snipers, on both the roof and plaza areas, and additionally have and hold large quantities of sniper ammunition in storage. There will be no facility like this anywhere in the World. Out of the 59 top cities and Capitals, Washington, D.C., IS THE ONLY ONE IN THE WORLD THAT DOES NOT HAVE A TRIUMPHAL ARCH, but it will now and, by far, the greatest of them all! Thank you for your attention to this matter. President DONALD J. TRUMP.[7]

Present plans show the Arch will rise 250 feet—more than twice the height of the Lincoln Memorial, taller than a 20-story commercial building, and tall enough to require the placement of an unusual, natural-gas powered "eternal flame" on top to warn pilots approaching nearby Reagan National Airport (DCA). The Arch is slated to have five levels of accessible interior space, totaling more than 70,000 gross square feet, including a gallery and an observation deck. The "Triumphal Arch and Military Complex," as the Executive Branch now calls it, will be the largest monumental arch in the world, occupying more than 15,000 square feet of ground space in Memorial Circle.

The Arch will permanently and significantly impair the viewshed of the region that has been cultivated through careful, congressionally authorized planning, including the Potomac River, the area surrounding the Lincoln Memorial, and Arlington National Cemetery. It will directly obstruct the sight line from the Lincoln Memorial to Arlington House, the home of

---

[7] *Supra* note 1.

Confederate General Robert E. Lee. For more than a century, that direct sight line has stood as a testament to the reunification of the nation after the Civil War and a point of reflection for visitors to our Nation's Capital and the sacred space of Arlington National Cemetery.

Although the Trump administration has recently doubled down on its military plans for the Arch—with Secretary of Defense Pete Hegseth attesting in a sworn declaration that the Arch presents "a generational national defense opportunity to mitigate … evolving threats" to the National Capital Region[8]—the government has not revealed where in the structure the snipers and ammunition will be housed relative to tourists and visitors to the observation deck. In addition to the Arch itself, the project will include a public plaza within Memorial Circle, security features, significant exterior lighting, utilities, and permanent traffic modifications.

On September 3, 2026, while review of the project was still ongoing, Secretary Burgum announced that "we are preparing to start, over the next two-week period, the excavation work necessary for the Great Triumphal Arch … at Memorial Circle." Sec'y Doug Burgum (@SecretaryBurgum), X (Sept. 3, 2026, 3:01 PM).[9] NPS later asserted, in a declaration filed in separate litigation raising constitutional challenges to the Arch project, that the excavation work was then limited to soil testing. *See* Decl. of Jennifer T. Nersesian, *Lemmon*, No. 1:26-cv-00544, Dkt. No. 57-1 (Sep. 4, 2026).

NPS issued a revised EA on October 9, 2026. Then just one week later, NPS submitted the Arch project to the National Capital Planning Commission (NCPC) for consideration at its November 5, 2026 meeting.[10] NPS subsequently gave the *Lemmon* court notice that, "[i]n the event the NCPC approves the Proposal at the November 5 meeting and the Department of Interior

---

[8] Decl. of Sec'y Pete Hegseth ¶ 10, *Lemmon v. Trump*, No. 26-cv-544, Dkt. No. 74-9.
[9] https://perma.cc/YNP3-34UJ.
[10] https://perma.cc/ABP5-EELL.

thereafter issues a final decision authorizing construction of the Proposal, construction or demolition in preparation for construction of an arch on Memorial Circle could commence immediately upon [NPS] publishing a notice of that authorization … NPS may publish such notice as early as November 5, 2026, and construction could commence as early as November 5, 2026." *See Lemmon*, Dkt. No. 63 (Oct. 21, 2026).

Defendants' NCPC submission did not include drones, snipers or other features of the military complex that Trump said he would add to the project.[11] The proposal that NCPC actually considered was limited to construction of a monument hosting tourists and other visitors—not a "Triumphal Arch and Military Complex." Defendants nonetheless invoked national-security concerns to defend against the Veterans' challenge to the Arch in *Lemmon*. One week before the NCPC meeting to consider the proposal, Homeland Security Secretary Markwayne Mullin attested that the Arch will serve as "a centralized and elevated infrastructure node at a key geographic location" to allow "physical co-location and real-time information sharing" between the five federal agencies that "possess the explicit statutory authority to lawfully conduct" counter-drone activities.[12] Secretary of Defense Pete Hegseth was even more explicit, testifying that the Arch "will be utilized as a dual-purpose structure: a major national monument that also incorporates military utility to support Homeland defense" by "situat[ing] state-of-the-art [counter-drone] defense capacities in the heart of the [national capital region.]"[13]

At its November 5, 2026 meeting, the NCPC heard roughly ten hours of comments from approximately 140 members of Congress and the public, the overwhelming majority of whom expressed strong opposition to the Arch. Commissioner Phil Mendelson moved to postpone a final

---

[11] https://perma.cc/L6NL-Y7V8.
[12] Decl. of Sec'y Markwayne Mullin ¶¶ 4, 13-14, *Lemmon*, No. 26-cv-00544, Dkt. No. 74-8.
[13] Hegseth Decl. ¶ 10, *supra* note 8.

vote on the project, pointing out that NPS's submission omitted any details of the government's plan to convert the Arch into a military installation. In response, Vice-Chair Levenbach—a proponent of the Arch—pointed out that NPS had said it was under "time constraints" and sought a decision that very night, a point the agency confirmed on the spot.[14] The motion to postpone failed by an 8-4 margin, and the Commission swiftly proceeded to approve the Arch by an 8-4 vote.

Twenty-one minutes later, Acting Director of the NPS Jessica Bowron signed a decision document authorizing construction of the Arch. NPS stated that "[t]he purpose of the selected action is to celebrate 250 years of American independence by honoring America's founding principles through installation of an Arch," while simultaneously insisting that the Arch "is not designed to perpetuate the memory of any … event or other significant element of American history." Decision Record at 1.[15] And NPS asserted that the rationale for building the Arch is to fulfill the "unrealized monumental intent" of the "century-old civic design concept" for Memorial Bridge, which allegedly envisioned "a grand, symbolically charged landscape" surrounding Memorial Circle—*i.e.*, the 1925 plan. Decision Record at 16. NPS also claimed that building a massive arch specifically within the GW Parkway park unit would be "consistent with the park's purpose as a scenic roadway honoring the nation's first president and protecting" the Potomac's "cultural and natural resources." *Id.* Any other alternative, NPS claimed, would fail to advance its purposes.

NPS did not address the impact of drones, snipers, or national-security functions. Instead, it disclaimed any need to consider those impacts as "not within the NPS's or the Department of

[14] *See* NCPC, Nov. 5, 2026 Commission Meeting, https://www.ncpc.gov/videos/655/04m41s.
[15] https://perma.cc/K4F4-WNRT.

the Interior's regulatory authority" and asserted that "national security uses for the Arch" have not yet "been finalized." *Id.* at 9. NPS does include plans for visitor entry through timed passes and "access [to] the gallery, which will house all visitor service functions, including exhibit space, a café, a gift shop, and public restrooms," including "free time within the public area of the Arch." *Id.* at 9. The agency stated that the first phase of construction—including mobilizing and staging equipment and barricading the surrounding roads—would take a matter of days before excavation work would begin. *Id.* at 5. Completion of the project is slated to take an estimated two to three years, with construction work running 20 hours per day, year round. *Id.* at 8.

The court overseeing the *Lemmon* litigation promptly issued a temporary restraining order. *See Lemmon*, No. 1:26-cv-00544, Dkt. No. 111, Mem. Op, (Nov. 5, 2026). In that order, the court held that the District of Columbia and Commonwealth of Virginia, whose suit the court had previously consolidated with the private plaintiffs' claims in *Lemmon* were likely to succeed on their claim that constructing the Arch would violate the CWA. *Id.* at 20-25. In particular, the court rejected NPS's reliance on the 1925 act as authorizing the Arch: "The sheer improbability that a 100-year-old statute would contain authority, unknown to every previous administration, to erect a 250-foot arch at a principal location in the Nation's capital indicates how far Defendants must stretch to justify this project." *Id.* at 23. The court also found that the equitable factors favor relief and granted a 14-day restraining order.[16]

## STANDARD OF REVIEW

The same standard applies to both a motion for a temporary restraining order and a preliminary injunction. *Ga. Vocational Rehab. Agency Bus. Enter. Program v. United Case*, 354 F.

[16] The court held the individual plaintiffs' motion for preliminary injunction in abeyance and deferred ruling on the District and Virginia's motion for a stay pursuant to 5 U.S.C. § 705.

Supp. 3d 690, 693 (E.D. Va. 2018). In either case, a plaintiff must "establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020) (quoting *Winter v. NRDC*, 555 U.S. 7, 20 (2008)). The APA likewise empowers courts to "issue all necessary and appropriate process to … preserve status or rights pending conclusion of the review proceedings" when doing so is "necessary to prevent irreparable injury." 5 U.S.C. § 705. The standard for temporary relief under Section 705 is also the same as for a preliminary injunction. *Casa De Md., Inc. v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020).

A court may enter a temporary administrative stay "to afford time to appropriately deliberate on the merits and avoid hasty decisions." *Sidelemine v. Blanche*, No. 26-26-2467, 2026 WL 3258708, at *2 (4th Cir. Oct. 28, 2026) (citing *United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring)).

## ARGUMENT

### I. The County Has a Strong Likelihood of Success on the Merits.

NPS intends to construct an unauthorized and inadequately reviewed project on land that directly abuts the County, the construction and presence of which will harm the County in numerous ways. The County thus has standing and can show a strong likelihood of success on several claims detailed below. *See Roe*, 947 F.3d at 224 (a plaintiff need only show success on one claim to obtain preliminary injunctive relief).

#### A. The County Has Standing.

Memorial Circle directly abuts County land, and the County will suffer direct harms during construction of the Arch and after its completion. Those harms will materialize as soon as NPS

blocks off the roads to break ground. "To establish standing, a plaintiff must show: '(i) that [it] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief.'" *AFSCME v. SSA*, 172 F.4th 361, 367 (4th Cir. 2026) (en banc) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). "At the preliminary injunction stage, a plaintiff must make a clear showing that [it] is likely to establish each element of standing." *Id*. (quotation marks omitted; emphasis added).

The County more than clears that threshold. *See* Mem. Op., *Lemmon*, No. 26-544, Dkt. No. 111, at 13-17 (finding District of Columbia and Virginia had standing to challenge Arch based on, among other things, showing of "economic harms," need to "expend resources," "increase[d] congestion," and ongoing "traffic disruptions"). Indeed, the harms the County will suffer are even more concrete and imminent than those the *Lemmon* court recognized as sufficient.

The Arlington County Fire Department provides fire and emergency medical services for Arlington National Cemetery, its metro station, and the area around Memorial Circle. For example, the County responded to roughly 200 incidents in that area in just 60 days preceding the filing of this case. Ex. B, Decl. of Aaron Miller ¶¶ 7-8. Its emergency vehicles also use the roadways surrounding Memorial Circle to reach other critical areas, including DCA, where the County responds to hundreds of emergencies per year. *Id.* ¶¶ 11-20. The County's ability to timely respond to those emergencies will be substantially hampered by construction and operation of the Arch. *Id.* ¶¶ 15-23. And President Trump's decision to host drones, snipers, and large stockpiles of ammunition at the Arch alongside tourists—all without "basic firefighting infrastructure"—will create inherently dangerous conditions that will only increase the already sizeable number of incidents to which the County is called upon to respond in the area. *Id.* ¶¶ 28-30. *See, e.g.*, *City of*

*Charleston v. Joint Comm'n*, 473 F. Supp. 3d 596, 613 (S.D.W.V. 2020) (increased need for municipal services constitutes an injury in fact).

The County also "owns, maintains, or is responsible for many of the surrounding roadways and multimodal facilities that connect to Memorial Circle" and "is responsible for operations and safety on that network." Ex. D, Decl. of Dan Nabors ¶ 5. Construction of the Arch will cause major road closures and traffic restrictions, including reducing westbound traffic from Memorial Bridge to two lanes; preventing any eastbound traffic from Memorial Avenue from turning northbound on Arlington Boulevard; restricting northbound traffic from Washington Boulevard from entering the Circle at all; and closing the sidewalk on the south side of Memorial Circle completely. Decision Record at 3. Those restrictions will ripple much farther into the County, increasing congestion and the attendant risks of vehicle accidents along the GW Parkway, State Route 110, Arlington Boulevard, and Washington Boulevard. *Id.* ¶¶ 6-10. Even after construction, increased pedestrian and vehicle traffic to the Arch and the permanent signalization NPS intends to add around Memorial Circle will significantly and permanently increase congestion. *Id.* ¶¶ 14-15. "[C]ertain consequences are predictable from well-established transportation-engineering principles," including that the increased volume of traffic in the area and pressure from delays "will inevitably decrease safety absent adequate mitigation, undermining the County's Vision Zero goals" to eliminate roadway deaths and serious injuries. *Id.* ¶ 19. This is particularly because construction will alter key pedestrian and cyclist routes and introduce a high-volume crossing across two opposing lanes of traffic. *Id.* ¶¶ 20-21. And these traffic impacts "will slow County bus service and undermine on-time performance" of bus routes that use State Route 110, including ART 43, "which can predictably be expected to depress ridership … [and] cause a direct financial loss to the County." *Id.* ¶ 16.

Similarly, the County will suffer injury from construction of the Arch given that its size (and the even larger size of the cranes used during construction) are likely to require changes to DCA's one-engine inoperative flight plans, and those changes will impact the County's planning and development options for the height of buildings in other nearby areas. Ex. E, Decl. of Anthony Fusarelli Jr. ¶¶ 10-14, 17-18. The Arch will also predictably make the County a less desirable place to live due to disruptions in recreational opportunities and impacts on properties near a new military installation explicitly intended for surveillance and lethal force, among other things. *Id.* ¶¶ 21-22. *See Gladstone Realtors v. Vill. Of Bellwood*, 441 U.S. 91, 110-11 (1979) ("A significant reduction in property values directly injures a municipality by diminishing its tax base, thus threatening its ability to bear the costs of local government and to provide services."); *Wash. Area Bicyclist Ass'n, Inc. v. Burgum*, 840 F. Supp. 3d 883, 903-904 (D.D.C. 2026) (finding risk of cyclist injuries from removal of bike lanes sufficient to confer standing). And the Arch will injure the County by inflicting direct harms on its historic properties and local history. Farris Decl. ¶¶ 11-20.

County law enforcement will no longer be able to deploy drones as they currently do to monitor large events or specific safety incidents, such as "vehicle and foot pursuits and barricade or hostage situations," in areas surrounding the Arch. Ex. C, Decl. of Mohammed Tabibi ¶ 6, 8. Airspace near the site is already heavily regulated, and the presence of a military installation from which counter-drone technology will be launched can predictably be expected to result in the FAA imposing further constraints. *Id.* ¶¶ 13-17.

The Arch will also strain the County's planning resources as construction will require constant adjustment, all without the benefit of information that would have been available had NPS conducted an adequate review of the Project. County traffic planners will have to repeatedly adjust traffic patterns and retime signals to accommodate congestion caused by the Arch, but they

will lack critical information to do so because NPS failed to conduct an adequate NEPA review that would have provided it. Nabor Dec. ¶¶ 22-25. The County will also have to repeatedly update its emergency-services plans to ensure it can continue responding timely to emergency calls as construction progresses. Miller Dec. ¶¶ 22-24. The County will incur direct expenses for the staff time required to make these adjustments. "These are not self-inflicted costs," either; as a sovereign responsible for providing emergency services to promote the health and wellbeing of its residents and to maintain its roadways, the County "cannot wait until a major commuter artery is disrupted to begin managing the detours." *Lemmon*, Mem. Op. at 27. And the County's historic review staffers lack an adequate catalogue of historic properties affected by the Arch and are thus unable to mitigate the harms it will cause. Farris Decl. ¶¶ 15-20. Those informational injuries constitute injuries in fact. *See Laufer v. Naranda Hotels*, LLC, 60 F.4th 156, 174 n.9 (4th Cir. 2023) (plaintiff establishes informational injury where it alleges that it "fail[ed] to obtain information which must be publicly disclosed pursuant to a statute" (quotation marks and alteration omitted)).

All those injuries are directly traceable to NPS's decision to authorize construction of the Arch after a sham process that not only ignored the agency's obligation to obtain congressional authorization but also failed follow the requirements of NEPA and the APA. And all of those injuries could be redressed by an order halting and setting aside Defendants' actions with respect to the Arch project. *See, e.g.*, *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025) (all that is required for redressability is that a judicial order would "likely" redress "at least some of" a plaintiff's injuries).

**B. The County Challenges Final Agency Action.**

The APA makes reviewable "final agency action." 5 U.S.C. § 704. For agency action to be "final" it must (1) "mark the consummation of the agency's decisionmaking process" and (2) "be

one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks omitted).

Here, both NPS's decision to construct the Arch and NPS's Revised FONSI constitute final agency actions subject to review under the APA. As to the first, NPS has reached a final decision to proceed with the Arch project and concluded (erroneously) that the project accords with all legal requirements. *See Anacostia Watershed Soc'y v. Babbit*, 871 F. Supp. 475, 480 (D.D.C. 1994) (NPS's record of decision was final agency action because "[t]here is simply nothing left for the Park Service to do."). As to the second, courts have consistently found that FONSIs constitute final agency action subject to review under the APA. *See Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 868 (9th Cir. 2022); *Cure Land, LLC v. U.S. Dep't of Agric.*, 833 F.3d 1223, 1231 (10th Cir. 2016); *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 813 (8th Cir. 2006); *S.W. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater*, 173 F.3d 1033, 1037 (6th Cir. 1999).

**C. NPS's Authorization to Construct the Arch Project Violates the APA.**

Plaintiffs are likely to succeed on the merits because Defendants' authorization to construct the Arch is contrary to numerous statutes; constitutes arbitrary and capricious agency action; and exceeds the statutory authority conferred by Congress.

*1. The Commemorative Works Act Prohibits Construction in Memorial Circle Without Express Congressional Authorization.*

The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). In making this determination, "[c]ourts must exercise their independent judgment" and "may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412-13 (2024).

The CWA prohibits construction of commemorative works within Area I (which encompasses Memorial Circle), unless "the recommendation [to construct the work] is approved by law not later than 150 … days after" Congress is notified of the recommendation of the Secretary of the Interior. 40 U.S.C. § 8908(b)(1). NPS has not sent any recommendation regarding the Arch to Congress or obtained legislative approval.[17] Defendants have also failed to comply with additional procedural requirements set forth in the CWA, including that Congress must designate a sponsor to establish a commemorative work, *id.* § 8902(a)(4), and the sponsor consult with the National Capital Memorial Advisory Commission regarding "alternative sites and design concepts," *id.* § 8905(a)(1).

Instead, the agency claimed the CWA does not preclude the Arch project because: (a) the Arch is not a "commemorative work" within the meaning of the Act; and (b) a 1925 plan for construction around Memorial Circle provides the requisite congressional authorization. *See, e.g.*, Defs.' Opp. to Pls.' Second Mot. for Prelim. Inj. at 5, 35-38, *Lemmon*, No. 1:26-cv-00544, Dkt. No. 74. Each of those assertions fails.

First, the Arch is plainly a "commemorative work." The CWA defines "commemorative work" as "any statue, monument, sculpture, memorial, plaque, inscription, or other structure or

---

[17] Nor has Congress carved out an exemption for the Arch, as it has for other commemorative works. *See, e.g.*, Pub. L. No. 108-126, § 101, 117 Stat. at 1348 (authorizing construction of Vietnam Veterans Memorial Visitor Center and stating that provision of 40 U.S.C. § 8908 "prohibiting the siting of a visitor center within the Reserve shall not apply"); Pub. L. No. 111-88, § 128, 123 Stat. 2904, 2933 (2009) (authorizing addition of plaque to World War II Memorial to commemorate Senator Dole's leadership, "[n]otwithstanding any other law"); Pub. L. No. 117-81, § 6605, 135 Stat. 1541, 2442 (2021) ("Notwithstanding [40 U.S.C. § 8908(c)], the National Global War on Terrorism Memorial . . . shall be located within the Reserve."); see also Jacob R. Straus, Cong. Rsch. Serv., IF11937, Commemorative Works Act: Siting Memorials in the District of Columbia 2 (2024), https://perma.cc/X6F7-HATM (collecting examples of exemptions authorized by Congress).

landscape feature, including a garden or memorial grove, designed to perpetuate in a permanent manner the memory of an individual, group, event or other significant element of American history." 40 U.S.C. § 8902(a)(1); *see also Friends of Iwo Jima v. Nat'l Cap. Planning Comm'n*, 176 F.3d 768, 772 (4th Cir. 1999). Here, the Arch is intended to "celebrate 250 years of American independence by honoring America's founding principles." Revised EA at 1. As the *Lemmon* court noted, NPS itself characterized the Arch in the Revised EA as a "major commemorative feature anchoring" Memorial Circle. *Lemmon*, Mem. Op. at 22 (citing Revised EA at A-2). The Arch is a structure celebrating a singularly significant moment in American history—its founding—and thus falls within the CWA's ambit.

Second, the 1925 plan does not authorize the Arch. The Memorial Bridge Commission proposed construction of "two stately columns" "framing in *but not interfering* with the view of the Lincoln Memorial from the direction of the Lee Mansion." Rep. at 41 (emphasis added); *see also* 43 Stat. 974 (approving the plans). The Commission did not recommend, and Congress did not approve, the construction of what NPS itself terms a "grand and ornate" 250-foot Arch. Revised EA at A-2. The CWA requires congressional approval of "*a* commemorative work," 40 U.S.C. § 8908(b)(1) (emphasis added)—*i.e.*, a specific proposed structure—not simply any indeterminate commemorative work. *See Niz-Chavez v. Garland*, 593 U.S. 155, 163 (2021) ("Congress's decision to use the indefinite article 'a' thus supplies some evidence that it used the term … as a discrete, countable thing."). Distant approval of a completely different structure a century ago does not meet that requirement.

NPS's reliance on the 1925 plan's approval of a completely different structure also ignores the CWA's focus on the aesthetics of specific designs. The Act was intended to ensure future works "are appropriately designed, constructed, and located; and reflect a consensus of the lasting

national significance of the subjects involved." 40 U.S.C. § 8901(4); *see also* 40 U.S.C. § 8905(b) (providing design criteria including "surroundings," "location," "material," "landscape features," and other "site-specific guidelines" to guide consideration of "site and design proposals."). In other words, the CWA cannot be satisfied with a one-size-fits-all authorization but requires congressional approval of the specific proposal.

Moreover, even if the 1925 Plan had ostensibly authorized the Arch, Congress's authorization expired long ago. The statute authorizing construction of Memorial Bridge and the attendant columns Defendants rely on references a "ten-year program of expenditures and construction." *See* Pub. L. No. 68-463, 43 Stat. 974 (1925). Needless to say, that time period has long since run.

*2. Section 8106 Bars Construction on NPS Land in the District.*

Section 8106 also plainly bars construction of the Arch. *See Nat'l Tr. for Hist. Pres. III*, 185 F.4th 1185, 1220 (D.C. Cir. Aug. 7, 2026) ("The plain text of Section 8106 unambiguously bars the ballroom construction, absent another statute providing the National Park Service with 'express authority' to construct buildings in federal parks in the District of Columbia.");[18] *see also Nat'l Park Serv. v. Nat'l Tr. for Hist. Pres. in the U.S.*, 609 U.S. 1068, 1076 (2026) (Roberts, C.J., dissenting) ("Pursuant to its plenary constitutional authority over the District of Columbia and federal property, Congress has explicitly prohibited the construction of any 'building or structure . . . on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress.'" (citation omitted)). Like the CWA, Section 8106 is project-specific: The statute refers to "[*a*] building or structure" requiring congressional

[18] Although the Supreme Court stayed the district court's preliminary injunction in the White House ballroom litigation, the majority of the Justices did not address the merits. *See Nat'l Tr. for Hist. Pres. v. NPS (IV)*, 609 U.S. 1068, 1075 (2026) ("Today, we do not pass upon the legality of the government's East Wing project.").

approval. Congress's approval of two slender columns over 100 years ago does not amount to current approval of a massive Arch. *Cf. Johnson v. Allstate Ins. Co.*, No. 95-151, 1996 WL 66231, at *2 (D. Me. Jan. 26, 1996) ("Caselaw … indicates that the choice of articles 'an' vs. 'the' makes a difference.").

*3. NPS's authorization to construct the Arch is contrary to its Organic Act.*

NPS's decision also violates the agency's Organic Act. The NPS Organic Act is "the most important statutory directive for the National Park Service." *Greater Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183, 190 (D.D.C. 2008) (citation omitted). The Organic Act provides that the Secretary, "acting through the Director of the National Park Service, shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units." 54 U.S.C. § 100101(a). That purpose is "to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." *Id.*; *see also Greater Yellowstone*, 577 F. Supp. 2d at 191 (the Organic Act imposes a "conservation mandate" on NPS). The "overriding aim of the Organic Act, as well as the purpose of NPS'[s] oversight and management of the park system, is to conserve the natural wonders of our nation's parks for future generations." *Bluewater Network v. Salazar*, 721 F. Supp. 2d 7, 21 (D.D.C. 2010).

Because the Arch will be located in the George Washington Memorial Parkway (GW Parkway) park unit within Lady Bird Johnson Park, Revised EA at 1-2, NPS's Organic Act obligations are supplemented by the Capper-Cramton Act, Pub. L. No. 71-284, which established the GW Parkway park unit in 1931. That statute specified that the Parkway is to serve as "a "park and parkway system,' including land for "playground, recreation center, community center, and similar municipal purposes." Pub. L. No. 71-284, 46 Stat. 482, 485 (1930). As described on the

Parkway's application for entry into the National Register of Historic Places, the GW Parkway was designed to "prevent[] development along the river corridor, and remove[] development potentially detrimental to the natural resources."[19]

Construction of the Arch will violate the Organic Act's conservation mandate. NPS is "forbidden from taking any action that is not consistent with its conservation mission unless Congress has 'directly and specifically' authorized the harmful activity." *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 290-91 (4th Cir. 2018). Yet nowhere did Congress authorize construction of a massive arch within the GW Parkway park unit—much less a military complex hosting snipers, drones, and large stockpiles of ammunition—nor did Congress appropriate funds for that purpose. The Arch project will not further the purposes of the GW Parkway or preserve its scenery or historic nature. And while the Parkway was set aside to prevent environmentally detrimental development, construction of the Arch will add development, not remove it. It is hard to imagine a project less consonant with an area intended for recreation than a large tourist and military complex.

Moreover, NPS engaged in a cursory review process that was predetermined by the President's determination to complete this project—indeed, NPS's NEPA and NHPA review never even considered any other alternative. Although construction within the GW Parkway may be consistent with the Organic Act and the Capper-Cramton Act where NPS carefully considers alternatives and selects the least intrusive design, *see Daingerfield Island Prot. Soc'y v. Babbit*, 823 F. Supp. 950, 956 (D.D.C. 1993), NPS here chose the very alternative that creates the most

---

[19] Nat'l Park Serv., Lady Bird Johnson Park, https://perma.cc/TC58-HMSJ (last updated Jan. 5, 2024) at 2.

disruption to the natural resources of the GW Parkway and the surrounding area. That choice violates NPS's duties under the Organic Act.

*4. NPS's decision to construct the Arch is arbitrary and capricious.*

NPS's decision to authorize construction of the Arch is also arbitrary and capricious. Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Agency action is arbitrary and capricious if the agency relies on factors that Congress did not intend for it to consider, entirely ignores important aspects of the problem, explains its decision in a manner contrary to the evidence before it, or reaches a decision that is so implausible that it cannot be ascribed to a difference in view." *United States v. F/V Alice Amanda*, 987 F.2d 1078, 1085 (4th Cir. 1993). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Nevertheless, courts "must ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (*quoting State Farm*, 463 U.S. at 43). "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained." *Id*. (emphasis added) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). NPS's decision here is arbitrary and capricious for several reasons.

First, NPS provides no reasonable explanation why the Arch is necessary in the first instance, nor why any arch (or other structure) must be located in Memorial Circle, particularly given the strident opposition that the agency has acknowledged but largely ignored in service of the President's preferences. This failure is patently unreasonable when considered against the

agency's conservation mandate, which requires the agency to preserve national parks, including GW Parkway, for public enjoyment. *See Sierra Club v. Andrus*, 487 F. Supp. 443, 448–49 (D.D.C. 1980) (Congress "clearly set some limit on the Secretary's discretion in discharging his statutory duties"); *See also Nat'l Tr. for Hist. Pres.*, 185 F.4th at 1222; *Greater Yellowstone*, 577 F. Supp. 2d at 193 (while the Organic Act confers discretion on the Park Service in determining how best to protect Park resources, that discretion is "not unlimited" and is "bounded by the terms of the Organic Act itself") (quotation marks and citation omitted).

Second, NPS's entire legal compliance and review process was nothing more than a charade. President Trump announced his intention to construct the Arch in October 2025 and has never wavered from his conviction to see the project completed as quickly as possible despite public criticism and litigation. *See supra* Background. While NPS has purported to engage in a routine decisional process to consider whether to authorize an Arch to celebrate America's founding, its truncated review and rush to reach a final approval demonstrate that the entire process has been a sham to shore up legal justifications for carrying out the President's latest vanity project. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (APA review "ensure[s] that agencies offer genuine justifications for important decisions" "that can be scrutinized by courts and the interested public.").

Among other things, NPS: (a) abruptly terminated the consultation process required under the NHPA without making a true good-faith attempt to reach a memorandum of understanding, *see* Farris Decl. ¶¶ 8-10; (b) unreasonably rushed out flawed and unreasoned EAs and FONSIs, *see infra* § D; (c) invoked statutory authority that on its face does not justify construction of the Triumphal Arch while flouting the requirements of the CWA and Section 8106; and (d) rushed to

secure approval from the NCPC, which has been stacked with the President's allies,[20] in a late-night session after some ten hours of vehement public opposition. No matter the outcome of any step in this purported decisional process, NPS was never going to reach any decision other than the one announced by President Trump last year and consistently maintained since. This Court is "not required to exhibit a naiveté from which ordinary citizens are free," or to "ignore the disconnect between the decision made and the explanation given." *Dep't of Com.*, 588 U.S. at 785. Nor can the agency simply rely on "the excuse 'the President made us do this.'" *County of King v. Turner*, 189 F.4th 819, 826 (9th Cir. 2026).

NPS's claim to be fulfilling the 1925 plan for Memorial Bridge (which included narrow columns, not a massive arch) is also pretextual. The government only invoked that century-old plan some six months after the President's announcement drew significant controversy (and had spawned litigation). And the total incongruence between the 1925 vision for the area and the current plan for a military complex hosting snipers, drones, and large stockpiles of ammunition in a tourist destination belies NPS's claim to be faithfully executing the Memorial Bridge Commission's design. *See* Hegseth Decl. ¶ 16 (the Arch "will provide permanent infrastructure to see, communicate, coordinate, and respond" as part of the "broader, layered air-defense and counter-drone network"). Either the true purpose of the Arch is to serve as a military installation and NPS's claim to be fulfilling the 1925 plan is pretextual—or the military purpose is a sham aimed at insulating Defendants' actions from judicial review by invoking national security. Either way, this Court need not ignore "an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process," because "[a]ccepting

---

[20] Dan Diamond, *Trump Shuffles Key Federal Panel Ahead of Vote on His Arch*, The Wash. Post (Oct. 21, 2026), https://perma.cc/M6DM-44S7.

contrived reasons would defeat the purpose of the enterprise" and turn "judicial review" into "an empty ritual." *Dep't of Commerce*, 588 U.S. at 785.

Third, NPS utterly "ignore[d]" one of the most "important aspect[s] of the problem" before it, *Ohio v. EPA*, 603 U.S. 279, 293 (2024) (internal quotation omitted)—the administration's broader plan to convert the Arch into "a dual-purpose structure: a major national monument that also incorporates military utility to support Homeland defense." Hegseth Decl. ¶ 10. As both the Secretaries of Homeland Security and Defense have attested in *Lemmon*, *see* Miller Decl. ¶¶ 29-31, the Executive Branch claims to intend to use the Arch for surveillance and defense capabilities. It is self-evident that a national-security site used to store large quantities of dangerous ammunition and supply lethal force to protect the National Capital Region will need to be a secure facility, not one which tourists and visitors can freely enter to sightsee. By outright refusing to consider those plans as "not within NPS's or the Department of the Interior's regulatory authority," Decision Record at 9, NPS failed to consider the serious safety risks inherent in housing ammunition at a site where there is not even a fire hydrant nearby, or inviting tourists to view the national monuments from a sniper's nest, and failed to evaluate how that military purpose and use comports with Congress's instruction that the GW Parkway should be a site for recreation and transit. *See Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 433 (D.C. Cir. 2018) (agency acts arbitrarily and capriciously by ignoring dangers created by its action). NPS also failed to consider the impact that a major military complex intended for drone warfare would have on the environment, on the protected park land of the GW Parkway, on other historic properties in the region, on mourners at Arlington Cemetery, or on Arlington County and its residents. NPS failed even to consider whether the placement of lethal war-fighting capabilities is compatible with the congressional purpose to

preserve and maintain scenic natural lands and wildlife in our national parks. By failing to consider these critical issues before authorizing construction, NPS acted arbitrarily and capriciously.

Fourth, NPS "offered an explanation for its decision that runs counter to the evidence." *State Farm*, 463 U.S. at 43. For example, NPS relied on a faulty and overly narrow traffic study that failed to capture the true impacts of the Arch. As the County's declarant explains, based on his 30 years' experience in this field, the agency employed an artificially narrow study area that circumscribed the analysis when compared to the agency's prior studies in that same area. Nabors Decl. ¶ 13. So too, the agency erred in blindly adopting the FAA's specious finding that the Arch would not pose a significant danger to air navigation around DCA. The FAA ignored that construction cranes may rise to over 320 feet, well over the intended height of the completed Arch. Fusarelli Decl. ¶ 17. And the FAA explicitly declined to consider the impact of the Arch on airlines' one-engine inoperative plans, even though the Arch will intrude on the single safety corridor currently established in those plans. *Id.* ¶¶ 11-19. NPS accepted the FAA's analysis without even acknowledging these flaws.

Finally, NPS's decision is so utterly illogical that it cannot be ascribed to differences in reasonable policy judgment. The APA requires that agency action be "reasonable and reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423. Constructing a massive Arch on national park land intended to preserve the scenery and forestall development, while purporting to rely on a defunct, century-old plan to construct two slender columns that would have framed, not obstructed, the view, is wholly arbitrary. So too is claiming the Arch will permit tourists to experience "free time within the public area" of a military installation intended for lethal force to protect the national capital region. *See* Decision Record at 9. NPS's rationale is inherently contradictory and unreasonable.

*5. NPS's decision exceeds its statutory authority.*

Finally, NPS exceeded its statutory authority by greenlighting construction of a massive military project on protected national park land without express congressional authorization. "[A]n agency literally has no power to act … unless and until Congress confers power on it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Nowhere has Congress authorized NPS to build military or defense complexes on national park land, and certainly not in the nation's capital, where Congress has made the contrary determination to explicitly forestall development in certain areas without specific authorization. Contrary to NPS's assertion, the 1925 Act provides no discretion or other power to construct the Arch, a project far removed in time and scope from the slender columns envisioned a century ago. And the NPS Organic Act is a mandate to conserve park land unimpaired, not a blank check to construct whatever monument a President demands. NPS thus exceeded its legal authority in violation of the APA.

**D. NPS's NEPA Review Was Insufficient.**

NPS's statement of purpose and need and evaluation of alternatives did not fulfill NEPA's requirements. Under NEPA, an agency must consider reasonable alternatives to the proposed action. 42 U.S.C. § 4332(2)(C). The scope of an agency's obligation to evaluate alternatives is defined by the project's purpose and need, which is the agency's statement of the "goals" and objectives of the project. *See City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). While an agency's obligation to consider alternatives is lessened when preparing an EA, *see Mt. Lookout-Mt. Nebo Prop. Prot. Ass'n v. FERC*, 143 F.3d 165, 172 (4th Cir. 1998), the "existence of a 'viable but unexamined alternative' renders the environmental review conducted under NEPA inadequate." *Env't Def. Ctr.*, 36 F.4th at 877 (citation omitted).

In its original EA, NPS defined the purpose and need for the project as "celebrat[ing] 250 years of American independence by honoring America's founding principles through installation

of *a structure* at the intersection of Arlington Memorial Bridge and Memorial Avenue within George Washington Memorial Parkway, in a manner consistent with the avenue's established role as a ceremonial gateway and 'Avenue of Heroes' celebrating valor, sacrifice, and American heritage." EA at 4 (emphasis added). Against that broad purpose and need, NPS assessed only one possibility: construction of the Arch that President Trump had announced months earlier. EA at 6-7. Although NPS has claimed that columns were originally envisioned for the site decades ago, the agency did not consider that alternative. Nor did it consider any other alternative, including honoring America's founding principles through construction of an arch (or any other structure) at a location other than Memorial Circle.

The day after the County filed this suit, NPS released an amended EA and FONSI. The Revised EA made a subtle yet substantial tweak to the project's stated purpose and need: Rather than describe the purpose broadly as construction of "a structure," NPS now referred to the need as simply construction of "an arch." Revised EA at 1. The Revised EA also included an appendix that offers new post-hoc explanations for why the agency rejected all non-Arch alternatives and all alternatives not located at Memorial Circle. Revised EA at A-1. According to the appendix, NPS "dismissed alternative locations outside Memorial Circle because the proposed undertaking is grounded in the historic design intent for the Arlington Memorial Bridge and Memorial Avenue corridor. The location is not being treated as an interchangeable site for a new commemorative feature; rather, it is the specific location identified in the historic planning framework for the bridge, Memorial Avenue, and Columbia Island/Memorial Circle." Revised EA at A-1. Accordingly, NPS stated that, while "[a]lternative locations may reduce or avoid some adverse effects associated with Memorial Circle, [ ] they would also sever the project from the specific historic planning precedent that provides the rationale for the undertaking's placement." *Id*. The

Revised EA did not mention any need to construct a structure whose "height and strategic location provide enhanced lines of sight … critical to … security operations."[21]

NPS also rejected construction of a structure other than an arch. The agency admitted that "[d]uring the planning process . . . a wide range of alternative concepts were suggested, including smaller or more discreet commemorations and landscape-based features." Revised EA at A-2. NPS rejected those suggestions, however, on the grounds that "[t]he purpose and need for action is to celebrate 250 years of American independence by honoring America's founding principles through installation of an Arch in Memorial Circle," *id*., and "[t]he proposed Arch's size, design and statuary are intended to celebrate America's independence through a grand and ornate design. Thus, alternative designs and concepts that did not meet this purpose and need were dismissed." *Id*.

NPS's purpose-and-need statement and consideration of alternatives were unreasonable in several respects. First, although the original purpose-and-need statement merely described installation of a "structure," EA at 4, the agency initially evaluated only construction of an arch, *id*. at 6-7, and as alternatives considered only construction of smaller arches. *Id*. at A-1. NPS's failure to consider alternatives including the very 1925 column proposal the agency has relied on as authorizing the project is patently arbitrary and capricious. *See Env't Def. Ctr.*, 36 F.4th at 876 ("The existence of a viable but unexamined alternative renders an EA inadequate.") (internal citations and quotations omitted).

Second, in the Revised EA, NPS narrowed the stated purpose and need to refer to "installation of an arch" (rather than a "structure"). Revised EA at 1. But an agency "may not define the objectives of its action in terms so unreasonably narrow" as to preclude review of

[21] Hegseth Decl. ¶ 10, *supra* note 8.

reasonable alternatives. *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991). NPS gave no reasonable explanation why the purpose and need of the project could be achieved only by construction of an arch rather than any other structure as first contemplated. Moreover, NPS's stated purpose and need entirely ignored the claimed military need for the structure. *See Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000) (agency's NEPA review "must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made.").

Third, the Revised EA's truncated analysis of smaller arches, alternative locations, and other potential structures, Revised EA at A-1-2, did not meet the agency's burden to consider reasonable alternatives. The agency discounted smaller arches because they would "not create any new viewing opportunities," dismissed alternative locations on the ground that Memorial Circle was supposedly "the specific location identified in the historic planning framework for the bridge," and claimed the Arch is consistent with the GW Parkway because the Arch will offer "a new elevated vantage point." Revised EA at A-1. But those explanations are again contradicted by the agency's refusal to consider the columns it invokes as authority for the project in the first instance.

The agency also claimed that a "grand and ornate design" is necessary, *id.* at A-2, but never explained why. By failing to offer "a logically coherent explanation for its decision," *High Country Conservation Advocs. v. U.S. Forest Serv.*, 951 F.3d 1217, 1227 (10th Cir. 2020), NPS violated NEPA.

## II. The County Will Suffer Irreparable Harm Absent Preliminary Relief.

"The role of a preliminary injunction is to protect the plaintiff from suffering new or additional irreparable harm between the time the preliminary injunction is entered and the case's final resolution." *AFSCME*, 172 F.4th at 372. "Irreparable harm need only be likely; it need not be

certain." *PSEG Renewable Transmission LLC v. Arentz Fam., LP*, 185 F.4th 497, 513 (4th Cir. 2026). Here, the County is likely to suffer irreparable harm from construction of the Arch in numerous respects.[22]

First, the disruption to County emergency services that will result from traffic congestion and road closures during and after construction of the Arch constitutes irreparable harm to the County, not to mention its residents. Miller Decl. ¶¶ 7-21; *see Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (finding irreparable harm where state enforcement action against air ambulance service provider would have, among other things, left customers without emergency services); *see also New York v. Shinnecock Indian Nation,* 280 F. Supp. 2d 1, 4 (E.D.N.Y. 2003) (finding irreparable harm where "local roads in the area are not sufficient to handle the present traffic congestion, much less the number of vehicles estimated to travel to the proposed [project]."); *Stat Emergency Med. Serv., Inc. v. Saginaw Valley Med. Ctrl. Auth.*, No. 13-14960, 2016 WL 3902742, at *10 (E.D. Mich. July 19, 2016) (finding irreparable harm stemming from "inability to operate [ ] emergency medical services business").

Second, the County faces irreparable harm in the form of increased costs it cannot recoup from the federal government. *See Maryland v. United States Dep't of Agric.*, 770 F. Supp. 3d 779, 813 (D. Md. 2025) ("the harm is irreparable because money damages are likely not available"). The Fourth Circuit has acknowledged that a required "diversion of resources" constitutes "significant and irreparable injuries." *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021). Here, the County will face substantial increased costs from the need to undertake immediate planning to mitigate the traffic effects of construction, Nabors Decl. ¶ 22-25, and from the need to rework its

[22] That the *Lemmon* court has entered a temporary restraining order does not change this calculus, particularly where that order will expire before Plaintiffs' motion is noted for a hearing.

emergency-services planning to offset congestion around Memorial Circle, Miller Decl. ¶¶ 22-24. And over time, the County will lose revenue on its bus routes as on-time performance on affected routes suffers. Nabors Decl. ¶ 16.

Third, the County faces irreparable harm from the safety risks the Arch will pose. The Arch will raise the threat of irreparable harm due to accidents and flight disruption, both during construction and when completed. Miller Decl. ¶¶ 29-31; Fusarelli Decl. ¶¶ 11-17; *see United States v. City of Berkeley*, 735 F. Supp. 937, 938, 940 (E.D. Mo. 1990) (finding delay in construction of a radar system at an airport caused "a threat of irreparable harm" because a delay "could deprive the flying public of enhanced air safety for several years and disrupt a national program to improve air traffic control safety."); *Scott v. City Council for City of Santa Monica*, No. 17-7329, 2017 WL 4511380, at *2-3 (C.D. Cal. Oct. 8, 2017) (finding irreparable harm where plaintiffs contended that "flight at lower altitude over densely populated areas increases the risk to pilots, such as by eliminating the ability to turn back to land on the departure runway in the event of engine or other mechanical failures"). "The standard for preliminary injunctive relief requires a *threat* of irreparable harm, not that irreparable harm already have occurred." *Mullins v. City of New York*, 626 F.3d 47, 55 (2d. Cir. 2010). And as explained in the Nabors declaration, "[i]ncreased congestion in and around the Circle may result in more crashes involving vehicles, pedestrians, cyclists, and people using micromobility devices that require mitigation and the potential deployment of County resources." Nabors Decl. ¶ 9. The Arch also poses risks to cyclist and pedestrian safety during construction. *See, e.g.*, *Cnty. of Berks v. Otis Elevator Co.*, No. 15-cv-4862, 2015 WL 5585732, at *3 (E.D. Pa. Sept. 23, 2015) (injunction "[wa]s necessary to prevent immediate and irreparable harm" because "the evidence demonstrates that there are thousands of

individuals who use the elevators on a daily basis and who could potentially be harmed by a malfunctioning elevator.").

Fourth, the County faces irreparable harm in the form of environmental damage that the Fourth Circuit has recognized is presumptively irreparable. *North Carolina v. City of Va. Beach*, 951 F.2d 596, 603 (4th Cir. 1991) ("our decisions have favored injunctions when a NEPA review is required and has not been conducted"). Here, for the reasons described above, NPS's NEPA review was insufficient (including ignoring the military aspects of the Arch), and circuit precedent weighs in favor of emergency relief.

## III. The Equities Favor Entering an Injunction and Preserving the Status Quo.

Finally, the equities favor issuance of an injunction. The final two factors—the balance of the equities and the public interest—"merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

First, "the public undoubtedly has an interest in seeing its governmental institutions follow the law." *Roe v. Dep't of Def.*, 947 F.3d at 230–31 (quotation marks omitted); *see also Nat'l Tr. for Historic Pres. III*, 2026 WL 2276494, at *42 ("National parklands in the District are 'unique resources that the Federal Government holds in trust for the American people.'" (quotation omitted). "Congress has not given the Park Service authority, specifically and expressly, or otherwise, to [disrupt] protected historic sites in the name of presidential functions or national security. As the Defendants are very likely without statutory authority to act, those interests cannot carry the weight that the Defendants claim in the balancing of interests." *Nat'l Tr. for Hist. Pres.*, 185 F.4th at 1238.

Second, "[o]rdinarily, the balance of equities strongly favors preserving the status quo, not disrupting it." *Ams. for Prosperity Found. v. Albence*, No. 26-2469, 2026 WL 2563151, at *1 (3d.

Cir. Aug. 31, 2026). Defendants provide no persuasive rationale why construction needs to commence imminently, nor does their belated national-security justification change the calculus. *See Nat'l Trust for Historic Pres.*, 185 F.4th at 1239 ("Nowhere do the Defendants explain how this newly asserted national security requirement that either did not exist or was withheld" later "materialized . . . with such force that it should have tilted the . . . balance of equities in the Defendants' favor. Such shifting and contradictory positions are a frail reed on which to rest equitable arguments.").

Finally, "[t]he purpose of a preliminary injunction is to preserve the status quo until there is a trial on the merits." *Maryland*, 770 F. Supp. 3d at 815, and it is plainly in the public interest to halt construction before it begins rather than waiting to undo Defendants' unlawful actions once the project is underway. *See Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 201 (3d. Cir. 2024) ("Case preservation is thus the main reason that the benefits of a preliminary injunction may outweigh its risks."). Defendants are once again racing to outrun judicial review and undoubtedly will argue, once construction is in full swing, that the Court cannot halt ongoing operations without imposing costs on the federal government and affecting national security. Yet as soon as NPS begins closing roads, excavating dirt, and sinking deep caissons into Memorial Circle, the County (among many other affected parties) will suffer irreparable harm. The Court should preserve the status quo now and forestall Defendants' unlawful construction before it begins. *See Nat'l Tr. for Hist. Pres. v. NPS (II)*, 827 F. Supp. 3d 93, 115 n.19 (D.D.C. 2026) (reasoning that if the court were to "allow construction to continue while the case progresses, any eventual victory on the merits for the [plaintiff] may … prove to be too little, too late").

### IV. If It Becomes Necessary, the Court Should Enter an Administrative Stay to Protect the County.

As explained in the County's cover motion, the County is not currently seeking emergency relief in light of the temporary restraining order entered by the *Lemmon* court. If that order is stayed or lifted before the County can be heard on the relief requested here, however—or if Defendants appear to take any steps toward commencing construction despite that order—the County reserves the right to supplement this motion with a request for an immediate administrative stay sufficient to protect the County during the intervening time period. *See Texas*, 144 S. Ct. at 798 (the point of an administrative stay "is to minimize harm while an appellate court deliberates") (Barrett, J., concurring); *see also Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget*, 763 F. Supp. 3d 13, 17 (D.D.C. 2025) ("While administrative stays are more common in appellate courts, district courts have recognized their applicability in cases seeking emergency relief under the APA."). Should such a stay become necessary, the balance of the equities described above will favor entering an administrative stay to protect the status quo pending this Court's consideration of the instant motion.

## CONCLUSION

For the foregoing reasons, the Court should enter a preliminary injunction and stay under Section 705 of the APA according to the terms of the County's proposed order.

November 6, 2026

Respectfully submitted,

*<u>/s/_Catherine M.A. Carroll__</u>*
Catherine M.A. Carroll (VA Bar No. 50939)
Kate Talmor+ (DC Bar No. 90036191)
Gregory M. Cumming+ (DC Bar No. 1018173)
Brian D. Netter+ (DC Bar No. 979362)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043

Ryan Samuel (VA Bar No. 84400)
County Attorney
Arlington County Attorney's Office
2100 Clarendon Blvd. Suite 403
Arlington, Virginia 22201
Phone: (703) 228-3100
Fax: (703) 228-7106

rsamuel@arlingtonva.us

Phone: (202) 448-9090
Fax: (202) 796-4426
ccarroll@democracyforward.org
ktalmor@democracyforward.org
gcumming@democracyforward.org

*Counsel for Plaintiff*

+ Admitted pro hac vice

**CERTIFICATE OF SERVICE**

I hereby certify that on the 6th day of November, 2026, I will cause the foregoing to be electronically filed with the Clerk of Court and all Parties using the CM/ECF system.

*/s/_Catherine M.A. Carroll__*
Catherine M.A. Carroll (VA Bar No. 50939)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
ccarroll@democracyforward.org

*Counsel for Plaintiff*