# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

**COUNTY BOARD OF ARLINGTON COUNTY, VIRGINIA,**

*Plaintiff,*

v.

**NATIONAL PARK SERVICE**, *et al.*,

*Defendants.*

Case No. 1:26-cv-03372

**DECLARATION OF LORIN FARRIS IN SUPPORT OF PLAINTIFF'S MOTION FOR EMERGENCY RELIEF**

I, Lorin Farris, declare as follows:

1. I am over eighteen years of age and competent to make this declaration. The facts stated here are based on my personal knowledge, on my review of records maintained by Arlington County ("the County") in the ordinary course of its business, on my review of documents prepared by the National Park Service ("NPS") for the proposed Triumphal Arch at Memorial Circle ("the Arch" or "the Arch project"), and on information provided to me by County staff in the course of my official duties. If called as a witness, I could and would testify competently to these facts.

**Background**

2. I am the Historic Preservation Section Supervisor in the County's Department of Community Planning, Housing & Development, where I oversee implementation of the County's Historic Preservation Program. I have worked in the historic preservation field for twenty-three years. I graduated from Longwood University with a bachelor's degree in history in 2001 and earned a master's degree in historic preservation from the Goucher College in 2012. From 2003

to 2012, I worked for several historic preservation and history organizations, such as the National Trust for Historic Preservation, the Smithsonian Institution, and Montgomery County Government. From 2012 to 2019, I worked as an architectural historian for a private cultural resource management firm. In 2019, I joined Arlington County's Historic Preservation Program as Principal Planner, and in 2025, I was promoted to Historic Preservation Section Supervisor. My education and professional experience meet the Secretary of the Interior's Professional Qualification Standards for Historic Preservation and History.

3. Among my responsibilities, I supervise and oversee the County's participation in reviews conducted under Section 106 of the National Historic Preservation Act, 54 U.S.C. § 306108, for federal undertakings that may affect historic properties in Arlington County. In this capacity, I supervise the County staff member principally responsible for the County's participation as a consulting party in NPS's Section 106 review of the Arch project.

4. I submit this declaration to describe how construction of the Triumphal Arch will harm historic resources in Arlington County and the County's Historic Preservation Program, and how NPS's failure to fully identify and analyze those effects has impaired the County's ability to protect them.

**The County's Historic Preservation Program**

5. The County maintains a Historic Preservation Program that identifies, documents, and protects historic resources in the County and helps private property owners steward those resources. The Program's work is not limited to County-owned property; much of Arlington's historic fabric consists of privately owned homes, commercial buildings, and neighborhoods, and the Program works with owners and communities to recognize and preserve them.

6. Part of that work is broadly assisting owners in their pursuit of being listed in the National Register of Historic Places. National Register listing can give property owners access to

financial incentives, including federal rehabilitation tax credits for eligible income-producing properties, state rehabilitation tax credits for qualifying rehabilitation work at owner-occupied and/or income-producing properties, potential tax deductions through preservation easements, and eligibility for certain federal, state, and local preservation grants and loan programs. Listing also ensures that the effects of federally funded, licensed, or assisted projects on the property are considered through the Section 106 review process. And designation formally recognizes a property's historic significance, enhancing its prestige, public visibility, and potential long-term market appeal. Each additional property that is identified and recognized also strengthens the documented record of Arlington's history and the Program's ability to help owners care for their historic properties.

7. A property may be eligible for the National Register if it is generally at least fifty years old, retains integrity, and is significant under one or more of the National Register criteria at the national, state, or local level and/or is significant under one of the National Register Criteria Considerations. A property may therefore be eligible because of its importance to Arlington's local history alone, even if it has no national or statewide significance. Many such properties in Arlington are eligible for the National Register but have not yet been listed.

**The County's Participation in the Section 106 Review**

8. The County participated as a consulting party in NPS's Section 106 review of the Arch project. Throughout that process, the County has raised three principal concerns.

(a) First, NPS has not adequately considered alternative designs or locations for the project that could avoid or minimize adverse effects on historic resources. The Section 106 process does not require that every adverse effect be avoided, but it is designed to build consensus around ways to avoid, minimize, or mitigate those effects—and that cannot happen if the agency considers only one option. The

Arch as proposed will have much more significant effects on historic resources than alternatives that NPS could (and should) have considered.

(b) Second, NPS has repeatedly justified its choice of Memorial Circle by pointing to historical plans for the site, as set forth in the Arlington Memorial Bridge Commission's 1924 report. As the County has explained, those plans envisioned two columns designed to enhance—not obstruct—the view between Arlington House and the Lincoln Memorial. The proposed 250-foot Triumphal Arch bears no resemblance to that initial plan. And NPS has not even considered, as an alternative, building what those plans actually contemplated (*i.e.*, two narrow columns).

(c) Third, NPS has not completed a comprehensive, *i.e.*, adequate, identification of the historic properties eligible for listing on the National Register of Historic Places that the Arch may affect. This specific concern was first brought forward in a memorandum written and submitted to NPS on August 6, 2026 (Exhibit A). It was again noted in a memorandum written on September 4, 2026, and shared with NPS on September 16, 2026 (Exhibit B). Additionally, to our staff's knowledge, NPS has not provided or conducted a comprehensive archaeological study of the site past the Phase IA study already completed. The Phase IA study recommended that further studies be conducted prior to excavation and construction (Exhibit C – Triumphal Arch at Memorial Circle Assessment of Effects Report, June 2026, pgs. 19 – 20). Arlington County's request for further archaeological studies was first shared with NPS in an email written and sent to NPS on June 15, 2026, and in subsequent memorandums.

9. The County has also objected to the atypical, compressed timeline NPS imposed. On June 15, 2026, the County's Historic Preservation Program submitted written comments to NPS as a Section 106 consulting party. Those comments objected that NPS's ten-day review period for the draft Programmatic Agreement and Assessment of Effects "did not follow the standard process for Section 106," and asked NPS to share the agency's draft Environmental Assessment ("EA") with the County. Three days later, on June 18, 2026, NPS issued the final EA together with its Finding of No Significant Impact ("FONSI").

10. The County also objected to the abrupt termination of Section 106 consultation for this project. On September 24, 2026, Arlington County's Historic Preservation Program was notified of the Advisory Council of Historic Preservation's decision to suddenly terminate Section 106 consultation for the Arch project, citing NPS's determination that "additional consultation on the existing proposal [would be] unlikely to result in agreement on an MOA to resolve adverse effects." The Advisory Council requested that all consulting parties provide their comments on the termination by September 29, 2026, just five days after the original notification. In both a memorandum and a virtual consulting parties meeting on September 29, 2026 Arlington County's Historic Preservation Program shared with the Advisory Council that it objected to the premature termination of the Section 106 process "considering that NPS [had] not made a good faith effort to address the concerns brought forward by numerous consulting parties," including Arlington County. On October 9, 2026, the Advisory Council shared with consulting parties a letter notifying the Secretary of the Interior of their decision to terminate Section 106 consultation and on October 13, 2026, the Secretary acknowledged receipt of the letter and noted that a final decision about the undertaking would be made by his office after the

National Capital Planning Commission meeting on November 5, 2026, when the project would be reviewed.

**The Arch Will Cause Significant Adverse Effects on Historic Resources in Arlington**

11. NPS concedes that the Arch will have adverse direct and indirect effects on historic resources. The EA acknowledges that the Arch would "alter a defining sightline" between Arlington House and the Lincoln Memorial and would "introduc[e] a visually dominant vertical element into an area historically defined by open space and low structural forms." EA at 20, 29.

12. Outside the area immediately surrounding Memorial Circle, the Arch's greatest impact on Arlington's historic resources will be visual. Rising 250 feet, the Arch will be visible from, and will cause significant adverse visual effects on, multiple higher-elevation historic neighborhoods in Arlington, including Rosslyn, Radnor/Fort Myer Heights, Clarendon-Courthouse, Lyon Park, Penrose, Foxcroft Heights, and Arlington View. It will impair the integrity of historic resources in the County, including their feeling, setting, and design—aspects on which National Register eligibility depends.

13. Those visual effects will extend into the night. Because of the Arch's height and proximity to Reagan National Airport, it must carry an aviation warning; current plans show an "eternal flame" atop the Arch for that purpose, and the project also includes significant exterior flood lighting. Those lights will compound the Arch's adverse nighttime visual effects on surrounding historic resources.

14. The changed sight lines also threaten to decrease the property values and aesthetic appeal of many historic and high-value residential properties in Arlington, which would in turn reduce tax revenue to the County and the funds available for core services for its residents.

**NPS Failed to Identify the Full Range of Affected Historic Properties**

15. Although NPS concedes the Arch will cause adverse effects, it has not identified the full universe of historic properties the Arch will affect. NPS did not complete a comprehensive architectural survey of the area to identify properties that are eligible for, but not yet listed on, the National Register. Those properties include privately owned homes and areas significant to Arlington's local history, such as the neighborhoods of Arlington View, Foxcroft Heights, Arlington Ridge, Pentagon City, and Crystal City, among others.

16. NPS also has not completed the archaeological investigation that its own Phase IA archaeological study indicates is needed. To my knowledge, NPS has not conducted additional comprehensive studies regarding archaeological resources that may be present at the site.

**These Failures Directly Harm the County**

17. NPS's failure to identify affected historic properties harms the County directly. Effects on historic properties that NPS has not identified cannot be avoided, minimized, or mitigated; a property cannot be protected if no one has found it.

18. As a consulting party, the County's Historic Preservation Program cannot advocate for avoidance or mitigation of adverse effects on properties that NPS never identified. The Program thus loses the ability to perform one of its core functions. The responsibility to comprehensively identify architectural and archaeological resources that may be affected by a proposed undertaking lies with the federal agency managing the Section 106 process, not with consulting parties. Per §800.4(b), the federal agency "shall take steps necessary to identify historic properties within the area of potential effects," which may include "background research, consultation, oral history interviews, sample field investigation, and field survey." In the spirit of cooperation and compliance with §800.4(a)(3), Arlington County's Historic Preservation Program offered to "provide greater information and coordination with information gathering

concerning these resources upon request within a reasonable timeframe of 15 days or more" in a memorandum shared with NPS on September 4, 2026. NPS never followed up to request additional information or to provide Arlington County with the requested comprehensive study of architectural resources.

19. And the Arch's effects on unrecognized historic resources will impair the County's ability to document and protect its local history and to help owners steward historic properties in the County—including by helping them pursue National Register listing and the incentives that come with it. Harm to properties significant to Arlington's local history is harm to the County's history itself.

20. A more fulsome environmental and historic preservation review would have required NPS to consider alternatives that might avoid these effects, to analyze the historic, cultural, and aesthetic effects of the project, and to respond to the County's comments. That process would give the County information it needs to protect historic resources in Arlington before irreversible construction begins.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 5, 2026, in Arlington, Virginia.

Lorin V. Farris
Historic Preservation Section Supervisor Department of
Community Planning, Housing & Development
Arlington County, Virginia

# Exhibit A

ARLINGTON VIRGINIA

DEPARTMENT OF COMMUNITY PLANNING, HOUSING & DEVELOPMENT
Neighborhood Services Division – Historic Preservation Program
2100 Clarendon Boulevard, Suite 700, Arlington, VA 22201
TEL 703.228.3830 www.arlingtonva.us

# Memorandum

**To:** Tammy Stidham, Associate Regional Director, National Park Service (NPS)

**Date:** August 6, 2026

**From:** Mical Durak, Historic Preservation Program (HPP), CPHD

**Subject:** HPP Feedback on Expanded APE and Viewshed Study and Applying Criteria of Adverse Effects

Thank you for reaching out to seek input on the datasets provided as well as how National Park Service (NPS) should apply the criteria of adverse effect to the historic resources that will be impacted by this proposed undertaking. Please see below for Arlington County's Historic Preservation Program's (HPP) comments:

*Feedback on the Updated Area of Potential Effects, Identified Historic Resources, and Viewshed Study:*

- HPP staff appreciate the expansion of the Area of Potential Effects (APE) to include a 3.5-mile radius around the project area given the significant height of the proposed arch. We also appreciate the additional consideration taken regarding the viewshed and the potential visual impact of this project on historic resources in both Arlington County and Washington, D.C.
  - However, it was unclear if this viewshed analysis accounted for different times of the year, and therefore, varying levels of vegetation. For example, was the estimated viewshed impact evaluated during the summer, when there is more vegetation, and the winter, when there is less? If this was considered, HPP staff suggest addressing the full methodology in the "Viewshed Analysis Summary" provided.
  - Additionally, the maps shared with the HPP note the APE inconsistently. On one, it is noted as the Study Area, whereas on others it is noted as the APE. Please clarify.
- We request that locally significant historic resources that are eligible for the National Register of Historic Places (NRHP), located within the APE, be included in the datasets presented and analyzed for impact. That information can be accessed through Arlington County's GIS mapping systems, and we are happy to provide greater information and coordination with information gathering concerning these resources upon request.
- Furthermore, HPP notes that an analysis of impact on archaeological resources located in the expanded APE must be completed. This data was not included in the information most recently shared. We look forward to reviewing that data in the future and note that it

is necessary for the provision of comprehensive comment and assessment of the impact of this proposed project.

- HPP staff found the datasets presented lacking in some clarity. For example, it was unclear if "Table 1: Historic Properties within the Area of Potential Effect, Adjacent and Overlapping the Project Area" corresponded only with the resources that were included in the viewshed of the project or all historic resources located within the APE. This should be addressed more clearly; if it is the latter, then it appears that data is missing from the table. Furthermore, the corresponding map for that table set should be noted as it was unclear which map HPP staff should review while reviewing the data presented in the table.
    - HPP staff also strongly suggest that these tables include a column for the address of each historic resource or that the table be split between resources located within Arlington County, Virginia and Washington, D.C.
- In "Table 2: Historic Properties within the Area of Potential Effect," HPP staff request a detailed explanation of this dataset, and which map corresponds with it. Furthermore, there were several resources for which a "Contributing Views/Vistas" was "Not identified." For example, this was the case for the Arlington Heights Historic District and the Penrose Historic District, both of which are in Arlington County. What does "not identified" mean? HPP staff request this be addressed in future iterations of the table.
- HPP staff suggest that NPS outline exactly the parameters they are utilizing for determining adverse effect, particularly for those resources that will experience an adverse visual effect. Providing clearly defined terms and insight into the methodology behind these determinations will be helpful to the public and to consulting parties when reviewing those determinations. For example, in "Table 3: Assessment of Adverse Effects," several of the resources have a note that "the proposed undertaking would only be visible from the rooftop level, and therefore, views to and from the resources would not be adversely affected by the proposed undertaking" which resulted in a determination that "no adverse effect [would be] anticipated." How was this standard applied to properties with other potential views impacted by the project? When determining viewshed with human scale in mind, is NPS considering only the facades of historic resources or secondary elevations too? Is it considering the public right-of-way only? Providing meaningful comment on this undertaking requires clearer guidance, defined terms, and an understanding of the proposed methodology.
- Finally, HPP staff reserve our final opinion about whether we concur with the suggested effects findings for the historic resources located within the APE for when that finalized data is presented to all consulting parties.

*Feedback on How to Apply Criteria for Adverse Effect:*

- Since making the determination of adverse effect for historic resources located within an APE is the responsibility of the federal agency managing the Section 106 process for a proposed undertaking, HPP staff, as a consulting party, did not apply the criteria of adverse effect on the 200+ listed properties as requested by NPS. We look forward to reviewing NPS's determinations of effect when that final data is presented. We do concur with NPS's preliminary finding of an adverse effect and welcome participating in future

conversations about how to mitigate or minimize that adverse effect to the historic resources in the APE.

- However, as requested by NPS, HPP staff does have guidance for NPS on how to apply the criteria of adverse effect to the listed historic properties in the APE:
  - Considering both the direct and indirect impact of an undertaking on historic resources is essential to determining adverse effect. For several resources in the APE, this proposed undertaking would have a direct and permanent physical and visual impact whereas others would experience a more indirect visual or atmospheric impact. Other aspects to consider include the potential for the proposed undertaking to physically destroy or partially damage historic properties, for the proposed undertaking to introduce alterations to a historic district that do not match the Secretary of the Interior's Standards for Rehabilitation, and for it to introduce a change to the property's physical setting or environment.
  - As NPS is aware, considering the seven aspects of integrity is also critical. For many resources located directly in the project area, their setting, design, feeling, and association could all be altered by this proposed undertaking and therefore, would impact that historic resource's ability to convey its historic significance.
  - Finally, NPS needs to consider the atmospheric and noise effects of this proposed undertaking. By NPS's estimation, the construction of the triumphal arch could last for two to three years. The noise and atmospheric effects from the construction of the arch would impact the historic resources in the APE for the duration of construction as well as the tenure of the structure itself. Those impacts will spread to areas outside of the immediate project area. Transportation modes and traffic around Memorial Circle will be significantly impacted by this proposed construction project. This will result in an increase in traffic to other parts of Arlington County and Washington, D.C. – as such, those areas will likely experience an increase in traffic noise, pollution, and other effects from increased vehicle traffic and roadway usage.

In conclusion, HPP staff would like to reiterate that the requested deadline for comments on this specific topic does not follow standard protocols and has impacted our ability to provide a comprehensive response. As with the past two engagements with consulting parties, it does not follow the standard Section 106 process. Requesting that consulting parties "apply the criteria of adverse effects on the listed properties" also strays from the standard Section 106 process. This attempts to shift the responsibility of the federal agency managing the Section 106 process for a proposed undertaking; therefore, we require further clarity as to exactly what NPS is requesting of Arlington County as a consulting party.

We welcome future opportunities to meaningfully engage in the Section 106 process for this undertaking in the future.

Mical Durak

Mical Durak
Historic Preservation Principal Planner

# Exhibit B

ARLINGTON VIRGINIA

DEPARTMENT OF COMMUNITY PLANNING, HOUSING & DEVELOPMENT
Neighborhood Services Division – Historic Preservation Program
2100 Clarendon Boulevard, Suite 700, Arlington, VA 22201
TEL 703.228.3830 www.arlingtonva.us

# Memorandum

**To:** Tammy Stidham, Associate Regional Director, National Park Service (NPS)

**Date:** September 4, 2026

**From:** Mical Durak, Historic Preservation Program (HPP), CPHD

**Subject:** HPP Feedback on Assessment of Effects Report – August 2026

Thank you for reaching out to seek input on the final Assessment of Effects (AoE) Report. Please see below for Arlington County's Historic Preservation Program's (HPP) comments:

*Feedback on the Assessment of Effects (AoE) Report:*

Proposed Undertaking:

- National Park Service (NPS) staff note in the "Proposed Undertaking" section of the report that the plans presented for the arch "may not reflect the final design" and that "dimensions will be finalized during future design efforts." (pg. 8). HPP staff understand that certain changes occur in the field to construction projects; however, we are uncomfortable that what is presented is an approximation of what could be constructed. We request that NPS clarify in the AoE any design features they anticipate may require adjustment in the future and provide an outline of how and when NPS will engage with consulting parties if that design (including its dimensions) is altered.
- HPP Staff request that NPS staff elaborate on how the arch would be utilized by the public. HPP staff are aware that the proposed arch would have an observation deck, but NPS also notes "the gallery level would contain exhibit space…with the possibility of including a café and gift shop" (pg. 9). On A-2.20 of Appendix F, HPP staff also see two rooms dedicated to "program space." What would be on display or exhibited inside the arch? Would it be a permanent exhibit or a rotating one? Could it be connected to any of the mitigation measures outlined by NPS in the AoE? Or would it focus solely on the commemoration of the 250th anniversary which is NPS' stated main purpose for this project? It is unclear to HPP staff how this proposed arch would be a new destination for learning and contemplation as noted by NPS on pg. 11.

Project Alternatives:

- NPS staff note in the "Project Alternatives" section that they did not evaluate other alternative locations for the proposed arch outside of Memorial Circle since the arch design is "grounded in the historic design intent of the Arlington Memorial Bridge and Memorial Avenue corridor" (pg. 10). Further, NPS notes that the design intent for this portion of the corridor was intended to include further construction/development.

  - While it appears that the original 1924 Report of the Arlington Memorial Bridge Commission called for the construction of vertical monumental elements at Columbia Island, the originally proposed columns framed the corridor and measured 33.5 feet wide and 166 feet tall. In short, the original proposal called for something significantly smaller and more to scale with the surrounding landscape in comparison to what is currently being proposed by NPS. The construction of a commemorative feature of that original scale in this area would comply with the original plans, but HPP staff believe that the scale and massing of the proposed 250-foot-tall triumphal arch fall outside of the original scope of that plan and do not comply with its intended spirit, undermining any reliance on the initial intentions.
- NPS staff also note that placing the arch in the George Washington Memorial Parkway (GWMP) is "consistent with the park's purpose as a scenic roadway…protecting the cultural and natural resources that frame the Potomac River corridor" (pg. 11).
  - HPP staff disagree with this assessment. The placement of the proposed triumphal arch within the parkway would have a direct adverse effect on the historic resource, would impact the viewshed of the parkway, and would not protect the natural resources of the Potomac River corridor. Per the National Register of Historic Places (NRHP) nomination form (1995) for the GWMP, it has "significance as an instrument of conservation and protection of scenic and recreational resources. By its very existence, it prevents development along the river corridor and removes development potentially detrimental to the natural resources." Development along and within the GWMP has historically been limited to ensure that the iconic vistas and views of the parkway are visible to those utilizing it. Furthermore, part of the stated significance of the GWMP is in its ability to limit development, such as the kind being proposed by NPS.
- Given these factors, HPP staff strongly recommend that alternative locations for the proposed triumphal arch should be explored by NPS and do not agree with the assessment that its placement is directly grounded in connection to either the original plans for the Memorial Corridor and the GWMP.

<u>Identification of Historic Properties:</u>

- As noted in 36 CFR § 800.16(1), a historic property means any prehistoric or historic district, site, building, structure, or object listed or <u>*eligible for*</u> listing in the NRHP. Per Appendix J: List of Historic Properties within the Project Area and Appendix K: List of Historic Properties within the APE, NPS has only identified historic properties listed on the NRHP or listed as eligible/potentially eligible by the Virginia Department of Historic Resources (DHR) staff, but has not identified all historic properties that are eligible for listing in the NRHP, such as properties that have not been previously identified but meet the age requirements for eligibility. A full architectural survey should be completed to assess eligibility and effect on eligible resources. Therefore, this assessment does not comply with 36 CFR § 800.16(1) and standard requirements for an AoE. For assistance with this assessment as it pertains to Arlington County historic resources, we are happy to provide greater information and coordination with information gathering concerning these resources upon request within a reasonable timeframe of 15 days or more.

- HPP staff appreciate the additional information shared in Appendix H: Landscape Renderings including the new viewpoints and views of the arch at night. As shown in the rendering from the "Lee House Portico – After," the view of the Lincoln Memorial is completely obscured by the proposed triumphal arch. If the stated purpose of the original Memorial Corridor plan was to connect the north (embodied by the Lincoln Memorial) and the south (embodied by Arlington House), the construction of the proposed triumphal arch does not achieve and maintain that stated purpose and instead, by NPS' own assessment, obscures that view.
- It is still unclear to HPP staff if the viewshed analysis completed by NPS accounted for different times of the year, and therefore, varying levels of vegetation. This was not addressed in the "Viewshed Analysis" section of the AoE.

Identification of Effects:

- HPP staff agree that Memorial Circle, Arlington Memorial Bridge, Memorial Avenue, Arlington National Cemetery, Arlington House, and the Lincoln Memorial corridor would have a substantial adverse effect from this undertaking. We also agree that the Lincoln Memorial Cultural Landscape, Lincoln Memorial, National Mall Site and National Mall Historic District, The Mall Cultural Landscape, Washington Monument, Washington Monument and Grounds Historic District, Washington Monument and Grounds Cultural Landscape, the East and West Potomac Park Historic District, L'Enfant Plan of the City of Washington, Arlington Ridge Park, Pentagon, Fort Myer NHL District, George Mason Memorial, Thomas Jefferson Memorial, Thomas Jefferson Memorial Cultural Landscape, United States Capitol, Georgetown Historic District, Old Naval Observatory, Observatory Hill Historic District, Key Bridge, National Cathedral, and National War College, to name a few, would all be adversely effected by this project due to the visual impact and alterations to their setting, context, and nighttime visual character.
  - However, until all historic properties eligible for listing in the NRHP are outlined in NPS' analysis (Appendix L: Assessment of Adverse Effects), HPP staff cannot provide our full assessment of this data.
- HPP staff continue to suggest that NPS outline exactly the parameters they are utilizing for determining adverse effects, particularly for those resources that will experience an adverse visual effect or indirect effect. For example, how did NPS determine viewshed impact from certain resources? When determining viewshed with human scale in mind, is NPS considering only the facades of historic resources or secondary elevations too? Is it considering the public right-of-way only? Providing clearly defined terms and insight into the methodology behind these determinations will be helpful to the public and necessary for consulting parties when reviewing those determinations.
- HPP staff appreciate the commitment by NPS to conduct a Phase IB subsurface archaeological investigation prior to the start of any construction activities as noted in the "Identification of Historic Resources" section. However, we question whether excluding this information from the AoE complies with standard Section 106 procedures. NPS notes that a "programmatic agreement will be developed for this project to define the continued consultation process for the identification and evaluation of resources, and the resolution of any adverse effects on NRHP-eligible archaeological resources" (pgs. 33 – 34). Not having this data presented in the AoE leaves it incomplete and therefore, makes

it challenging for consulting parties to provide a full assessment of the data. HPP staff request that data be included in the AoE and note that it is necessary for the provision of comprehensive comment and assessment of the impact of this proposed project.

<u>Avoidance, Minimization, and Mitigation Measures:</u>

- NPS notes that a smaller arch was “ultimately dismissed” given that it would have had a “greater impact on the cultural landscapes” due to obstructing the views between the Lincoln Memorial and the Arlington National Cemetery (pg. 35). Furthermore, a smaller design was also dismissed because the arch is intended to celebrate the 250th anniversary of America by measuring 250 feet tall.
  - While HPP staff can understand the desire for the symbolic connection between the 250-foot-tall arch and the nation’s 250th anniversary, we do not find this relationship sufficient to justify the arch’s substantial scale and massing. It is still unclear to HPP staff how this arch celebrates and reflects the 250th anniversary of America through its design.
  - Furthermore, HPP staff request that any study completed of a smaller arch design be shared with consulting parties for their review. NPS notes that smaller designs obstruct the views between the Lincoln Memorial and Arlington National Cemetery; however, the current design also obstructs those views. A smaller designed arch or commemorative feature in this circle would be more appropriate and would have less of an impact on the existing historic and cultural landscape.
- NPS staff state that “avoidance through eliminating the proposed vertical commemorative feature was also not consistent with the undertaking’s purpose” (pg. 36) and was ultimately not considered given that it would fail to meet the undertaking’s purpose and need.
  - HPP staff understand that a no-build option would not meet the undertaking’s purpose and need to commemorate the 250th anniversary. However, as reiterated above, full consideration of a smaller feature was not completed by NPS or at least shared as an alternative with consulting parties. NPS notes that several concepts for commemorative features in Memorial Circle were reviewed over the years and that “later design revisions reduced the scale of those earlier concepts and ultimately replaced the proposed monumental columns with smaller sculptural pavilions…” (pg. 36). There is precedent, from a design conception point of view, for smaller, to scale commemorative features in this circle rather than what is being proposed today. Scaling the massing and height of the proposed arch or exploring other more appropriately designed commemorative features for the circle would still allow NPS to “accomplish the undertaking’s core purpose of completing the historically contemplated civic and commemorative role of Memorial Circle.” (pg. 36).
- HPP staff appreciate the proposed mitigation and minimization measures outlined on pgs. 37 – 45 of the AoE that could be considered during the development of a Memorandum of Agreement (MOA). HPP staff would support the implementation of all or most of these measures to mitigate the large impact of this undertaking on surrounding historic and cultural resources.
  - Construction management control is essential, especially given the impact the construction of this proposed undertaking would have on the daily operations of

the Arlington National Cemetery (ANC). HPP staff have concerns about the potential noise impact of this project on the cemetery during solemn events. Furthermore, NPS notes that they would coordinate with ANC to "avoid disruptive construction activities during funerals" (pg. 37). ANC has 24 to 27 funerals a day and had over 5,200 funerals in fiscal year 2025 alone. HPP staff strongly urge NPS staff to consider how this project will impact these operations to honor and remember those who have served and how it is a virtual certainty this project will have construction activities impact active funerals at ANC given their frequency.

- Under "Archaeological Investigation," HPP staff seek clarification on the archaeological monitoring proposed. NPS notes that archaeological monitoring would occur during "excavation, foundation work, and utility installation" on pg. 38, but on pg. 39 notes that monitoring would occur during "deep excavation." Given the potential for archaeological resources, as noted by NPS, monitoring during any excavation would be warranted – not just during "deep excavation."
- Under "Documentation," NPS offers oral histories as a mitigation measure; however, it notes that "transcripts and recordings would be archived and, where appropriate, made available for interpretation, research, and public education" (pg. 41). Could NPS explain why only certain transcripts would be made available? How would this be a true mitigation measure if this information was not available to the larger public for research and study?
- HPP staff want to reiterate that the terms of mitigation should apply to all adversely effected properties such as, but not exclusive to, Memorial Circle, Arlington Memorial Bridge, Memorial Avenue, ANC, Arlington House, and the Lincoln Memorial corridor. Furthermore, for the mitigation efforts proposed that would not have placement on or near the site, the final products should be accessible to the public either through a repository such as the Library of Congress or a website. HPP staff would like to be notified where those items are located in the future so we can request access to them.
- Outside of what was proposed in the AoE for mitigation and minimization, NPS should also consider further measures to support American troops and veterans utilizing these areas (both the ANC and the Military Women's Memorial) given the impact this proposed project would have on that landscape and those spaces. NPS should also consider the use of easements or placement of other limitations on future redevelopment for these historic areas and cultural landscapes.

In conclusion, HPP staff have concerns that NPS has not considered avoidance or alternative options to what is being proposed enough as part of this effort. It is unclear what the ultimate purpose of the proposed triumphal arch would be and how it would benefit the American public. Furthermore, HPP staff have significant concerns that the full impact of this undertaking on all historic and archaeological resources has not been fully considered by NPS and presented to consulting parties. Finally, we would like to reiterate that the requested deadline for comments on the AoE does not follow standard protocols and has impacted our ability to provide a comprehensive response. As with the past three engagements with consulting parties, it does not follow the standard Section 106 process.

We welcome future opportunities to meaningfully engage in the Section 106 process for this undertaking in the future.

Mical Durak
Historic Preservation Principal Planner