# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| COUNTY BOARD OF ARLINGTON COUNTY, VIRGINIA,<br><br>*Plaintiff*,<br><br>*v*.<br><br>NATIONAL PARK SERVICE, *et al.*,<br><br>*Defendants*. | Case No. 1:26-cv-03372 (LMB-WEF) |

**DECLARATION OF DAN NABORS P.E. IN SUPPORT OF PLAINTIFF'S MOTION FOR EMERGENCY RELIEF**

I, Dan Nabors, declare as follows:

1. I am over eighteen years of age and competent to make this declaration. The facts stated here are based on my personal knowledge, on my review of records maintained by Arlington County ("the County") in the ordinary course of its business, on my review of the initial and revised Environmental Assessments ("EA") and Findings of No Significant Impact ("FONSI") issued by the National Park Service ("NPS") for the proposed Triumphal Arch at Memorial Circle ("the Arch" or "the Arch project"), including NPS's supplemental documents and traffic analyses, and on information provided to me by County staff in the course of my official duties. If called as a witness, I could and would testify competently to these facts.

**Background**

2. I am Arlington County's Director of Transportation, a position that I have held for approximately one year in both the acting and officially appointed roles. In this capacity I am responsible for all transportation bureaus and associated work within Arlington County, including Arlington Transit, Transportation Engineering and Operations, Transportation

Planning and Capital Project Management, Development Services, and Transportation Resources. Prior to that I served as Chief of the Engineering and Operations Bureau starting in 2023. In my role as Bureau Chief, I led the County's traffic-signal, transportation design, traffic operations, streetlight, and Vision Zero programs, and I was responsible for the safe and efficient operation of the transportation network the County manages.

3. Before joining Arlington County, I served as a commissioned officer in the U.S. Army Corps of Engineers and as a manager and transportation engineer in the private sector. I have co-authored more than a dozen publications and guidance documents for the Federal Highway Administration and have developed training courses on transportation safety and operations for state and local practitioners. I am a graduate of Virginia Tech and Kansas State University, receiving a Bachelor of Science in Civil Engineering and a Master of Science from each institution respectively. I am also a licensed Professional Engineer in the Commonwealth of Virginia. I have over 30 years of experience in engineering spanning across my career.

4. I submit this declaration to describe how construction and operation of the Arch will harm the County's transportation network and operations, and how NPS's failure to analyze those effects has deprived the County of information it needs to plan for and mitigate the effects of construction and placement of the Arch in Memorial Circle.

**The County's Transportation Network and Memorial Circle**

5. The County owns, maintains, or is responsible for many of the surrounding roadways and multimodal facilities that connect to Memorial Circle and carry vehicular, bus, bicycle, micromobility (i.e., electric personal assistive mobility devices, e-bikes, motorized scooters, and similar devices), and pedestrian traffic within Arlington and between Arlington and the District of Columbia. The County is responsible for operations and safety on that network.

The County has approximately 245,000 residents, a substantial portion of whom travel for work or other needs every day in ways that depend on the routes around Memorial Circle.

6. Memorial Circle, together with the roadways and mixed-use paths that connect directly to it, is a regional convergence point. It carries residential and commercial traffic, buses, emergency vehicles, cyclists, and pedestrians traveling within the County and between the County and the District every day. The principal regional routes that converge there—including the George Washington Memorial Parkway (GWMP), State Route 110, Arlington Boulevard, Washington Boulevard (Route 27), Memorial Avenue, and Arlington Memorial Bridge—are corridors on which County residents rely heavily. The Mount Vernon Trail, which passes the Circle, is a major route for pedestrians, cyclists, and people using micromobility devices. NPS itself acknowledges that the roadways around the Circle "serve as a major convergence of regional roadways and travel modes that interact through a complex series of merges, weaves, and intersections." EA at 36.

7. County transportation staff are keenly aware of the operational and safety challenges that already exist at the Circle. The interactions among vehicles, pedestrians, and cyclists there have previously required mitigation. Placing a 250-foot monument and a public plaza—not to mention military assets and all the requisite security that would entail—in the middle of those interactions will exacerbate existing challenges in an already congested area.

**Construction Will Disrupt Traffic Throughout the County's Network**

8. Because Memorial Circle connects to the County's roadway and trail network, closures and restrictions on the roads connecting the construction site to Arlington will ripple much further into the County. NPS's plans compound those effects. As I understand those plans, NPS proposes to bar eastbound traffic on Memorial Avenue from turning north onto Arlington Boulevard; to restrict northbound Washington Boulevard traffic from turning left to Memorial

Avenue; to reduce Arlington Memorial Bridge to two westbound lanes; and introduce a new crossing across two opposing lanes of traffic for pedestrians, cyclists, and people riding micromobility devices on the north side of Memorial Circle. Additional closures and detours can be expected during various phases of construction.

9. Construction delays will worsen congestion both in the Circle itself and in abutting areas of the County. Increased congestion in and around the Circle may result in more crashes involving vehicles, pedestrians, cyclists, and people using micromobility devices that require mitigation and the potential deployment of County resources.

10. Delays also have effects on roads beyond the immediate vicinity of the disruption. When a route becomes congested, drivers change their routes, and the County must then respond to the changed traffic patterns on its own network. If, for example, traffic volumes increase on the approaches to Key Bridge or Theodore Roosevelt Bridge because of delays or closures on the approaches to Memorial Bridge, the County would likely need to retime signals, modify traffic infrastructure, or take other active steps to counteract those effects.

11. The EA contains only very limited regional traffic modeling that would allow the County to predict how traffic will divert during and after construction or how those diversions will affect County roadways. Unlike the analyses the County typically receives for comparable private-development projects, NPS did not conduct the kind of comprehensive traffic or safety analysis that would allow the County to anticipate those effects and adequately mitigate potential harms. For example, NPS has not provided a safety analysis of existing and future safety conditions, which should include a detailed analysis of crashes, identify crash patterns, causes, and trends, and propose mitigation strategies. This is critical given the numerous weaves and merges on roadways surrounding Memorial Circle. The analysis also does not address the crash

hotspots that were identified in the Memorial Circle Safety Improvements Environmental Assessment dated November 2018 {Figure 2, page 4}.

12. NPS initially confined its traffic analysis to a limited area directly adjacent to Memorial Circle itself. Even within that narrow study area, NPS's own traffic simulation showed congestion backing up past the edges of the modeled network and predicted that 410 vehicles would be "denied" entry to the modeled network because queues extended beyond its boundaries.

13. After Arlington County filed this suit, NPS updated its EA with a revised traffic analysis. The revised EA modestly expanded the analysis but still lacks the necessary detail to fully assess the impacts of the proposed development. By cutting off the analysis at the edge of an artificially narrow study area, NPS failed to capture where those queues go: onto the approaches that County roadway users rely on. The County would recommend a study area similar to the study area in the Memorial Circle Safety Improvements Environmental Assessment dated November 2018.[1] That study area encompassed approximately 170 acres, most centered on Lady Bird Johnson Park (formerly Columbia Island), bounded to the east by the main stem of the Potomac River, to the north by the north end of Lady Bird Johnson Park, extending west to include portions of Memorial Avenue, and southward to the vehicular lanes merging between Memorial Circle, GWMP, and Washington Boulevard{Figure 1, page 2}. The County also continues to recommend that more robust multimodal traffic analysis tools are used to assess impacts, such as VISSIM, which would more accurately model the interaction between pedestrians, cyclists, and vehicles and would give a better representation of the weave condition to the south of the site. For example, for the North Meade Street Bridge and Interchange project

---

[1] https://parkplanning.nps.gov/showFile.cfm?sfid=349834&projectID=51448.

in the Rosslyn neighborhood located just 4,000 feet from Memorial Circle, the Virginia Department of Transportation required Arlington County to use VISSIM to model multimodal operations adequately. In short, a more detailed traffic analysis is needed for the County to fully understand how Memorial Circle, the proposed signalization, bike/pedestrian crossings, weaves, and travel lane changes would operate for all modes. Because the microsimulation tool utilized for this analysis did not accurately model the increased demand flowing through the network, the impacts to the study intersections and the adjacent areas were not accurately conveyed. Furthermore, the revised traffic study indicates that there are still major operational issues to the south of the site where the George Washington Memorial Parkway (GWMP) and Washington Boulevard merge, which according to the study, operates at a level of service "F" in both the existing and developed conditions, with the developed condition showing further degradation in operations. The delays and queuing at the weave are essentially metering traffic into the study area, which means the demand at the circle is underestimated. This weave was also identified as a hotspot in the Memorial Circle Safety Improvements Environmental Assessment dated November 2018 {Figure 2, page 4}. NPS proposed no mitigation for the conditions or impacts at the weave.

**The Permanent Configuration Will Continue to Harm the County's Network**

14. Harms to the County will not end when construction is complete. The current plans for the Arch include a public plaza inside the traffic circle, protected by a barricade seat wall and retractable bollards, designed to accommodate pedestrian visitors. To reach it, visitors will have to cross traffic into the center of a complex, high-volume circle. The Arch plan accommodates pedestrians and cyclists by introducing permanent traffic signals and crosswalks into what is now a free-flowing traffic circle.

15. Traffic signals and crosswalks necessary to protect pedestrians and other vulnerable road users will permanently and significantly alter vehicle movement through and around the Circle, with ripple effects on the surrounding roadways and alternative routes. NPS's traffic analysis includes a more detailed assessment of pedestrian crossing impacts, including Pedestrian Level of Service, but does not include an equivalent assessment for bicycle traffic despite bicycles accounting for 40-50% of multimodal users. The sidewalks and trails adjacent to the proposed crossings should also be analyzed to understand the space needed to accommodate the combination of 1) projected volumes of pedestrians and bicyclists waiting to cross and 2) projected pedestrian and bicycle through volumes. Furthermore, the report does not include a safety analysis of existing and future safety conditions, which is critical given the volume of pedestrian and bicyclist demand resulting from this project.

**Harm to County Bus Service**

16. Traffic effects on State Route 110 will also disrupt County bus service that uses that highway, including ART 43. Arch-related delays on that corridor—whether from construction that backs up onto Route 110 or from the permanent signalization of the Circle—will slow County bus service and undermine on-time performance, which can predictably be expected to depress ridership on County routes. This will cause a direct financial loss to the County.

**Harm to Pedestrian and Cyclist Safety and the County's Vision Zero Program**

17. Arlington is a Vision Zero community committed to eliminating traffic deaths and serious injuries by 2030. In service of that goal, the County requires any comparable redevelopment within its jurisdiction to perform a robust safety analysis that compares existing and future operations, evaluates crash trends (including whether crashes are associated with the

development), assesses whether the proposed changes will improve or degrade safety for those within and outside the project area, and identifies mitigation for any adverse impacts.

18. NPS did not undertake any comparable safety study. Because the Arch is a federal project on federal land, the County cannot require one.

19. Even without that analysis, certain consequences are predictable from well-established transportation-engineering principles. Construction causes delay and the rerouting of trips. Delay creates higher-risk conditions for all roadway users, in part because frustrated drivers engage in riskier behavior. Both the delays and diversions that will occur during construction and the permanent traffic modifications the Arch plan entails will create higher-risk conditions. And placing a major new trip generator in the center of the Circle—with high volumes of pedestrians and cyclists needing to cross traffic to reach it—will inevitably decrease safety absent adequate mitigation, undermining the County's Vision Zero goals.

20. Construction will also significantly alter a key pedestrian and cyclist connection. The maintenance of traffic plan calls for the installation of a crosswalk on the north side of the circle to accommodate all pedestrians, cyclists, and people using micromobility devices traveling between the Mount Vernon Trail and the Cemetery and the Washington Boulevard Trail. This introduces a high-volume crossing across two opposing lanes of traffic, which currently does not exist in the circle, which will increase conflicts between vehicles and vulnerable road users.

21. The heavy bicycle and pedestrian volumes at this location make it particularly important—and particularly difficult—to model accurately. Older traffic models do not adequately capture these multimodal interactions; a location like this one requires a robust multimodal analysis. Typically, the level of multimodal activity encountered and projected at Memorial Circle requires a more robust multimodal traffic analysis tool, such as VISSIM, which

County staff continue to recommend. NPS did not perform one, and the absence of that information will hamper the County's ability to prepare for the Arch's impacts.

**NPS's Failure to Analyze These Effects Imposes Direct Costs on the County**

22. As noted above, if a private developer proposed a comparable project in the County, the County would require and receive a discrete safety and multimodal traffic-modeling analysis for the project, typically prepared by the developer and reviewed by County staff. Those analyses allow the County to adjust its planning for safety and infrastructure needs before construction begins. At the level of design NPS has reached, I would ordinarily expect to see that discrete analysis.

23. Moreover, NPS inexplicably failed to use as a baseline a more detailed study of Memorial Circle that the agency itself prepared roughly a decade ago, which would have provided an important point of comparison. And NPS largely ignored the County's technical comments on its transportation study. On June 17, 2026, the County's Planning Director submitted written comments to the National Capital Planning Commission that were accompanied by 32 detailed technical comments from the County's Division of Transportation identifying deficiencies in the project's transportation study. The next day, NPS issued the EA and FONSI.

24. The result is that the County must manage its network around a series of significant "known unknowns." County transportation staff will have to devote increased time to continually assessing, and responding to, the effects of each phase of construction and of the Arch's permanent configuration—figuring out in real-time what the changes mean for the County's network, without the data needed to plan ahead. That diversion of staff time is a concrete and ongoing cost to the County.

25. A more thorough review, likely including regional traffic modeling and a safety analysis of the kind described above, consideration of alternatives and mitigation, and responses to the County's comments and concerns, would allow the County to plan for and, where possible, mitigate the harms to its transportation network before construction begins.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 5, 2026, in Arlington, Virginia.

Dan Nabors, P.E.
Director of Transportation

Arlington County, Virginia