**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **COUNTY BOARD OF ARLINGTON COUNTY,**<br><br>*Plaintiff*,<br><br>v.<br><br>**NATIONAL PARK SERVICE**, *et al.*,<br><br>*Defendants*. | Civil Action No. 26-cv-3372 |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION, SECTION 705 STAY, AND CONDITIONAL TEMPORARY RESTRAINING ORDER, AND DEFENDANTS' MOTION FOR STAY PENDING APPEAL**

## TABLE OF CONTENTS

INTRODUCTION ........ 1

BACKGROUND ........ 1

II. Factual and Procedural Background ........ 3

A. The Executive Branch Fulfilled the Relevant Statutory Processes for Review of the Arch Proposal ........ 3

B. Other Litigation Challenging the Arch ........ 4

STANDARD OF REVIEW ........ 5

ARGUMENT ........ 6

I. Plaintiff Does Not Establish Standing, Let Alone Irreparable Harm that Requires Emergency Relief ........ 6

A. Plaintiff Fails to Establish Article III Standing ........ 6

B. Plaintiff's Injuries Do Not Fall Within the Zones of Interests of the Statutes It Invokes ........ 10

II. Plaintiff Cannot Show Irreparable Harm ........ 12

III. Plaintiff Has Failed to Establish Substantial Likelihood of Success on the Merits ........ 14

A. The Preliminary Injunction Must Be Denied Because Venue Is Improper ........ 14

B. The Proposed Arch Does Not Violate Any Statutes ........ 15

1. The Authorization Act and the Organic Act Authorize the Arch ........ 15

2. The CWA Does Not Apply ........ 18

3. Section 8106 Does Not Apply to the Arch ........ 20

4. Authorization of the Arch Complies with the Organic Act ........ 23

B. NPS Reasonably Approved the Arch and Reasonably Explained its Decision ........ 27

C. The Agency's NEPA Review was Adequate ........ 30

IV. The Public Interest Weighs Against Injunctive Relief .......... 32

V. FRAP 8 Stay Pending Appeal .......... 34

CONCLUSION .......... 35

## TABLE OF AUTHORITIES

### Cases

*Abbott v. Perez*,
585 U.S. 579 (2018) .... 33

*Adams v. Vance*,
570 F.2d 950 (D.C. Cir. 1978) .... 5

*AFSCME v. Social Sec. Admin.*,
172 F.4th 361 (4th Cir. 2026) .... 6

*All. for Legal Action v. F.A.A.*,
69 F. App'x 617 (4th Cir. 2003) .... 30

*Barnhart v. Peabody Coal Co.*,
537 U.S. 149 (2003) .... 16

*Bennett v. Spear*,
520 U.S. 154 (1997) .... 11

*Bluewater Network v. Salazar*,
721 F. Supp. 2d 7 (D.D.C. 2010) .... 24

*Britt v. U.S. Army Corps of Eng'rs*,
769 F.2d 84 (2d Cir. 1985) .... 15

*Casa de Md. v. Wolf*,
486 F. Supp. 3d 928 (D. Md. 2020) .... 6

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .... 10

*Clinton Comm. Hosp. Corp. v. S. Md. Med. Ctr.*,
510 F.2d 1037 (4th Cir. 1975) .... 12

*Daingerfield Island Protective Soc. v. Babbitt*,
40 F.3d 442 (D.C. Cir. 1994) .... 24, 25

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) .... 27

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
952 F.2d 802 (4th Cir. 1991) .... 12

*Dreher v. Experian Info. Sols., Inc.*,
856 F.3d 337 (4th Cir. 2017) .... 9

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .... 7

*Fed. Power Comm'n v. Fla. Power & Light Co.*,
404 U.S. 453 (1972) .... 35

*Food & Drug Admin. v. R. J. Reynolds Vapor Co.*,
606 U.S. 226 (2025) ........ 10

*Frazier v. Prince George's Cnty.*,
86 F.4th 537 (4th Cir. 2023) ........ 12

*Haaland v. Brackeen*,
599 U.S. 255 (2023) ........ 6

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ........ 8

*HIAS, Inc. v. Trump*,
985 F.3d 309 (4th Cir. 2021) ........ 13

*Hilton v. Braunskill*,
481 U.S. 770 (1987) ........ 34

*Kerotest Mfg. Co. v. C–O–Two Fire Equipment Co.*,
342 U.S. 180 (1952) ........ 34

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........ 22

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........ 9

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ........ 11

*Maryland v. U.S. Dep't of Agric.*,
151 F.4th 197 (4th Cir. 2025) ........ passim

*Massachusetts v. Mellon*,
262 U.S. 447 (1923) ........ 6

*Metropolitan Edison Co. v. People Against Nuclear Energy*,
460 U.S. 766 (1983) ........ 11

*MicroStrategy Inc. v. Motorola*,
245 F.3d 335 (4th Cir. 2001) ........ 5

*Miranda v. Garland*,
34 F.4th 338 (4th Cir. 2022) ........ 32

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S, 139 (2010) ........ 14

*Moore v. Kempthorne*,
464 F. Supp. 2d 519 (E.D. Va. 2006) ........ 5

*Moore v. United States*,
943 F. Supp. 603 (E.D. Va. 1996) ........ 28

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)........................................................................................................26

*Murthy v. Missouri*,
603 U.S. 43 (2024)......................................................................................................6, 9

*Nat'l Audubon Soc'y v. Dep't of Navy*,
422 F.3d 174 (4th Cir. 2005)..........................................................................................30

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*,
595 U.S. 109 (2022)......................................................................................................22

*Nat'l Tr. for Hist. Pres. v. NPS*,
185 F.4th 1185 (D.C. Cir. 2026)....................................................................................11

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021)......................................................................................................18

*Nken v. Holder*,
556 U.S. 418 (2009)................................................................................................12, 32

*NPS v. Nat'l Tr. for Hist. Pres.*,
609 U.S. 1068 (2026)..........................................................................................9, 11, 33

*Pawnee Nation of Oklahoma v. Zeldin*,
No. 25-9548, 2026 WL 3092945 (10th Cir. Oct. 16, 2026)............................................16

*Pres. Soc'y of Newport Cnty. v. Burgum*,
No. 23-CV-03510 (APM), 2026 WL 787910 (D.D.C. Mar. 20, 2026)...........................28

*Proctor & Gamble Co. v. Ranir, LLC*,
No. 1:17-CV-185, 2017 WL 3537197 (S.D. Ohio Aug. 17, 2017).................................14

*Real Truth About Obama v. FEC*,
575 F.3d 342 (4th Cir. 2009)............................................................................................5

*S. Utah Wilderness All. v. Dabney*,
222 F.3d 819 (10th Cir. 2000)..................................................................................23, 25

*S. Utah Wilderness All. v. National Park Service*,
387 F. Supp. 2d 1178 (D. Utah 2005)..............................................................................23

*Scotts Co. v. United Indus. Corp.*,
315 F.3d 264 (4th Cir. 2002)....................................................................................12, 13

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025)................................................................................................passim

*Sierra Club v. Fed. Highway Admin*,
715 F. Supp. 2d 721 (S.D. Tex. 2010)............................................................................31

*Sierra Club v. FERC*,
153 F.4th 1295 (D.C. Cir. 2025)....................................................................................29

*Sierra Club v. FERC*,
97 F.4th 16 (D.C. Cir. 2024) .................................................................................... 29

*Sierra Club v. Mainella*,
459 F. Supp. 2d 76 (D.D.C. 2006) ............................................................................ 24

*Sierra Club, Inc. v. United States Forest Serv.*,
897 F.3d 582 (4th Cir. 2018) .................................................................................... 30

*South Carolina ex rel. Campbell v. O'Leary,*
64 F.3d 892 (4th Cir. 1995) ...................................................................................... 31

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .............................................................................................. 6, 9

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ................................................................................................ 10

*Thompson v. North Am. Stainless, LP*,
562 U.S. 170 (2011) ................................................................................................ 11

*Trump v. California*,
609 U.S. 1032 (2026) .............................................................................................. 35

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ......................................................................................... 33, 35

*United Keetoowah Band of Cherokee Indians v. F.C.C.*,
933 F.3d 728 (D.C. Cir. 2019) .................................................................................. 28

*United States v. Bryant*,
949 F.3d 168 (4th Cir. 2020) .................................................................................... 20

*United States v. Texas*,
599 U.S. 670 (2023) .................................................................................................. 7

*Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*,
50 F.4th 164 (D.C. Cir. 2022) .................................................................................. 22

*Webster v. U.S. Dept. of Agric.*,
685 F.3d 411 (4th Cir. 2012) .................................................................................... 30

*Weinberger v. Cath. Action of Hawaii/Peace Educ. Project*,
454 U.S. 139 (1981) ................................................................................................ 29

*Western Watersheds Project v. Burgum*,
No. 1:18-CV-00187-REP, 2025 WL 3853055 (D. Idaho Dec. 29, 2025) ........................... 14, 15

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ............................................................................................. passim

**Statutes**

16 U.S.C. § 451 ........................................................................................................ 21

28 U.S.C. § 1391(e)(1)(C) .......... 14
37 Stat. 417 (1912) .......... 20, 21
39 Stat. 535 (1916) .......... 17
40 U.S.C. § 8106 .......... 11, 20, 21
40 U.S.C. § 8901(2) .......... 12
40 U.S.C. § 8901(4) .......... 12
40 U.S.C. § 8902(a)(1) .......... 18
40 U.S.C. § 8902(b) .......... 20
40 U.S.C. § 8905(b)(2)(B) .......... 12
49 U.S.C. § 46110 .......... 9
5 U.S.C. §§ 124–132 (1934) .......... 2
54 U.S.C. § 100101(a) .......... 12, 17
54 U.S.C. § 100101(b)(2) .......... 24, 25
54 U.S.C. § 306108 .......... 11
Pub. L. No. 101-512, 104 Stat. 1915 (1990) .......... 21
Pub. L. No. 103-111, 107 Stat. 1046 (1993) .......... 22
Pub. L. No. 104-333, 110 Stat. 4093 (1996) .......... 21
Pub. L. No. 62-432, 37 Stat. 866 (1913) .......... 2
Pub. L. No. 68-463, 43 Stat. 974 (1925) .......... 2, 15, 16, 17
Pub. L. No. 73-109, 48 Stat. 362 (1934) .......... 2
Pub. L. No. 80-841, 62 Stat. 1112 (1948) .......... 21
Pub. L. No. 99-652, 100 Stat. 3654 (1986) .......... 20

**Rules**

Fed. R. App. P. 8(a)(1) .......... 34
Fed. R. App. P. 8(a)(2) .......... 34

**Other Authorities**

89 Fed. Reg. 97,631 (Dec. 9, 2024) .......... 17
S. Doc. No. 68-95 (1924) .......... 2, 3
S. Res., 17 Cong. Rec. 4826 (May 24, 1886) .......... 1

## INTRODUCTION

Plaintiff County Board of Arlington County, Virginia ("Plaintiff") has not met the burden necessary for this Court to enjoin construction of a proposed arch at Memorial Circle. Plaintiff lacks standing and, even if it could establish standing, the arch fulfills a century-old congressional vision authorizing the redesign and construction of 166-foot-tall columns surmounted by statues at that site. The National Park Service (NPS) complied with all legal requirements, preparing analyses that mirror in scope those produced for other celebratory sites, like the Martin Luther King, Jr., Memorial. Plaintiffs' disagreement with the agency's decision, however strongly felt, does not establish illegality, irreparable harm, or any other need for a preliminary injunction.

## BACKGROUND

American leaders have long envisioned majestic arches adorning the banks of the Potomac. President Andrew Jackson sought a bridge spanning the Potomac River "with arches of ever-enduring granite," and Secretary of State Daniel Webster pushed to fulfill that vision. Ex. A, NPS website, "Arlington Memorial Bridge & Avenue," last updated Apr. 5, 2023). The U.S. Senate eventually acted to make that vision a reality, directing the Secretary of War to examine and report on such a bridge in 1886. S. Res., 17 Cong. Rec. 4826 (May 24, 1886). The "favored design" of the Senate Park Commission (a.k.a. the McMillan Commission) was the below:



Fig. 16 George Keller, proposed design for Memorial Bridge, 1900; perspective view from Washington side of the bridge. Library of Congress, General Collections

Ex. B, U.S. Comm'n of Fine Arts, Designing the Nation's Capital: The 1901 Plan for Washington, D.C. 117–18 (2006) (Eds., Sue Kohler & Pamela Scott).

Congress created the Arlington Memorial Bridge Commission (Bridge Commission) to report "to Congress a suitable design for a Memorial Bridge across the Potomac River." Pub. L. No. 62-432 § 23, 37 Stat. 866, 885 (1913). The Bridge Commission's design recommended "development of Columbia Island as a park," with "two stately columns" "surmounted by statues" to provide "a plaza with fitting architectural adornment." Report of the Arlington Memorial Bridge Commission 40–41, Senate Doc. No. 95, 68th Congress, 1st Session (Washington: U.S. Government Printing Office, 1924) (Bridge Commission Report).[1] "The columns are 166 feet high or practically of the same height as the Colonne de Juillet in Paris." *Id.* at 41.

Congress authorized construction "in accordance with the design" in the Bridge Commission Report and empowered the Bridge Commission to make design changes "as in its discretion may be found to be necessary or advisable." Pub. L. No. 68-463 § 1, 43 Stat. 974 (1925) (Authorization Act). Despite explicit congressional authorization, the monument plaza has not yet been built. In 1931, the Commission on Fine Arts (CFA) recommended "postpon[ing] the erection of these columns until the other features" were finished, while emphasizing that the columns were "an essential feature in the proposed development of Columbia Island." Ex. C, Ltr. from Commission of Fine Arts ("CFA") Chairman to Lt. Col. Ulysses S. Grant III, Exec. Officer, Bridge Commission (Nov. 20, 1931).

After the Great Depression and WWII, and after the Bridge Commission functions were reassigned to NPS,[2] the National Capital Planning Commission (NCPC) returned to the treatment

---

1 https://www.govinfo.gov/content/pkg/SERIALSET-08240_00_00-002-0095-0000/pdf/SERIALSET-08240_00_00-002-0095-0000.pdf

2 During the New Deal-era reorganization of government, President Franklin Roosevelt transferred the Bridge Commission's functions to the Office of National Parks, Buildings, and Reservations in the Department of the Interior. 5 U.S.C. §§ 124–132 (1934); Executive Order 6166 § 2. And Congress renamed that office as the NPS. *See* Department of the Interior Appropriations Act, Pub. L. No. 73-109, ch. 38, 48 Stat. 362, 389 (1934).

of Columbia Island. Ex. D, Extract from Minutes of NCPC Meeting (Oct. 30–31, 1947). The former Executive Officer of the Bridge Commission lamented that "the central plaza on Columbia Island has never been undertaken and seems to be absolutely essential to link together the two parts of the project, namely, the main bridge itself and entrance to Arlington Cemetery." Ex. E, Ltr. from Maj. Gen. U.S. Grant III to Newton B. Drury (Nov. 17, 1947). The NCPC agreed, explaining that "[b]ecause of the war and the other things the plan for development of the Island was forgotten," leaving the "middle knocked out" of the design. Ex. F, Extract from Minutes of NCPC Meeting (Dec. 11–12, 1947).

However, Columbia Island remains incomplete. It does not resemble "a plaza with fitting architectural adornment," including "two stately columns" "surmounted by statues." Bridge Commission Report 40–41. Memorial Circle instead remains an approximately 300-foot-diameter circle of grass.

## II. Factual and Procedural Background

### A. The Executive Branch Fulfilled the Relevant Statutory Processes for Review of the Arch Proposal.

Since the President announced his idea for an Arch in Memorial Circle, NPS has prepared environmental assessments to comply with NEPA. *E.g.*, Ex. G, Revised Environmental Assessment ("EA"). Local governments and interested parties consulted on the effects the proposed arch would have on historic properties under Section 106 of the NHPA. The Federal Aviation Administration (FAA) determined it would not be a hazard to air navigation. Ex. H. The CFA approved the architectural design. Ex. I, Ltr. from Thomes Luebke, FAIA to Sec. Burgum, DOI (May 28, 2026).

National security agencies have considered that the Arch can be incorporated into their ongoing efforts to defend the National Capital Region from evolving threats, like those posed by

the proliferation of small, unmanned aircraft systems (UAS). The Arch's current design—its location and height—present an "opportunity to mitigate these evolving threats." Ex. J, Decl. of Pete Hegseth, Secretary of War ¶ 10 (originally submitted in Civ. No. 26-544, D.D.C); *see also* Ex. K, Decl. of Markwayne Mullin, Sec'y of Homeland Sec. ¶¶ 12–18 (originally submitted in Civ. No. 26-544, D.D.C) (the Arch could enhance the Department of Homeland Security's ability to counter threats from unmanned aircraft). The capabilities being considered "would not require any structural modifications or alterations to the existing plans for the Arch." Ex. J, ¶ 15; Ex. K., ¶ 16. Both agencies are in the planning process for how to integrate the uses being considered into the Arch and have not made final decisions. Ex. R, Decl. of Ricky D. Buria, Chief of Staff to the Sec'y of War, ¶ 4; Ex. S, Decl. of Steven Willoughby, Exec. Dir., Program Exec. Office for UAS, Dep't of Homeland Sec. ¶ 4.

On November 5, 2026, the NCPC approved site and building plans. Ex. L, Media Release: "NCPC Approves New Monumental Arch Final Site and Building Plans" (Nov. 6, 2026). After the NCPC approved the building site and design, NPS issued its final decision approving construction. Ex. M, NPS, Decision Record, "Triumphal Arch at Memorial Circle," (Nov. 5, 2026).

### B. Other Litigation Challenging the Arch.

Two other actions have been filed challenging the Arch. In February 2026, three veterans of the Vietnam War and a retired historian filed an action alleging an ultra vires claim and a claim based on the Constitution's Take Care Clause. *Lemmon, et al. v. Trump*, *et al*. Civ. No. 26-544 (TSC) at Dkt. 1. On October 22, 2026, the *Lemmon* plaintiffs moved for a preliminary injunction, which is fully briefed, *id.* at Dkt. 64, 74, 85, and has been placed in abeyance. *Id.* at Dkt. 111.

On October 31, 2026, the District of Columbia and Commonwealth of Virginia filed an

action against the National Park Service and the Department of Interior seeking nearly identical relief that Plaintiff seeks here. *District of Columbia et al., v. National Park Service, et al.* ("*DC/VA*")*,* Civ No. 26-3838 (TSC) at Dkt. 1. They moved for a temporary restraining order (TRO). *Id.* at Dkt. 2. The court consolidated the *DC/VA* action with the *Lemmon* action. *Id.* at 4. On November 5, 2026, the court granted the *DC/VA* plaintiffs' motion for a TRO and enjoined defendants from "initiating, making, or otherwise effectuating any construction, excavation, demolition, land-disturbance, utility installation, or roadway-closure activity, or any other construction-related activity at or near Memorial Circle in Washington, D.C., that is for the purpose of constructing an arch at Memorial Circle" for a period of 14 days. Civ. No. 26-544 at Dkt. 110.

## STANDARD OF REVIEW

"The standard for granting either a TRO or a preliminary injunction is the same." *Moore v. Kempthorne*, 464 F. Supp. 2d 519, 525 (E.D. Va. 2006). Both "are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola*, 245 F.3d 335, 339 (4th Cir. 2001). The movant "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The movant bears the burden as to all "four requirements, each of which must be satisfied." *Real Truth About Obama v. FEC*, 575 F.3d 342, 345-47 (4th Cir. 2009) (reinstated in relevant part after vacatur, 607 F.3d 355). Injunctive relief that "deeply intrudes into the core concerns of the executive branch" may be awarded only upon "an extraordinarily strong showing" on each element. *Adams v. Vance*, 570 F.2d 950, 954–55 (D.C. Cir. 1978). The standards for granting a

preliminary injunction and a Section 705 stay are essentially the same. *See Casa de Md. v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020).

## ARGUMENT

### I. Plaintiff Does Not Establish Standing, Let Alone Irreparable Harm that Requires Emergency Relief.

#### A. Plaintiff Fails to Establish Article III Standing.

Plaintiff lacks Article III standing. Arlington County cannot sue the federal government as *parens patriae* on behalf of its citizens. *Haaland v. Brackeen*, 599 U.S. 255, 295 & n.11 (2023); *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923). Plaintiff therefore cannot establish standing by relying on longer commutes, *see, e.g.*, Am. Compl. ¶¶ 13, 123, Dkt. 14, decreased private property values, *id.* ¶¶ 165–166, aircraft noise, *id.* ¶¶ 171–174, diminished appeal of recreational areas, *id.* ¶¶ 150, 168, the County becoming a "less desirable place to live," Pl.'s Br. 14, Dkt. 17, or other injuries allegedly suffered by Plaintiff's residents who are not before the court.

Instead, to establish Article III standing, Plaintiff must demonstrate that it has itself suffered an injury-in-fact that is "fairly traceable to the challenged conduct of the defendant" and "likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). It must make a "clear showing" on "each element of standing" to justify a preliminary injunction. *AFSCME v. Social Sec. Admin.*, 172 F.4th 361, 367 (4th Cir. 2026) (en banc) (quoting *Murthy v. Missouri*, 603 U.S. 43, 58 (2024)). Plaintiff relies on five categories of harm: (1) interference with its emergency services, (2) increased congestion, (3) changes to airline flight plans, (4) harm to historic properties, and (5) limits on county law enforcement operations. None of these harms are sufficient to establish standing by the "clear showing" required.

Article III precludes reliance not just on "speculative links" but also on "attenuated" ones. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024). Thus, "where the government action is [too] far removed from its distant (even if predictable) ripple effects . . . plaintiffs cannot establish Article III standing." *Id.* In *United States v. Texas*, the Supreme Court held that States lacked standing to challenge a federal policy that imposed "additional costs" on their budgets. 599 U.S. 670, 676 (2023). The Court explained that "in our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending." *Id.* at 680 n.3. Harms resulting from "those kinds of indirect effects" are too "attenuated" to provide a sufficient injury. *Id.*

The Fourth Circuit recently applied *Texas* to reject a theory of standing similar to Plaintiff's. In *Maryland v. U.S. Department of Agriculture*, the plaintiff States alleged they would be injured by federal action that required them to incur "rapid-response-related expenses" and imposed "various indirect impacts" on their budgets. 151 F.4th 197, 209 (4th Cir. 2025). The Fourth Circuit rejected an "open-ended" approach to standing that would allow governments to challenge "[i]nnumerable federal actions" merely because they "impact state budgets and programs." *Id.* at 210. Such "downstream" costs are "too attenuated from the legal violation to serve as cognizable injuries-in-fact." *Id.*

Each of Plaintiff's injuries are too attenuated to support standing. Start with emergency services. Plaintiff argues that Arch construction will "substantially hamper[]" its "ability to timely respond" to emergencies in areas around Memorial Circle. Pl.'s Br. 12. But Plaintiff cannot assert a *parens patriae* injury based on harm to patients from slower response times. Instead, Plaintiff contends that it will "likely" have to allocate "additional County resources to maintain acceptable emergency response times," Am. Compl. ¶ 156, Dkt. 14, and that it will have to update its

emergency-services plans accordingly. Plaintiff does not attempt to quantify any delays or planning costs and acknowledges that "alternate routes" exist. Miller Decl. ¶ 12, Dkt. 17-2. The core of this injury is that Plaintiff may, once it studies the issue, decide to make changes to its emergency services budget. But neither the indirect effects of the Arch on Plaintiff's budgeting nor the costs of studying those effects are sufficient, under *Maryland* and *Texas*, to establish Article III standing.

Similar problems hinder Plaintiff's attempt to ground standing on increased congestion. Plaintiff argues that construction will increase congestion "along the GW Parkway, State Route 110, Arlington Boulevard, and Washington Boulevard." Pl.'s Br. 13. But the GW Parkway is owned by the federal government and the rest belong to Virginia, which has brought a separate suit based on these alleged harms to its roads. Plaintiff attempts to find some harm to its own secondary roads, alleging that "if traffic volume increases on the approaches" to other bridges, it "would likely need to retime signals, modify traffic infrastructure," or otherwise modify its traffic management. Am. Compl. ¶ 145, Dkt. 14. Plaintiff also suggests that congestion will lead to slower buses, worse on-time performance, and eventually lower ridership, *id.* ¶ 148, and that traffic modifications will hinder its Vision Zero goals, *id.* ¶ 149. But virtually every federal action in the capital region, from federal support for transit safety to return-to-office requirements, has ripple effects on traffic volume in Arlington. *Maryland* makes clear that these attenuated consequences for municipal operations are not enough for standing, and that peripheral revenue effects—like Plaintiff's bus fares—"float ever further downstream." 151 F.4th at 210. As for Plaintiff's Vision Zero goal, a "setback" to a municipality's "abstract social interests" has never been enough for standing either. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

Plaintiff next attempts to identify an injury by theorizing that the Arch is "likely to require changes to DCA's one-engine inoperative flight plans," which may "impact the County's planning and development options." Pl.'s Br. 14. Plaintiff has not seen the airlines' flight plans but believes that the Arch "may affect" them. Fusarelli Decl. ¶¶ 9, 12, Dkt. 17-5. Plaintiff does not identify any pending permit applications or proposed projects that it believes would be affected, but speculates that, at some point in the future, changed flight plans "could limit permissible development" in unspecified areas of the county. *Id.* ¶ 13. Without any concrete plans, these "'some day' intentions" do not amount to an "actual or imminent" injury sufficient to establish standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992). And to the extent Plaintiff challenges the FAA's determination that the Arch will not pose a hazard to air navigation, it must bring that challenge in a petition for review, 49 U.S.C. § 46110, not this action.

Nor can Plaintiff base a concrete injury on harm to historic properties. Plaintiff argues that the Arch will "inflict[] direct harms on [the County's] historic properties and local history." Pl.'s Br. 14. Plaintiff's alleged harm—the visual impacts of the Arch on historic neighborhoods—reflects "offense, disagreement, or distaste," which is not a concrete injury. *NPS v. Nat'l Tr. for Hist. Pres.*, 609 U.S. 1068, 1071 (2026) (per curiam). Plaintiff's declaration also reveals that its claim is not based on its own historic properties; instead, it is concerned about "privately owned homes." Farris Decl. ¶¶ 5, 12, 15, Dkt. 17-1. Plaintiff may not sue as *parens patriae* on behalf of private homeowners. *Murthy*, 603 U.S. at 76, and any downstream effects on County tax revenues is too attenuated to form a cognizable injury, *Maryland*, 151 F.4th at 210. Absent any underlying concrete injury, any procedural or informational injury is insufficient to establish standing. *See Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (requiring a plaintiff to allege a lack of information "creates a 'real' harm with an adverse effect" (quoting *Spokeo, Inc. v.*

*Robins*, 578 U.S. 330, 340 (2016))); *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (requiring "some concrete interest" to support a procedural injury).

Finally, Plaintiff alleges that it will be harmed because the Arch will limit when County law enforcement can deploy drones. Pl.'s Br. 14. But Plaintiff also points out that the NCPC submission "did not include drones, snipers or other features of [a] military complex," *id.*at 8, and that "NPS did not address the impact of drones, snipers, or national-security functions," *id.* at 9. Plans for any operations have not yet been finalized, are not included in the record, and fall outside the Department of the Interior's regulatory authority. Any future national security uses would result from separate action by the Departments of War or Homeland Security, Ex. R, ¶ 4, Ex. S, ¶ 4, neither of which is a defendant in this case. Plaintiff nonetheless relies on a declaration that speculates that, if either agency were to take such a final action, the FAA "could" limit County drone operations "[d]epending on the scale" of the federal action, which "risk[s] reducing [Plaintiff's] capacity" to address crime. Tabibi Decl. ¶ 15, Dkt. 17-3. But standing may not be based on a "highly attenuated chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). Plaintiff may seek to challenge final agency action by DOW, DHS, or the FAA in a future case, but this speculative harm is insufficient to establish standing here.

### B. Plaintiff's Injuries Do Not Fall Within the Zones of Interests of the Statutes It Invokes.

Should the court determine that Plaintiff has adequately pled a concrete injury in fact, the court will then need to determine whether Plaintiff is within the relevant statute's zone of interests. "To invoke a statutory cause of action, a plaintiff must be within the 'zone of interests' that the statute protects." *Food & Drug Admin. v. R. J. Reynolds Vapor Co.*, 606 U.S. 226, 232 (2025). Because Plaintiff's interests are not "arguably within the zone of interests to be protected or regulated by the statute[s]" they invoke, *id*. at 233, the claims cannot move forward.

Should the court determine that Plaintiff has adequately pled a concrete injury in fact, the court will then need to determine whether Plaintiff's Article III injury falls within the zone of interests of the statutes that supply its causes of action. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990). None of Plaintiff's injuries fall within the zone of interests of Section 8106, and only its alleged aesthetic injury falls within the zone of interests of the NHPA (and is inadequate).

Plaintiff's interests and injuries fall outside the zone of interests of 40 U.S.C. § 8106. The "specific provision[s] which [Plaintiff] allege[s] ha[ve] been violated," *Bennett v. Spear*, 520 U.S. 154, 176 (1997), is the express Congressional authorization requirement. Am. Compl. ¶¶ 185, 191, Dkt. 14. This requirement defines the relationship between the legislative and executive branches and reflects Congress's efforts to safeguard its "exclusive powers" over federal property in the District of Columbia. *Nat'l Tr. for Hist. Pres. v. NPS*, 185 F.4th 1185, 1196 (D.C. Cir. 2026), *stay granted*, 609 U.S. 1068 (2026) (per curiam). Harms to emergency services, traffic, airline flight plans, historic properties, or police drone operations, even if injuries "in an Article III sense," "are unrelated to the statutory prohibitions" in 40 U.S.C. § 8106, which exists to protect Congress's interests and not Plaintiff's. *Thompson v. North Am. Stainless, LP*, 562 U.S. 170, 178 (2011).

NHPA focuses on harm to historic properties, 54 U.S.C. § 306108, not emergency services, congestion, or other unrelated forms of injury. Thus, even if the court determines that one of Plaintiff's other harms is sufficiently concrete, that injury is not enough to support Plaintiff's NHPA claim. Plaintiff has alleged no concrete Article III injury to its own historic properties; instead, it alleges aesthetic harm to private properties, an impermissible *parens patriae* suit. Absent some concrete injury to Plaintiff's own historic properties, Plaintiff cannot pursue an NHPA claim.

NEPA's zone of interests is "protecting the physical environment," *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 773 (1983), while the Organic Act promotes

conservation of park resources, 54 U.S.C. § 100101(a). To the extent that Plaintiff's injury is based on the economic consequences of the Arch (planning costs, staff time, or lost revenues), rather than environmental impacts, its injury falls outside the zone of interests of these statutes. *See Clinton Comm. Hosp. Corp. v. S. Md. Med. Ctr.*, 510 F.2d 1037, 1038 (4th Cir. 1975) (per curiam). Similarly, the CWA aims to "ensure the continued public use and enjoyment of open space," 40 U.S.C. § 8901(2), by ensuring commemorative works are "appropriately designed, constructed, and located," *id.* § 8901(4). The CWA aims to "protect[] open space, existing public use, and cultural and natural resources." *Id.* § 8905(b)(2)(B). To the extent that Plaintiff's injury is based on something other than existing public uses of Memorial Circle, such as planning costs, flight-plan changes, or lost revenues, it falls outside the zone of interests of the CWA.

## II. Plaintiff Cannot Show Irreparable Harm.

Merely showing some "possibility of irreparable injury" for preliminary relief is insufficient. *Nken v. Holder*, 556 U.S. 418, 434–35 (2009). Instead, a movant must show that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). This must be a "'clear showing of irreparable harm'" that is "'neither remote nor speculative, but actual and imminent.'" *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). A failure to establish irreparable harm independently justifies denying a preliminary injunction. *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 544 (4th Cir. 2023).

Plaintiff has not identified any irreparable harm based on emergency response times. As explained above, this injury is either a harm to residents, not Plaintiff itself, or it reflects the indirect costs of responding to federal action, which is not a concrete harm under *Maryland*, 151 F.4th at

210. Even if the court concludes that this harm is sufficiently concrete, Plaintiff has provided no details about the delays on any given route or how reallocation could affect emergency services elsewhere in the County, so it cannot show that this harm is substantial and irreparable.

Next, Plaintiff states it will suffer harm in the form of the costs of "immediate planning to mitigate the traffic effects of construction," "the need to rework its emergency-services planning to offset congestion," and lost bus revenues. Pl.'s Br. 31–32. The County cites *Maryland v. U.S. Department of Agriculture*, 770 F. Supp. 3d 779 (D. Md. 2025) for the proposition that its "harm is irreparable because money damages are likely not available." Pl.'s Br. 31. Plaintiff omits that case's subsequent history: After the district court granted a preliminary injunction and the plaintiffs appealed, the Fourth Circuit vacated the district court's opinion and remanded with directions to dismiss for lack of standing. *Maryland*, 151 F.4th 197. The Fourth Circuit concluded that the monetary harms to the plaintiff States were not even a "judicially cognizable injury," *id.* at 210, much less the kind of substantial and irreparable injury that could justify a preliminary injunction. Even if Plaintiff's planning costs are cognizable, Plaintiff's declarations do not identify how much money or staff time will be required, so it has not shown that it will suffer "significant and irreparable" injuries absent an injunction. *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021). In the absence of any evidence of the significance of its planning costs, Plaintiff's harm is exactly the kind of "administrative inconvenience" the court distinguished in *HIAS*.

Third, Plaintiff's alleged harms of "threat of irreparable harm due to accidents and flight disruption," as well as "cyclist and pedestrian safety[,]" Pl.'s Br. 32, are risks to motorists, cyclists, pedestrians, and airline passengers, not Plaintiff itself, and none present the "actual or imminent" threat required to establish irreparable harm. *Scotts Co.*, 315 F.3d at 283. Plaintiff speculates that the Arch "will raise the threat of irreparable harm," create "risks," and "may result in more

crashes," Pl.'s Br. 32, all of which are speculative and fall short of the "likely" harm that Plaintiff must demonstrate. *Winter*, 555 U.S. at 20.

Finally, Plaintiff suggests it will suffer "environmental damage" because NEPA review was purportedly insufficient. Pl.'s Br. 33. Contrary to Plaintiff's suggestion, there is no presumption "that an injunction is the proper remedy for a NEPA violation." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S, 139, 157 (2010). Instead, an injunction may only issue if a movant shows that it will suffer irreparable injury. *Id.* at 162. Plaintiff has not identified any environmental harm to its land or infrastructure.

Plaintiff fails to demonstrate it would suffer any irreparable harm as a result of the Arch. Plaintiff's failure to meet its burden on this factor independently requires this court to deny the motion.

## III. Plaintiff Has Failed to Establish Substantial Likelihood of Success on the Merits.

### A. The Preliminary Injunction Must Be Denied Because Venue Is Improper.

This venue is improper. "Courts faced with an argument that venue is improper must resolve that issue prior to addressing the merits of any claim, including a preliminary injunction." *Proctor & Gamble Co. v. Ranir, LLC*, No. 1:17-CV-185, 2017 WL 3537197, at *4 (S.D. Ohio Aug. 17, 2017) (collecting cases). While Plaintiff invokes the plaintiff-based venue provision of § 1391(e), Am. Compl. ¶ 21 (citing 28 U.S.C. § 1391(e)), Plaintiff overlooks that Congress authorized plaintiff-based venue *only* "if no real property is involved in the action." 28 U.S.C. § 1391(e)(1)(C). But Plaintiff's action "involves" real property—Memorial Circle. E.g. Am. Compl. ¶ 77.

The thorough and persuasive analysis of the plain meaning, statutory structure, legislative history, and relevant precedent in *Western Watersheds Project v. Burgum*, No. 1:18-CV-00187-

REP, 2025 WL 3853055, at *11-16 (D. Idaho Dec. 29, 2025), explains that all statutory construction tools compel a broad interpretation of "involved" here. Plaintiff's action thus "involves" Memorial Circle: its requested injunctive relief affects what NPS may build there; its claims include D.C.-specific legal property restrictions as a necessary condition of building on that site; and its entire action draws Memorial Circle into this suit—brings it into connection—by discussing that federal property over 50 times. *E.g.*, Am. Compl. ¶ 77; *W. Watersheds Project*, 2025 WL 3853055, at *11–16. Because Plaintiff provides no other basis for venue aside from its residence, it has failed to carry its burden to establish proper venue. Its suit must therefore be dismissed or transferred to the District of Columbia, where three similar challenges are currently pending.

**B. The Proposed Arch Does Not Violate Any Statutes.**

**1. The Authorization Act and the Organic Act Authorize the Arch.**

NPS has authority to build the Arch under the 1925 Authorization Act and NPS's Organic Act. As set forth above, Congress authorized construction of Memorial Bridge and development of Columbia Island as a park "in accordance with the design" set forth in the Bridge Commission Report, Pub. L. No. 68-463, § 1, 43 Stat. 974 (1925) and empowered the Bridge Commission to make design changes, "as in its discretion may be found to be necessary or advisable." *Id.* When Congress authorizes a project "in accordance with" plans set forth in a report to Congress, the Executive Branch generally has "considerable discretion" to modify aspects of the project's design. *See, e.g.*, *Britt v. U.S. Army Corps of Eng'rs*, 769 F.2d 84, 89-90 (2d Cir. 1985) (collecting cases). And here the 1925 Authorization Act expressly specified that the Commission had discretion to make changes.

And the Authorization Act contains no language indicating that the authorization of construction pursuant to a "ten-year program of expenditures and construction," 43 Stat. at 974–75, expired or was repealed after that time, or that congressional reauthorization was necessary. Because the Authorization Act does not contain any sunset or express expiration, the authorization provided therein remains in effect today. *See, e.g.*, *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 159 (2003). "[S]tatutes seldom say anything about their duration, and we usually only find a duly enacted provision of Congress is expired when it says so." *Pawnee Nation of Oklahoma v. Zeldin*, No. 25-9548, 2026 WL 3092945, at *10 (10th Cir. Oct. 16, 2026). Here, Congress elected not to include any sunset date for the Authorization Act and this Court should reject Plaintiff's attempt to amend the statute through litigation.

The historical implementation of the Authorization Act reflects that design elements changed over time and construction under the Act continued well past 1935—the 10-year benchmark—to add elements. *Supra* 2–3. In 1947, 12 years past the 10-year timeline, NCPC considered that the authority was still valid, as shown by its recommendation to NPS, to complete the project, Ex. E, including by adding the "middle" back into the design. Ex. F. Further, elements were indeed added after that. Equestrian statutes at the Washington entrance to the bridge—not part of the original design—were added to Memorial Bridge by 1951,[3] under the aegis of the Authorization Act. Thus, although the monument plaza has not yet been built, the Congressional authorization remains both to build on Memorial Circle and to do so under designs approved by the NPS, NCPC, and CFA.

---

[3] Although sculptors prepared plaster models in 1941, the statues were not added until 1951, after the Government of Italy cast them as a gift. National Park Service, Historic American Engineering Record (HAER), Arlington Memorial Bridge, HAER No. DC-7, at 96–102, https://tile.loc.gov/storage-services/master/pnp/habshaer/dc/dc0600/dc0604/data/dc0604data.pdf.

Plaintiff is thus wrong that the Authorization Act does not authorize the Arch. Pl.'s Br. 18–19. And Plaintiff is wrong that the Authorization Act precludes design updates, such as an arch of 166 feet plus statues on top instead of columns of 166 feet plus statues on top. Pl.'s Br. 18. The original pylons envisioned at the Washington entrance to the bridge gave way to gold equestrian statues; the "stately columns" "surmounted by statues" can also give way to a different element on Memorial Circle under the Act's authorization to make design changes "as in its discretion may be found to be necessary or advisable." Pub. L. No. 68-463 § 1, 43 Stat. 974. Plaintiff has not shown otherwise.

In addition to the Authorization Act, NPS has authority to construct the Arch pursuant to its Organic Act authority and its general authorization to operate the Park System. Congress specifically empowered the Secretary of Interior, through NPS, to "promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects . . . ." 54 U.S.C. § 100101(a). This power dates back to the initial NPS Organic Act, ch. 408, 39 Stat. 535 (1916). NPS has used this statute for more than 100 years to engage in major construction on parkland. *Program Comment on Stewardship and Management of National Park Service Mission 66-Era Facilities* (1945-1972), 89 Fed. Reg. 97,631, 97,631 (Dec. 9, 2024).

As relevant here, NPS has used that authority for decades to engage in major construction in national park system units in the District of Columbia without any further congressional approval. This includes the National Capital Region Headquarters; the U.S. Park Police Headquarters; 74,000 square feet of administrative facilities in East Potomac Park; U.S. Park Police Stables on the National Mall; and a 7,500-seat tennis stadium in Rock Creek Park. *See* Nat'l Cap. Plan. Comm'n, Executive Director's Recommendation, at 1 (Jan. 7, 2016),

https://perma.cc/8D47-BNV6 (last visited Nov. 12, 2026); Ex. M, Decl. of Tammy Stidham, Assoc. Reg. Dir., Lands and Planning, NPS (dated November 13, 2026). None of those projects was specifically exempted from § 8106 by an act of Congress. All were done pursuant to the NPS Organic Act and its general authorization to operate the National Park System.

Accordingly, the Arch is authorized by the Authorization Act of 1925 and the Organic Act.[4]

**2. The CWA Does Not Apply.**

The CWA does not apply to the Arch for two independent reasons—the Arch is not a "commemorative work" within the meaning of the CWA, and even if it were a "commemorative work," the CWA does not apply to such works authorized by laws enacted before 1985. The CWA defines a "commemorative work" as one "designed to perpetuate in a permanent manner the memory of an . . . event or other significant element of American history, except that the term does not include . . . a structure which is primarily used for other purposes." 40 U.S.C. § 8902(a)(1); *Niz-Chavez v. Garland*, 593 U.S. 155, 163 (2021) ("Congress's decision to use the indefinite article 'a' thus supplies some evidence that it used the term . . . as a discrete, countable thing."). In its Final Decision Record, NPS explained that the Arch is designed to "celebrate 250 years of American independence" and "symbolizes perseverance, strength, and greatness" and "the profound blessing of living in this great country, America." Ex. N, NPS Decision Record, at 1. Thus, NPS explained that the Arch is "not designed to perpetuate the memory of any individual, group, event or other significant element of American history[,]" and is, instead, a "monument to the future of America." *Id.* Thus, the Arch is *forward-looking* in design, intended to perpetuate American greatness, not *backwards-looking* to *commemorate* something.

---

[4] Authorization of the Arch does not substantively contravene the Organic Act, either, as explained *infra* 23–27.

The definition of a commemorative work also excludes "a structure which is primarily used for other purposes," and Plaintiff has not shown that the Arch will "primarily" be used to perpetuate the memory of a significant element of American history. Rather, NPS has explained that "[r]egardless of the symbolism that any one person attaches to it, the arch will be used for the primary purpose of presenting an inspiring ceremonial gateway to Washington, D.C." Ex. N, NPS Decision Record, at 1. This purpose is consistent with the goals of the Authorization Act which included "the provision of a magnificent entrance to Washington from Virginia for the Lee Highway coming across the entire country from Los Angeles, California." Bridge Commission Report 5. The primary purpose of the Arch is up to the government to decide, not the Plaintiff.

And contrary to Plaintiff's assertion, the Revised EA does not describe *the Arch* as a "major commemorative feature." Pls' Br. 18 (citing Ex. G, Revised EA, at A-2). Rather, the Revised EA discussed the initial design as including "two columns representing national reunion," and it then explained that "the original vision of a major commemorative feature anchoring the Circle was never fulfilled." Ex. G, Revised EA, at A-2. To the extent Plaintiff is effectively acknowledging that the Arch fulfills that design element in the 1925 Authorization Act, the CWA is inapplicable because the Arch was authorized before 1985. And in any event, there is reason to doubt even the original columns would fall within "commemorative work" as defined in the CWA: the columns were meant to symbolize reunion of the North and South and the future of America, not to commemorate the Civil War or the disunion. Accordingly, it was forward-looking and aspirational. In any event, the Revised EA states that the Arch, while "reflect[ing]" that "intended character," provides a "new interpretive and experimental landmark" that "celebrates 250 years of American independence[,]" *id.*, and the Decision Record calls it a "monument to the future of America." Ex. N, NPS Decision Record, at 1.

Second, even assuming the Arch were a commemorative work under the CWA, the CWA "does not apply to commemorative works authorized by ***a*** law enacted before January 3, 1985." Pub. L. No. 99-652 § 10(e), 100 Stat. 3654, codified at 40 U.S.C. § 8902(b) (emphasis added). As explained above, the Arch was authorized by "a" law enacted before 1985—the Authorization Act of 1925. *Supra* 15–17.

### 3. Section 8106 Does Not Apply to the Arch.

40 U.S.C. § 8106 also does not apply to the Arch for two independent reasons. First, as explained above, Congress authorized the Arch with the Authorization Act of 1925, so § 8106 does not apply; there is no question that § 8106 permits construction of buildings or structures with "express authority of Congress." 40 U.S.C. § 8106. On this claim, the court could stop there.

Second, § 8106 does not apply (and has never applied) to the NPS. Section 8106 provides that: "A building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." *Id.* But this language cannot be read in isolation and must be understood considering the entire enacting statute, the provision's history, and its implementation over the years. *See United States v. Bryant*, 949 F.3d 168, 175 (4th Cir. 2020) ("[W]e must interpret the statute with reference to its history and purpose as well.").

Congress originally enacted the provision that would become § 8106 via an appropriations bill in 1912. Aug. 24, 1912, ch. 355, 37 Stat. 417, 442–44 (1912). That original enactment prohibited the Engineer Department in the War Department (now the Army Corps of Engineers) from construction of buildings or structures on any reservation, park, or public grounds in DC without expression Congressional authority. *See id.* ("Under Engineer Department . . . [h]ereafter there shall not be erected on any reservation, park, or public grounds, of the United States within

the District of Columbia, any building or structure without express authority of Congress."). In the very same appropriations bill, Congress enacted a separate limitation on the Interior Department's administration of national parks: "No expenditure for construction of administration or other buildings . . . exceeding one thousand dollars shall hereafter be made in any national park except under express authority of Congress." *Id.* at 460 (later codified at 16 U.S.C. § 451).

Thus, Congress enacted two different limitations at the same time: one on Interior's construction on national park lands everywhere (codified at 16 U.S.C. § 451), and a separate one on the War Department's construction in the District of Columbia specifically (codified at 40 U.S.C. § 8106). The limitation on NPS's construction on parklands via Section 451 confirms that NPS **does** *otherwise* have general authority to construct buildings and structures under its Organic Act—there would be no need for a *limitation* if NPS has no authority in the first instance. In other words, Congress enacted a specific limit on NPS to cabin its inherent construction authority.

However, § 8106 placed no restriction on NPS, as shown by Congress routinely exempting NPS construction activity—including in the District of Columbia—from Section 451, *see, e.g.*, Pub. L. No. 80-841, 62 Stat. 1112, 1141 (1948); Pub. L. No. 101-512, 104 Stat. 1915, 1920 (1990), but not from § 8106. Thus, NPS constructed the National Capital Region Headquarters, the U.S. Park Police Headquarters, and the Rock Creek Tennis Center, as well as countless kiosks and other structures in the National Capital Region, all without either a specific exemption from or authorization pursuant to § 8106. Executive Director's Recommendation, National Capital Region Campus Renovation Project and Park Police District 1 Substation, Commission Meeting, National Capital Planning Commission at 1 (Jan. 7, 2016). Congress' regular exemption of NPS construction from Section 451, but not from § 8106—even for projects in the District—shows that Congress intended the limit in Section 451 rather than § 8106 to apply to NPS construction in DC.

In 1996, Congress repealed Section 451. *See* Pub. L. No. 104-333, 110 Stat. 4093, 4186 (1996). And NPS continued to construct buildings and structures in DC without any congressional exemption from § 8106, including new U.S. Park Police Stables on the National Mall and a 7,500-seat tennis stadium in Rock Creek Park. Ex. M at ¶¶ 14–21 (Nov. 13, 2026). Congress acquiesced in this interpretation. *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 119 (2022); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (explaining "longstanding practice of the government" is an "aid" to "inform a court's determination of what the law is" (citation modified)). Indeed, "[i]f Congress has continually declined to disturb a longstanding interpretation of a statute, that 'may provide some indication that Congress at least acquiesces in, and apparently affirms, that interpretation.'" *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 50 F.4th 164, 182 (D.C. Cir. 2022). Here, Congress has not exempted any NPS construction from the strictures of § 8106 and did not act at all in response to any of the above construction. The lack of exemption from § 8106 for NPS construction projects in the District after the repeal of Section 451 thus confirms that Section 451 was the *only* limit on NPS' construction on District parklands. Accordingly, the best reading of § 8106 is that Congress understands it not to apply to NPS construction on parklands in the District.

To drive the point home, the sole example of Congress exempting a particular building in the District pursuant to § 8106 is a 1993 statute providing that "the limitation on construction contained in [§ 8106] shall not apply to the construction" of "facilities to house bonsai collections at the National Arboretum." Pub. L. No. 103-111, 107 Stat. 1046, 1051 (1993). The exemption was necessary because the National Arboretum is managed by the Department of Agriculture, not NPS, and is not a national park. Accordingly, a reading of § 8106 as restricting entities other than NPS from constructing buildings on national parkland in D.C., is the best reading.

Finally, even if § 8106 did apply, and it does not, it cannot be read to require anything more than some form of authorization from Congress to construct a building. The Authorization Act of 1925 and the Organic Act, as explained, provide authorization to construct buildings on national parkland; as also explained below, approval of the Arch is consistent with the Organic Act.

**4. Authorization of the Arch Complies with the Organic Act.**

Plaintiff argues that authorization of the Arch "will violate the Organic Act's conservation mandate" and is "in derogation of the values and purposes for which the System units have been established," and therefore must be "directly and specifically provided by Congress[,]" under 54 U.S.C. § 100101(b)(2). Pl.'s Br. 3, 21 (citing *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 290-91 (4th Cir. 2018) (referencing the language from 54 U.S.C. § 100101(b)(2)). This argument confuses the elements of NPS's Organic Act mandate and is incorrect.

Although the Organic Act does require NPS to conserve park resources, that discretionary duty is separate from the Act's prohibition on the impairment of park resources. Under the Organic Act, NPS "balance[s] the sometimes conflicting policies of resource conservation and visitor enjoyment in determining what activities should be permitted or prohibited." *S. Utah Wilderness All. v. Dabney*, 222 F.3d 819, 826 (10th Cir. 2000). The "test for whether the NPS has performed its balancing properly is whether the resulting action leaves the resources 'unimpaired for the enjoyment of future generations.'" *See id.* at 827.

"Impairment" and "derogation" have consistently been interpreted to mean the same thing. *See NPS Management Policies 2006*, § 1.4.2;[5] *S. Utah Wilderness All. v. National Park Service*,

[5] Available at https://www.nps.gov/subjects/policy/mp-1-foundation.htm ("Although the two relevant statutory provisions use different wording ('unimpaired' and 'derogation'') to

387 F. Supp. 2d 1178, 1191 (D. Utah 2005) (equating the two terms in this context). The requirement that activities be "directly and specifically provided by Congress" in 54 U.S.C. § 100101(b)(2) only applies to activities that would cause "derogation," or impairment, of park resources.

NPS determined that its authorization of the Arch is not an activity that would cause derogation or impairment. NPS issued a non-impairment determination (NID) finding that the Arch would not impair park resources, *i.e.*, that the Arch is not in derogation of the values and purposes for which the GW Parkway was established. Ex. N, Decision Record, Appendix C (NID), C-1. And the agency determines what constitutes an impairment—a determination that is subject to arbitrary-and-capricious APA review under the APA. *Bluewater Network v. Salazar*, 721 F. Supp. 2d 7, 21 (D.D.C. 2010). The role of the court is thus not to determine in the first instance whether an action impairs park resources and requires Congressional authorization, but whether NPS's conclusion that activities will not impair park resources is reasonable. *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 98–99 (D.D.C. 2006). To the extent Plaintiff implies otherwise, Pl.'s Br. 20–22, that is wrong. In reviewing NPS' non-impairment determinations, the court examines the "how the facts found led to the conclusion that each impact was not an 'impairment' under the Organic Act." *Bluewater Network*, 721 F. Supp. 2d at 24. Like other APA actions, the court will "uphold the Park Service's exercise of discretion unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" and so long as it is "based on a reasoned, permissible construction of the relevant statute.'" *Daingerfield Island Protective Soc. v. Babbitt*, 40 F.3d 442, 446 (D.C. Cir. 1994) (citations omitted).

---

describe what the National Park Service must avoid, they define a single standard for the management of the national park system—not two different standards.)."

Thus, NPS did not need to seek separate Congressional authorization for the Arch under § 100101(b)(2) because a predicate condition for doing so—impairment of park resources—was not met. *Id.*[6] And the NID considered the park resources subject to the Organic Act's non-impairment requirement and identified in the Capper-Cramton Act,[7] so it considered the relevant statutes. *Daingerfield Island*, 40 F.3d at 446; *S. Utah Wilderness All.*, 222 F.3d at 824 (agency considered the park's enabling statute and the Organic Act). Ex. N, NID, C-2. The NID noted that the Foundation Document "identifies several fundamental resources and values that are impacted by this project," including two of the Parkway's fundamental values and resources—iconic vistas and views, and the Arlington Memorial Bridge/Memorial Avenue Corridor—that warranted detailed treatment. *Id.* at C-2–C-3.

In finding non-impairment for the Parkway's historic views, NPS noted that early concepts for Memorial Circle included prominent architectural features—two large columns—"which would have introduced substantial vertical elements in the same location as the Arch and would themselves have reframed historic sightlines[,]" *id.* at C-4; thus, NPS reasonably concluded that the introduction of vertical elements now "does not represent a fundamental departure from the area's designed framework." *Id.* NPS determined that "the key characteristics that define the Parkway's historic views remain discernible and intact and available to enjoy." *Id.* at C-5. Thus, NPS reasonably concluded that the fundamental resources of the Parkway—its historic views—would not be impaired.[8] *Id.* With regard to Memorial Avenue Corridor, NPS concluded that

[6] The Arch is also authorized. *Supra* 15–18.

[7] "Purpose," Foundation Document, George Washington Memorial Parkway at 9-10 (referencing the Capper-Cramton Act, Appendix A of the Foundation Document), available at https://npshistory.com/publications/foundation-documents/gwmp-fd-2014.pdf

[8] "Under NPS Management Policies, impairment occurs only when an impact will harm the integrity of park resources or values, including the opportunities that otherwise will be present for the enjoyment of those resources or values." Ex. N, NID, C-5.

"despite permanent modifications to view composition and visual hierarchy, the defining characteristics of the cultural landscapes will remain intact and clearly interpretable[,]" and thus were not impaired. *Id.* at C-6. The NID undertook a similar analysis for the other relevant resources and values of the Parkway. *Id.* at C-6 to C-9. The court can clearly discern how each non-impairment determination was made. *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (the court will uphold a decision if the agency's path may reasonably be discerned).

Moreover, Plaintiff's citation to Section 4 of the Capper-Cramton Act, regarding "playground, recreation center, community center, and similar municipal purposes," is irrelevant to Memorial Circle. Pl.'s Br. 20. Section 4 authorized acquisition of land in DC for the Parkway, but Memorial Circle, although in DC, has been federal land since its creation by filling in the 1910s and 1920s, *see* Ex. G, Revised EA, at 45, and was thus not acquired by Section 4. Section 1(a), incorporating the "the Mount Vernon Memorial Highway authorized by the Act approved May 23, 1928, upon its completion[,]" instead applies.[9] The purpose of Section 1(a) is to have a parkway, and to preserve natural resources in a particular portion of the parkway—the Potomac Gorge and Great Falls—that is located well upstream of Memorial Circle. The Arch is consistent with those purposes, as explained in the NID. Ex. N, NID, C-3.

Further, to the extent that the Parkway's nomination for listing in the NHRP is relevant at all to Plaintiff's Organic Act claim, Plaintiff misrepresents what it states. Pl.'s Br. 21. The nomination form does not state that the Parkway was "designed" to prevent development but rather

---

[9] That 1928 Act (ch. 719, 45 Stat. 721) authorized construction of a "suitable memorial highway to connect Mount Vernon, the home and burial place of George Washington, in the State of Virginia, **with the south end of the Arlington Memorial Bridge**[.]" Ex. O (Emphasis added). The south end of the Arlington Memorial Bridge is Memorial Circle, the physical connection between the Bridge and the Mount Vernon Memorial Highway.

that it "has significance" because, as detailed extensively in the 24-page nomination form, its existence prevents such commercial and residential development encroaching on the river, as well as hydroelectric development, not the placement of a monument. Ex. P, George Washington Memorial Parkway National Register of Historic Places Nomination Form, at PDF p. 20. In fact, the nomination form lists several other functions of the Parkway, including "as a designed entryway into the nation's capital: part of a strong effort over the years to provide visitors with entries appropriate to the important role played by Washington, D.C., in the national and international community[,]" and "a picturesque approach to the monumental core of the capital, dipping and rising with the landscape, providing glimpses of the Potomac River, the monuments, and the federal city beyond." *Id.* The placement of a monumental Arch as an entryway into the capital is consistent with that aspect.

**C. NPS Reasonably Approved the Arch and Reasonably Explained its Decision.**

For the reasons detailed extensively herein, NPS reasonably approved the Arch, and its decision withstands arbitrary and capricious review. NPS is reasonably fulfilling a century-old vision of the Memorial Bridge complex, which explains why the Arch is necessary and why at Memorial Circle. *Supra* 2–3; 15–18. As explained above, the Arch does not contravene NPS's conservation mandate, and NPS's choices for how to execute the direction from Congress and the President were well within the exercise of its discretion and consistent with the park unit that contains Memorial Circle. *Supra* Section III.B.4 (Organic Act). And the decision here "can be scrutinized by courts and the interested public." *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). The record is not yet before the Court, but the public documents available—the EA, the Decision Record, the NID—show the agency diligently pursuing the required reviews and adequately supporting its findings. Contrary to Plaintiff's suggestion, an agency moving

expeditiously is not evidence of a "charade" or a "sham" (Pl.'s Br. 23)," and moving quickly toward an Executive and congressional goal certainly does not come close to the "well-nigh irrefragable proof" needed to overcome the presumption of good faith, *Moore v. United States*, 943 F. Supp. 603, 614 (E.D. Va. 1996), if that is what Plaintiff is getting at.

The examples Plaintiff points to do not lend credence to its theory. Pl.'s Br. 23. With regard to Section 106 of the NHPA, that the consulting parties insisted only on alternatives that were unacceptable to the purpose and need does not demonstrate a lack of good faith to reach a memorandum of understanding; it demonstrates that "further consultation would not be productive," which is why the ACHP terminated. Ex. Q, ACHP Letter, at 1. The Section 106 review process also "does not dictate particular decisional outcomes," *United Keetoowah Band of Cherokee Indians v. F.C.C.*, 933 F.3d 728, 734 (D.C. Cir. 2019) (citation omitted), or "require . . . changes being made to the proposed project." *Pres. Soc'y of Newport Cnty. v. Burgum*, No. 23-CV-03510 (APM), 2026 WL 787910, at *16 (D.D.C. Mar. 20, 2026). With regard to NEPA, the EA and FONSI were not flawed or unreasoned. *Infra* III.C. And the agency appropriately presented to NCPC and appropriately received its approval in voted after the Commission heard every public commenter who registered, well beyond the scheduled end of the meeting. That Plaintiff may not like the vote does not mean that the approval is invalid.

Further, plans for any national security uses of the Arch have not yet been finalized, so it is premature to conclude that they would be incongruent with the approved plans. Nor is there any merit to Plaintiff's suggestion that NPS ignored this aspect because the extant environmental documents do not consider proposed security features of the Arch. The determination of "what facts" are relevant to the agency's decision is one entitled to substantial deference. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty. Co.*, 605 U.S. 168, 185 (2025). And it would generally be the

prerogative of national security agencies, not NPS, to determine the need for and analyze such design modifications.[10] While there may be a subsequent dispute about whether, in the event such plans are finalized, a supplemental EA or EIS must be prepared, no such dispute is ripe now. *See Sierra Club v. FERC*, 97 F.4th 16, 28 (D.C. Cir. 2024) (rejecting NEPA claim because agency "made no changes to the proposed project that would trigger a supplemental NEPA analysis").

The deference point warrants emphasis: *Seven County* repeatedly emphasized to lower courts that "the central principle of judicial review in NEPA cases is deference." 605 U.S. at 179. Thus, all NEPA requires is whether the agency "drew a reasonable and manageable line," not whether "NEPA would support drawing a different line," and not whether this Court or the Plaintiffs would like the agency to draw a different line. *Id.* at 190 (citation modified); *see also Sierra Club v. FERC*, 153 F.4th 1295, 1311 (D.C. Cir. 2025) (recognizing that, "[a]fter *Seven County*, the era of searching NEPA review is over"). This precedent forecloses Plaintiff's arguments, which rely on second-guessing agency decisionmaking and looking beyond the agency's own analysis to demand analysis of project features that have not been fully defined.

Deference is also warranted in the face of Plaintiff's fly-specking of NPS's analysis. Pl.'s Br. 26. NPS has "broad latitude" to decide "where to draw the line" in assessing environmental effects. *Seven Cnty.*, 605 U.S. at 182. And the decision not illogical—the existence of the Memorial Bridge plan indicates that having a structure on Memorial Circle has long been contemplated. Fulfilling that vision is not illogical or arbitrary. Nor has NPS greenlit a national security structure, since that aspect has yet to be fully determined by the relevant decision-makers and would be subject to other reviews. *See supra* I.A; *infra* IV. But "the district court" "exceed[s] the proper

---

[10] Under the Supreme Court's holding in *Weinberger v. Cath. Action of Hawaii/Peace Educ. Project*, an NEPA analysis "need not be disclosed" if necessary to "preserve military secrets." 454 U.S. 139, 145 (1981).

scope of its inquiry when it place[s] probative weight upon evidence of" the DOW's or DHS' "subjective intent." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 198 (4th Cir. 2005). And when there is additional planning to be done, subject to additional environmental reviews, the proper remedy is to wait for those specific reviews, not enjoin the national security project. *Id.* at 202 (reversing the district court's grant of an injunction prohibiting the Navy from taking any action to construct a base during the pendency of additional environmental reviews).

### C. The Agency's NEPA Review was Adequate.

Plaintiff incorrectly contends that NPS's statement of purpose and need and evaluation of alternatives did not fulfill NEPA's requirements. Pl.'s Br. 27–30. NEPA is a "purely procedural statute" that "imposes no substantive environmental obligations or restrictions." *Seven County*, 605 U.S. at 173. As it has for other symbolic and ceremonial structures within the District of Columbia, the agency took its direction from Congress and the President as to the purpose and need for the project and examined all viable alternatives that would achieve those ends.

NPS's statement of purpose and need was not deficient. "The statement of a project's purpose and need is left to the agency's expertise and discretion," and courts "defer to the agency if the statement is reasonable." *Sierra Club, Inc. v. United States Forest Serv.*, 897 F.3d 582, 598 (4th Cir. 2018); *see also Seven County*, 605 U.S. at 179 ("[T]he central principle of judicial review in NEPA cases is deference."). An agency's statement of purpose and need is reasonable where, as here, it reflects "the goals of the project sponsors" and of Congress. *All. for Legal Action v. F.A.A.*, 69 F. App'x 617, 622 (4th Cir. 2003); *see also Webster v. U.S. Dept. of Agric.*, 685 F.3d 411, 423–24 (4th Cir. 2012). NPS's objective of building an ornate monumental arch (rather than some other type of structure) is an appropriate exercise of its discretion and is entitled to deference. Ex. G, Revised EA, at 1.

Plaintiff's argument that NPS failed to consider a sufficient range of alternatives misconstrues NEPA's requirements for a project with a specific purpose. An EA need only include a no-action alternative and a preferred alternative, but beyond that, NEPA does not require a "minimum number of alternatives that an agency must consider." *Sierra Club v. Fed. Highway Admin*, 715 F. Supp. 2d 721, 732 (S.D. Tex. 2010). An agency has "substantial discretion" in determining what constitute reasonable alternatives when assessing a particular project. *Seven Cnty.*, 605 U.S. at 181-82. "[A]n agency is not required to consider alternatives which are 'infeasible, ineffective, or inconsistent with basic policy objectives' for the action at issue." *South Carolina ex rel. Campbell v. O'Leary,* 64 F.3d 892, 900 (4th Cir. 1995) (").

Here, NPS eliminated several alternatives from detailed consideration that were inconsistent with the project's purpose. *See* Ex. G, Revised EA, A-1–2. For example, NPS explained that building a monumental arch at a different location would "sever the project from the specific historic planning precedent that provides the rationale for the undertaking's placement." *Id.* at A-1. NPS also considered, but ultimately eliminated, the possibility of building a smaller arch because it would result in "greater impacts on the cultural landscapes, specifically the views between the Lincoln Memorial and Arlington National Cemetery." *Id.* Plaintiff contends that the alternatives review is insufficient because NPS failed to consider alternative structures, such as the columns that were proposed in 1925. Pl.'s Br. 29. But the record is to the contrary. In the Revised EA, NPS explained that because the project envisions installing an arch at Memorial Circle, other types of features lacking the same "size, design, and statuary" were eliminated from consideration, Ex. G., EA, A-2, which would include columns.

The agency's NEPA review was also not unusual or untoward. As the NEPA documentation for numerous monuments that NPS established in recent administrations shows, the purpose and

need includes a specific site and memorial features in keeping with those already envisioned for the project and then examines an action and no-action alternative. Notable examples of these analyses include (1) the Martin Luther King, Jr., Memorial (planning documents available at https://parkplanning.nps.gov/document.cfm?parkID=427&projectID=13015&documentID=29527); (2) the Dwight D. Eisenhower Memorial (planning documents available at https://parkplanning.nps.gov/documentsList.cfm?projectID=16139); (3) the National Desert Storm and Desert Shield Memorial (planning documents available at https://parkplanning.nps.gov/documentsList.cfm?projectID=62216) and (4) the Peace Corps Commemorative Park (planning documents available at https://parkplanning.nps.gov/documentsList.cfm?projectID=54907).

NEPA also does not demand a lengthy analysis. *See Seven Cnty.*, 605 U.S. at 181 ("Brevity should not be mistaken for lack of detail. A relatively brief agency explanation can be reasoned and detailed"). Here, NPS's alternatives analysis was appropriate given the project's purpose and need.

**IV. The Public Interest Weighs Against Injunctive Relief**

Because Plaintiff has not demonstrated likelihood of success on the merits or imminent irreparable injury, the Court need not consider the final two factors of the *Winter* standard. But these factors also tilt heavily against a preliminary injunction. In assessing these factors, courts "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Where a movant seeks to enjoin the government, the final two factors "merge" because the government's interest is the public interest. *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder,* 556 U.S. 418, 435 (2009)).

Plaintiff tellingly provides no argument as to why emergency relief would serve the public interest, instead relying on its claims of irreparable harm, which are actually asserted on behalf of

its citizens, or non-concrete, and thus insufficient. *See* Pl.'s Br. at 34. They also accuse the agency of attempting to outrun judicial review, but nothing requires an agency to self-enjoin just because a plaintiff somewhere has a problem with the agency's actions and has decided to bring a suit. Rather, Plaintiffs must meet the high bar necessary for extraordinary relief—which becomes ordinary relief if the courts do not hold them to it.

Conversely, the "inability to enforce its duly enacted plans clearly inflicts irreparable harm" on the government. *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). And the government is always "likely to suffer irreparable harm" when courts enter "injunctions that likely exceed the authority conferred" to them. *Trump v. CASA, Inc.*, 606 U.S. 831, 860 (2025).

Entry of a preliminary injunction here would be particularly damaging to the public interest. As the declarations proffered from the Departments of War and Homeland Security describe, the Arch represents an "opportunity to mitigate" evolving threats from the proliferation of small, unmanned aircraft systems (UAS). Ex. J, Hegseth Decl. ¶ 10; Ex. K., Mullin Decl. ¶ 18 (the Arch "would, when properly equipped, provide an opportunity to substantially expand UAS detection"). The agencies are currently in the planning process for how to integrate such capabilities into the existing design of the Arch. Ex. R, ¶ 4; Ex. S, ¶ 4. This planning process is based on the current proposed location and height for the Arch. *See* Ex. J, Hegseth Decl. ¶¶ 11–12; Ex. K.; Mullin Decl. ¶¶ 14–15; Ex. R, Buria Decl., ¶ 3; Ex. S, Willoughby Decl., ¶ 3.

An injunction against the Arch would interfere with the government taking important steps to mitigate an ever-growing threat to the Nation's capital. *Winter*, 555 U.S. at 33. These significant national defense concerns "plainly outweigh" Plaintiff's asserted interests. *See id.* at 25–26. Because the "harms and equities are not nearly in equipoise," no injunction can issue. *Nat'l Park Servs.*, 609 U.S. at 1075.

Finally, judicial and executive economy counsel strongly against an injunction from this Court. "Wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation" counsels against duplicative lawsuits. *Kerotest Mfg. Co. v. C–O–Two Fire Equipment Co.*, 342 U.S. 180, 183 (1952). Over seven months before Plaintiff filed this suit, another challenge to the Triumphal Arch was filed in the United States District Court for the District of Columbia. *Supra* 4–5. Given that court's primacy over this dispute, an additional complaint—from Plaintiff's superior sovereign (the Commonwealth of Virginia)—has also been filed in that court. *Supra* 4–5. And a third proposed complaint from proposed intervenors is currently pending in that court. Mot. to Intervene as Plaintiffs, Dkt. 9, No. 26-cv-3838-TSC (D.D.C. Nov. 10, 2026). That court has already issued a temporary restraining order and is currently entertaining two preliminary injunction motions requesting a ruling by November 19, 2026. There is no reason for this Court to duplicate efforts of the first-filed court.

## V. FRAP 8 Stay Pending Appeal

If the Court nonetheless grants a preliminary injunction, Defendants intend to appeal and seek a stay pending appeal pursuant to Federal Rule of Appellate Procedure 8(a)(2). Pursuant to Rule 8(a)(1), Defendants therefore request that if the Court grants a preliminary injunction, it stay or delay implementation of that order pending a decision from the Fourth Circuit on Defendants' appeal.

The Court should stay its order pending appeal because each of the three stay factors weighs in favor of Defendants. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (three factors govern the stay determination: likelihood of success on appeal, irreparable injury to the United States, and the combined balancing of harms and the public interest). First, as demonstrated above, Defendants are likely to succeed on the merits. Construction of a structure within Memorial Circle is authorized by two statutes and does not contravene any others. *See supra* 15–27. Moreover, NPS complied

with applicable procedures and issued a reasonable decision based on the evidence before the agency. *See supra* 27–32. Second, the proposed injunction constitutes an imminent, ongoing injury to the Executive Branch. *See Trump v. California*, 609 U.S. 1032, 1041 (2026). The government is always "likely to suffer irreparable harm" when courts enter "injunctions that likely exceed the authority conferred" to them. *CASA, Inc.*, 606 U.S. at 860. The preliminary injunction could impede further study and planning related to national security against technology that seeks to outpace our nation's vigilance. By contrast, Plaintiff will not suffer from a stay pending appeal because they have not identified an imminent, concrete harm—particularized to the County rather than its citizens—from changes in traffic patterns or flight paths or impacts on historic or cultural resources. And their planning concerns are non-concrete administrative burdens.

Third, the requested preliminary injunction improperly intrudes upon the province of the Executive Branch without conveying any benefit to the public. *Fed. Power Comm'n v. Fla. Power & Light Co*., 404 U.S. 453, 464 (1972). Congress authorized the construction of monumental columns "surmounted by statues" on Columbia Island. Bridge Comm'n Report at 41. Over a century later, that mandate remains unfulfilled. The equities weigh in favor of carrying out Congress's mandate.

The merits weigh against enjoining the Arch, but if the Court grants an injunction, relief should be stayed pending appeal. At a minimum, the Court should stay any injunction for 30 days to allow the Fourth Circuit adequate time to consider the complicated issues and historical statutes at hand.

## CONCLUSION

Because Plaintiff has failed at every step to meet its burden of showing its entitlement to emergency relief, the Court must deny its motion.

Date: November 13, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

ROBERT STANDER
Deputy Assistant Attorney General

BENJAMIN HAYES
Deputy Assistant Attorney General

*/s/ Alison S. Vicks*
MICHAEL S. SAWYER, Senior Attorney
ALISON S. VICKS, Trial Attorney
Energy and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
202-353-5134 (Sawyer)
202-297-2862 (Vicks)
E-mail: michael.sawyer@usdoj.gov
alison.vicks@usdoj.gov

TODD W. BLANCHE
ATTORNEY GENERAL

THEOPHANI K. STAMOS
FIRST ASSISTANT UNITED STATES ATTORNEY

/s/
MEGHAN LOFTUS
Assistant United States Attorney
Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Ave.
Alexandria, VA 22314
Tel: (703) 299-3757
Fax: (703) 299-3983
Email: meghan.loftus@usdoj.gov

*Counsel for Defendants*