IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| COUNTY BOARD OF ARLINGTON COUNTY, VIRGINIA,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL PARK SERVICE, et al.,<br><br>Defendants. | ) | 1:26-cv-3372 (LMB/WEF) |

MEMORANDUM OPINION

On October 8, 2026, the County Board of Arlington County, Virginia ("plaintiff" or "the County") filed a Complaint for Declaratory and Injunctive Relief, which it amended on November 6, 2026 ("Amended Complaint"). [Dkt. No. 14]. The Amended Complaint asserts eight Counts under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., against the National Park Service ("NPS"); the U.S. Department of the Interior; Doug Burgum, Secretary of the Department of the Interior; and Jessica Bowron, Comptroller and Acting Director of NPS (collectively, "defendants"). The County alleges that NPS's decision to approve plans to construct a 250-foot "Triumphal Arch" ("the Arch") in Memorial Circle at the western end of Memorial Bridge was arbitrary and capricious, and that the approval exceeds NPS's statutory authority and violates its Organic Act, the Commemorative Works Act ("CWA"), 40 U.S.C. § 8106, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(2)(C), and the National Historic Preservation Act ("NHPA"), 54 U.S.C. § 306108.

Before the Court is the County's Motion for Preliminary Injunction and Section 705 Stay, and Conditional Temporary Restraining Order ("Motion"), in which it seeks to enjoin defendants from commencing construction of the Arch. The Motion has been fully briefed and argued

before the Court. For the reasons stated in open court and further discussed in this Memorandum Opinion, the Motion will be granted, and the Court will issue a preliminary injunction enjoining defendants from taking any actions to begin construction of the Arch.

## I. Standing

Defendants first argue that the plaintiff lacks standing to bring this action. A threshold requirement for federal jurisdiction is that a plaintiff have "standing to sue under Article III of the Constitution." Food & Drug Admin. v. All. for Hippocratic Med., 602 U.S. 367, 378 (2024). To establish standing, a plaintiff must show that it has suffered or is likely to suffer an injury in fact "that was likely caused by the defendant" and "would likely be redressed by judicial relief." Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin., 172 F.4th 361, 367 (4th Cir. 2026) (en banc) (quoting TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021)). "At the preliminary injunction stage, a plaintiff must make a clear showing that [it] is likely to establish each element of standing." Id. (quoting Murthy v. Missouri, 603 U.S. 43, 49-50 (2024)). Because the County seeks "prospective relief," it must "establish a sufficient likelihood of future injury," All. for Hippocratic Med., 602 U.S. at 381 (citing Clapper v. Amnesty Int'l USA, 568 U.S. 398, 401 (2013)), which must be "concrete" and "particularized." Murthy, 603 U.S. at 57 (quoting Clapper, 568 U.S. at 409).

Plaintiff has established standing by pointing to, among other evidence, the NPS's Revised Environmental Assessment ("Revised EA") that recognize that construction of the Arch will cause major road closures and traffic reconfigurations, such as "reducing westbound traffic from Arlington Memorial Bridge to two lanes," "restricting eastbound traffic," and "prohibiting northbound traffic from . . . entering the circle." [Dkt. No. 26-8] ("Revised EA") at 53. Once the Arch is complete, new traffic patterns around Memorial Circle could "result[] in significant delay[s]" in the circulation of traffic, "reduced maneuverability, and limited ability to recover

from disruptions." Id. at 54. The traffic impact of the Arch, during and after its construction, establishes that the County faces a significantly likely threat of concrete and particularized harm.

In particular, the County has demonstrated that construction-related roadway closures and the ensuing traffic congestion will impact the County's emergency services. The Arlington County Fire Department provides fire and emergency medical services to areas that include Arlington National Cemetery, its metro station, and the area around Memorial Circle. [Dkt. No. 17-2] ("Miller Decl.") at ¶¶ 7-8. From January 1-November 5, 2026, the County responded to about 978 incidents in these areas, about 200 of which "were in Memorial Circle itself or on its ramps, most of them accidents with injuries, pedestrian strikes, and injury calls." Id. ¶ 8. The County's emergency vehicles also use the roadways surrounding Memorial Circle to reach other critical areas, including Reagan National Airport, where the County responds to hundreds of emergencies per year. Miller Decl. ¶¶ 11-20. The traffic impacts from the Arch will harm the County's emergency services by not only increasing the risk of vehicle, pedestrian, and cyclist accidents, placing greater strains on the County's emergency services, [Dkt. No. 17-4] ("Nabors Decl.") at ¶ 9; see Revised EA at 52, but also disrupting emergency routes to Arlington Cemetery, Reagan National Airport, and along the George Washington Memorial Parkway, Miller Decl. ¶¶ 11-12, 17-20, 22-23.

The County has demonstrated that the Arch construction will cause it to expend resources assessing and responding to the congestion around the circle, rerouting traffic, and adapting its emergency response. The County will constantly have to update and "remodel its emergency-response drive times . . . to confirm that it can continue to meet applicable response time standards." Miller Decl. ¶ 22. This analysis will have to be completed at every phase of construction as the traffic patterns change, which will "consume significant and valuable County

staff time." Id. ¶ 23. Moreover, the traffic congestion and changes "will likely require the County to provide or reallocate additional resources to maintain acceptable emergency response times." Id. The economic harms are not limited to the County's emergency services. For example, "County transportation staff will have to devote increased time to continually assessing, and responding to, the effects of each phase of construction and of the Arch's permanent configuration," including adjusting traffic patterns and re-setting traffic signals to accommodate congestion caused by the Arch. Nabors Decl. ¶¶ 22-25.

**II. Zone of Interests**

Defendants next challenge the County's ability to bring this action because the harms are not within the zones of interest of the statutes under which the County brings its claims. A plaintiff suing under the APA must show that "[t]he interest [it] asserts . . . [is] 'arguably within the zone of interests to be protected . . . by the statute' that [it] says was violated." Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 224 (2012) (quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970)). This test "is not meant to be especially demanding." Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 403 (1987).

The County has met that standard. First, the congressional purposes in passing the Commemorative Works Act are consistent with the County's asserted interests in maintaining safe and efficient surroundings. 40 U.S.C. § 8901 ("[The CWA is intended] to ensure the continued public use and enjoyment of open space in the District of Columbia and its environs."). Second, the harms from allegedly unlawful construction within the District of Columbia, on which the County bases its injuries, are within the zone of interest to be protected under 40 U.S.C. § 8106. Third, the County's NEPA claim is based on the types of harms to the "human environment" specifically protected by the statute. 42 U.S.C. § 4332(2)(C). Finally, County land directly abuts the George Washington Memorial Parkway, the unit of the park

service in which the Arch will sit, and the County's desire to maintain that environment is well within the purposes of NPS's Organic Act, see 54 U.S.C. § 100101(a).

### III. Venue

Defendants argue that venue is improper because the County wrongly invoked plaintiff-based venue, which is permitted only "if no real property is involved." 28 U.S.C. § 1391(e)(1)(C). Because Memorial Circle is real property, defendants argue that plaintiff-based venue is prohibited. This argument is unavailing. Defendants' argument contravenes the overwhelming weight of precedent, which consistently interprets § 1391(e)(1)(C) as referring to disputes over interests in real property, which are not what is at issue in this litigation. Defendants' reliance on an unpublished opinion from the District of Idaho to support their argument, see [Dkt. No. 26] at 14-15 (citing W. Watersheds Project v. Burgum, No. 1:18-cv-187, 2025 WL 3853055 (D. Idaho Dec. 29, 2025)), demonstrates the weakness of this argument. There is no dispute over property interest here: the County challenges a final agency action, not ownership or control of the real property located at Memorial Circle. [Dkt. No. 28] at 7.

### IV. Preliminary Injunction

A party seeking a preliminary injunction must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). All factors overwhelmingly favor the County.

#### A. Likelihood of Success on the Merits

The County is likely to succeed on the merits of its claims for the multiple reasons discussed in its memorandum, but especially because the record shows that the planning and proposed construction of the Arch was done in an arbitrary and capricious manner, without

congressional approval, and in violation of the CWA and NPS's Organic Act, among other laws, and therefore in violation of the APA.

1. The Commemorative Works Act

The County has clearly shown that construction of the Arch likely violates the CWA, 40 U.S.C. §§ 8901-8909. The CWA prohibits construction of commemorative works within Area I, which includes Memorial Circle, unless "specifically authorized by law." Id. §§ 8901(4), 8903(a)(1). Under the CWA a "commemorative work" includes "any statute, monument, sculpture, memorial, . . . or other structure or landscape feature . . . designed to perpetuate in a permanent manner the memory of an . . . event or other significant element of American history." Id. § 8902(a)(1). Such works must be built "subject to applicable" procedures. Id. § 8903(a)(2). For example, Congress must designate a sponsor to establish the commemorative work, who must consult with the national Capital Memorial Advisory Commission regarding "alternative sites and design concepts." Id. §§ 8905(a)(1), (4).

Defendants conceded that they did not comply with any procedures required by the CWA but defend that conduct by arguing that the CWA does not apply to the Arch for two reasons. First, according to defendants, the Arch is not a commemorative work within the meaning of the CWA because "the Arch is forward-looking in design, intended to perpetuate American greatness, not backwards-looking to commemorate something." [Dkt. No. 26] at 18 (emphasis in original). This argument is plainly rebutted by defendants' own statements. In the Revised EA, NPS itself characterizes the Arch as a "major commemorative feature." Revised EA at A-2; see also id. at 1 ("The Arch would serve as a signature monumental structure honoring the nation's 250th anniversary and contributing to Washington, D.C.'s tradition of honoring national principles."). On this record, the Court finds that the Arch was primarily designed to celebrate—

indeed, commemorate—the country's independence and founding principles, and constitutes a commemorative work under the CWA.

Defendants next argue that the CWA does not apply to the Arch because its construction was authorized by a 1925 Act, which would result in the Arch being exempted from the requirements of the CWA. See 40 U.S.C. § 8902(b) ("[The CWA] does not apply to commemorative works authorized by a law enacted before January 3, 1985."). This 1925 Act authorized the construction of Memorial Bridge under the supervision of the Arlington Memorial Bridge Commission ("the Commission"). Act of Feb. 24, 1925, Pub. L. No. 68-463, 43 Stat. 974 ("1925 Act"). The Commission was required to execute the project "in accordance with" the "design, surveys, and estimates of cost" that the Commission had provided Congress ("the 1925 Plan"). Id. §§ 1-2. To fund the project, the 1925 Act authorized a total budget of $14,750,000 and authorized the Commission to "make such changes in design and location of said bridge without increasing the total cost of the project as in its discretion may be found to be necessary or advisable." Id. The 1925 Plan, which defendants argue the Arch implements, proposed "a park" and "a plaza" in the area that is now Memorial Circle, with "two stately columns" on Memorial Bridge that would be "166 feet high" and "fram[e] but not interfere[e] with the view of the Lincoln Memorial from the direction of the Lee Mansion." Report of the Arlington Memorial Bridge Commission 9, Senate Doc. No. 95, 68th Congress, 1st Session (Washington: U.S. Government Printing Office, 1924) ("Comm'n Rpt.") (accessible at govinfo.gov/content/pkg/SERIALSET-08240_00_00-002-0095-0000/pdf/SERIALSET-08240_00_00-002-0095-0000.pdf).

Even assuming that the 1925 Act would provide authority to construct a commemorative work over 100 years later, the Arch is far beyond the "two stately columns" that the Commission

had planned for the bridge—and what Congress had approved. The proposed 250-foot arch is significantly different in size and kind from the authorized structure and would interfere with the very views Congress wanted protected.

The plain meaning of the text of the CWA is that Congress must approve a specific proposed structure. Cf. Niz-Chavez v. Garland, 593 U.S. 155, 163 (2021) ("Congress's decision to use the indefinite article 'a' thus supplies some evidence that it used the term . . . as a discrete, countable thing."). Congressional approval from 100 years ago for an aspect of a plan that was not implemented did not provide a blank check enabling defendants to build a structure in the same general location without seeking Congress's approval.

2. NPS's Organic Act

The County is also likely to succeed on its claim that the Arch project violates NPS's Organic Act and exceeds its statutory authority. The Organic Act provides that the Secretary, "acting through the Director of the National Park Service, shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units." 54 U.S.C. § 100101(a). That fundamental purpose is "to conserve the scenery, natural and historic objects, and wild life . . . and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." Id.; accord Bluewater Network v. Salazar, 721 F. Supp. 2d 7, 21 (D.D.C. 2010) ("[The] overriding aim of the Organic Act, as well as the purpose of NPS'[s] oversight and management of the park system, is to conserve the natural wonders of our nation's parks for future generations."). Accordingly, NPS is "forbidden from taking any action that is not consistent with its conservation mission unless Congress has 'directly and specifically' authorized the harmful activity." Sierra Club v. U.S. Dep't of the

Interior, 899 F.3d 260, 290-91 (4th Cir. 2018); La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power on it.").

Besides the 1925 Act, defendants have not pointed to any congressional authorization that "directly and specifically" authorizes it to build the Arch. Instead, defendants argue that NPS has used its Organic Act "authority for decades to engage in major construction in national park system units in the District of Columbia without any further congressional approval." [Dkt. No. 26] at 17. But all the construction projects they cite, including U.S. Park Police facilities and public parks, appear consistent with NPS's conservation mandate. In contrast, the Arch will impair the scenery and the purpose of the 1925 Plan that the Arch is purported to implement: an unobstructed "view of the Lincoln Memorial from the direction of the Lee Mansion." Comm'n Rpt. at 41.

Because the Arch would violate the Organic Act's conservation mandate, NPS must obtain explicit authorization from Congress to proceed with the project. Because NPS lacks such authorization, the County is likely to succeed on the merits of the Organic Act claims.

**B. Irreparable Harm**

The County must establish under the second Winter factor that "irreparable injury is likely in the absence of an injunction." Winter, 555 U.S. at 22 (emphasis and citations omitted). "Irreparable harm need only be likely; it need not be certain." PSEG Renewable Transmission LLC v. Arentz Fam., LP, 185 F.4th 497, 513 (4th Cir. 2026). The County has made that showing for many of the reasons discussed above. See Section I ("Standing"). Once any work begins on the Arch, the effects from traffic congestion will begin. See [Dkt. No. 26-15] ("Decision Record") at 5. But even before then, the County will have to begin planning for the traffic

changes as soon as defendants start preparing to mobilize—before they even arrive at the construction site. The County will immediately have to devote resources to traffic and emergency-services planning as described above. Diverting the County's finite resources is an irreparable harm. See HIAS, Inc. v. Trump, 985 F.3d 309, 326 (4th Cir. 2021) (recognizing that "diversion of resources" constitutes "significant and irreparable injuries"). And where the federal government is the defendant, any economic harm is unlikely to be recoverable. See Nat'l Mining Ass'n v. Jackson, 768 F. Supp. 2d 34, 52-53 (D.D.C. 2011) ("[W]here the plaintiff in question cannot recover damages from the defendant due to the defendant's sovereign immunity, any loss of income suffered by the plaintiff is irreparable per se." (quoting Feinerman v. Bernardi, 558 F. Supp. 2d 36, 51 (D.D.C. 2008) (cleaned up))).

Accordingly, the County is likely to suffer irreparable harm in the absence of preliminary relief.

**C. Balance of Equities and Public Interest**

The third and fourth factors—the balance of the equities and whether the injunction is in the public interest—"merge when the Government is the opposing party." Miranda v. Garland, 34 F.4th 338, 365 (4th Cir. 2022) (quoting Nken v. Holder, 556 U.S. 418, 435 (2009)). When assessing the equities and public interest factors, courts "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter, 555 U.S. at 24.

The County's "high likelihood of success on the merits is a strong indicator" that a preliminary injunction "would serve the public interest." League of Women Voters v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016). Moreover, "the public undoubtedly has an interest in seeing its governmental institutions follow the law." Roe v. Dep't of Def., 947 F.3d 207, 230-31 (4th Cir.

2020). And because "[t]he purpose of a preliminary injunction is to preserve the status quo until there is a trial on the merits," Maryland v. U.S. Dep't of Agric., 770 F. Supp. 3d 779 (D. Md. 2025), it is in the public interest to stop construction of the Arch before it begins rather than to have to undo the harms if plaintiff prevails on the merits. Defendants have failed to provide any persuasive reason for needing the construction to commence immediately, especially considering that they argue the Arch was first authorized over 100 years ago. Lastly, defendants have not cited to any concrete harm that the defendants will suffer if an injunction is entered. To the extent they point to any alleged national defense need for the Arch that claim lacks credibility as it first was raised after litigation about the Arch began and NPS did not consider the proposed national security uses during its review process. See Decision Record at 9 ("NPS's NEPA analysis does not consider any potential future uses of the Arch for national security purposes.").

## V. Conclusion

For the reasons discussed in open court and in this Memorandum Opinion, the County's Motion will be granted by an Order that will enjoin the defendants from taking any actions to begin construction of the Arch.

Entered this 20th of November 2026.

/s/ LMB
Leonie M. Brinkema
United States District Judge